IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(SOUTHERN DIVISION)

Fleur S. Bresler and Sidney M. Bresler as the
Co-Personal Representatives of the
Estate of Charles S. Bresler
10401 Grosvenor Place, Unit 1701
Rockville, MD 20852

Sidney Bresler,
Individually,
as a Beneficiary of the Charles S. Bresler
Irrevocable Insurance Trust
11200 Rockville Pike, Suite 502
Rockville, MD  20852,

                                    Plaintiffs,

- against -                                                 Case No. 8:09-CV-02957-PJM

Wilmington Trust Company
111 South Calvert Street, Suite 2620
Baltimore Office
Baltimore, MD  21202

Wilmington Brokerage Services Company
1100 North Market Street
Wilmington, DE  19890

Highland Capital Brokerage, Inc.
458 Main Street, 2nd Floor
Reisterstown, MD  21136

Edmond Ianni
9 Pheasants Ridge North
Wilmington, DE  19807

Ralph Wileczek
119 Bethel Mill Road
Sewell, NJ  19154

Matthew Waschull
1100 Lovering Avenue
Wilmington, DE  19806

                        Defendants.

## SECOND AMENDED COMPLAINT

Plaintiffs, by and through their undersigned attorneys, as and for their second amended complaint against the above-named Defendants, allege as follows:

### INTRODUCTION

In 2003, Wilmington Trust Company and Wilmington Brokerage Services Company (collectively, the "Wilmington Entities Defendants"), by and through their officers/agents/employees Edmond Ianni, ("Ianni"), Ralph Wileczek ("Wileczek") and later Matthew Waschull ("Waschull") (collectively with Ianni and Wileczek "the Individual Wilmington Defendants," and collectively with the Wilmington Entities the "Wilmington Defendants"), with the assistance of Highland Capital Brokerage, Inc. ("Highland Capital"), approached Charles Bresler, who was then Chairman of a long-time corporate client of Wilmington Trust, with an "Alternative Customized Tax-Saving Wealth Creation and Preservation Strategy for Mr. and Mrs. Charles Bresler" (the "Wilmington Wealth Program").

The Wilmington Wealth Program was a device used and designed to be used by the Wilmington Defendants to secure the trust, faith and confidence of high net worth individuals for the ostensible purpose of providing advice, counsel, and assistance ("Program Services") with a variety of ostensibly safe, legitimate and successfully-tested mechanisms for preserving and increasing the value of assets and asset portfolios.  The Wilmington Wealth Program included tax and estate–related Program Services, and its marketing emphasized both the reputation of Wilmington Trust for its long history of "integrity, intelligence and expertise," and the top-flight credentials of the officers, employees and agents who would provide the Program Services.

The externally-undisclosed goal of the Wilmington Wealth Program was to obtain for the Wilmington Entities Defendants and for certain of its officers, agents and employees: commissions for the placement of life-insurance products, and continued premium payments therefor; fees for the management of assets and of trusts created for purposes of the Wilmington Wealth Program; administrative expenses for the management of those trusts and for any estate created as a result of or by and the Wilmington Wealth Program; and, commercial rate interest on loans to fund and operate the Wilmington Wealth Program.  In addition, the Wilmington Wealth Program was designed to provide a vehicle to sell to the individuals who participated in the Wilmington Wealth Program ("Program Clients") various other financial products and services for which the Wilmington Entities Defendants and certain of its officers, agents and employees would receive additional fees and undisclosed commissions.  The Wilmington Wealth Program also was designed to obtain referrals and recommendations from the Program Clients to other high net worth individuals to whom the Wilmington Defendants could market the Wilmington Wealth Program (the "Wilmington Wealth Program Self-Interest").

The Wilmington Entities Defendants along with Ianni and Wileczek, in or around 2003, identified Charles Bresler and his wife Fleur Bresler ("Mr. and Mrs. Bresler") as targets for the Wilmington Wealth Program.  In March and April 2003, the Wilmington Entities Defendants, Ianni and Wileczek unsuccessfully marketed to Mr. and Mrs. Bresler, through attorney S. Laurence Shaiman ("Shaiman"), acting on behalf of Mr. and Mrs. Bresler, two schemes that would have required significant cash outlays by Mr. or Mrs. Bresler as Program Clients. Those schemes were rejected by or on behalf of Mr. and Mrs. Bresler because of the required outlays. They were also rejected because Charles Bresler would not participate in any arrangement that could impose on his wife Fleur after his death any financial or administrative requirements of

any kind, it being recognized and understood that Charles Bresler was likely to pre-decease Fleur Bresler (the "Spring 2003 Proposal Deficiencies").

In May 2003, the Wilmington Entities Defendants, Ianni and Wileczek re-designed the scheme so that no significant cash outlays, other than $500,000, of any kind were required by the Program Clients, and again urged Mr. and Mrs. Bresler to become Program Clients. Because the May 2003 scheme required no significant cash outlays, and no likely financial or administrative requirements in the event that Charles Bresler pre-deceased Fleur Bresler, and because the May 2003 scheme purported to cure the Spring 2003 Program Deficiencies, and relying on the reputation of the Wilmington Entities Defendants and the credentials of Ianni and Wileczek, Charles Bresler, also acting in part on behalf of his wife, no later than May 2003 and continuously thereafter until no sooner than December 2006, accepted and relied on the advice, counsel, services, including Program Services, and representations of the Wilmington Entities Defendants and Ianni, Wileczek and Waschull with respect to the Wilmington Wealth Program, and became a Wilmington Program Client.

In May 2003 and thereafter, the Wilmington Entities Defendants, Ianni and Wileczek proposed to Charles Bresler a program pursuant to which an irrevocable life insurance trust (an "ILIT"), called the Charles S. Bresler Irrevocable Insurance Trust ("Bresler Trust"), would be formed, and which would own second-to-die life insurance policies with increasing death benefits starting at forty million dollars to sixty million dollars ("Bresler Trust Policies"). Under the program, the seven figure annual premiums to acquire and to maintain the Bresler Trust Policies would not be paid directly by Mr. and Mrs. Bresler. Instead, the Wilmington Entities Defendants, as trustees of the Bresler Trust, would pay the premiums, pursuant to an interest-bearing loan to be made by the Wilmington Entities or a lending arm, division or affiliate thereof

(the "Wilmington Lending Facility"), to the Bresler Trust, and with the further agreement that

death benefit distributions would be applied first to payment in full of the loan and all accrued

interest (collectively, "Bresler Trust Policy Arrangement").

This device is referred to as "premium financing." From a cash flow perspective, the

premium financing program is a leveraging device that provides "free insurance" to clients such

as Charles Bresler to and through ILIT trusts such as the Bresler Trust. The Wilmington Entities

Defendants, Ianni and Wileczek, with Highland Capital, generated and transmitted to Charles

Bresler multiple spreadsheets designed to persuade Charles Bresler that the premium financing

program was viable, and that it would produce significant increases in both the death benefits

and the cash surrender values ("CSV") of the Bresler Trust Policies.

Commencing no later than May 2003, and thereafter: the spreadsheets disseminated to

Mr. Bresler were inaccurate and incomplete, relied on incorrect assumptions, failed to take into

account costs of insurance("COI") and other expenses, and failed to include entries for collateral

requirements; the program as described and as promised by the Wilmington Entities Defendants,

Ianni, and Wileczek, with the knowing assistance of Highland, were fatally flawed and

unworkable, and such flaws and lack of feasibility were and should have been known to

insurance experts and professionals; the second-to-die concept was negligently and imprudently

selected, and pursued, to the exclusion of other alternatives, and was not a suitable product in

conjunction with premium financing; products such as term face amounts, enhancement riders,

or other well-constructed, CSV weighted universal life ("UL") products were neither analyzed,

discussed nor promoted because they resulted in commission reductions of 75% to 85%; the

Bresler Trust Policies, alone and in conjunction with premium financing, were unsuitable for the

needs of Charles and Fleur Bresler; commissions payable to the Wilmington Entities Defendants,

Ianni, Wileczek and Highland were excessive, and were not disclosed, and their adverse impact on the assumptions, and projections and the Trust and its assets were not disclosed; the elections between variable and UL policies were negligently and imprudently made, and were made in the self-interest of the Wilmington Entities Defendants, Ianni, Wileczek and Highland, and not in the interest of Charles Bresler, and were undisclosed; insurance policies and the terms therefor were negligently and imprudently negotiated; premium payments were unnecessarily front-loaded and excessive, to the detriment of Charles Bresler and to the advantage of the Wilmington Entities Defendants, Ianni, Wileczek and Highland; more prudent, more appropriate and more cost effective alternatives were never presented by the Wilmington Entities Defendants, Ianni, Wileczek or Highland to Mr. Bresler; the Wilmington Entities Defendants, Ianni, Wileczek and Highland failed to disclose the conflicts of interest and the potential conflicts of interest between themselves and Highland, in their capacities as advisers, consultants, insurance professionals, brokerage general agencies ("GA") and as commission recipients, on the one hand, and Charles and Fleur Bresler on the other hand; and, the Wilmington Entities Defendants, Ianni, Wileczek and Highland designed and divided the commission provisions in a way that minimized analysis, disclosure and recommendations of insurance products most suitable for Charles and Fleur Bresler, while maximizing commissions to the Wilmington Entities Defendants, Ianni and Wileczek ( the "Policy Deficiencies"). Moreover, the Wilmington Defendants failed to make any disclosures and made numerous material omissions with respect to the Policy Deficiencies, including the failure to disclose the Policy Deficiencies (the "Policy Deficiency Misrepresentations.")

The Policy Deficiencies and the Policy Deficiency Misrepresentations were the result of the goal of the Wilmington Entities Defendants, Ianni, Wileczek and Highland to maximize for

themselves fees, undisclosed commissions and other income, including the Wilmington Wealth Program Self-Interest at the loss and expense of Charles Bresler.

In or about May 2003, the Wilmington Entities Defendants, Ianni and Wileczek knew and should have known of the existence at the Wilmington Lending Facility of underwriting standards, policies and procedures, which included preferences or requirements for loan collateral.

In the morning of September 3, 2003, the Wilmington Entities Defendants, Ianni and Wileczek and one or more other Wilmington Defendant employees met or conferred by phone to discuss the Bresler Policy Trust Arrangement. During those meetings (the "September 3 Meetings"), the Wilmington Entities Defendants confirmed that Wilmington Lending Facility anticipated that the Bresler Policy Trust Arrangement would require significant collateral payments of approximately $30 million dollars over ten years, with one or more equivalent alternatives also discussed (the "Internal Collateral Component"). Notwithstanding the Internal Collateral Component discussion during the September 3, 2003 Meetings, later that day the Wilmington Entities Defendants, Ianni and Wileczek delivered to Charles Bresler and Shaiman in Maryland, a letter that advised Messrs. Bresler and Shaiman that the Wilmington Entities Defendants issued a preliminary commitment for the loan, covering the premium payments and interest, requiring "…only an aggregate annual gift tax exclusion amount of $44,000" (so-called "Crummey Gifts") "…and a $500K initial gift into the Trust …." No mention of collateral requirements of any kind was made in the letter, nor was any mention made of the collateral requirements identified in the September 3 Meetings that morning, or of the Internal Collateral Component (the "Collateral Misrepresentations"). On September 3, 2003, the Wilmington Entities Defendants, Ianni and Wileczek knew that any request for collateral in the amount

discussed in the September 3, 2003 Meetings, or in any similar amount, would result in immediate termination by Charles Bresler of the discussions on the Bresler Trust Policy Arrangement.

On September 3, 2003, the Wilmington Entities Defendants, Ianni and Wileczek knew that any proposed program which permitted the possibility of a demand for cash or collateral payments from Fleur Bresler after the death of Charles Bresler would result in the immediate termination by Charles Bresler of the discussion on the Bresler Trust Policy Arrangement.

On September 3, 2003, the Wilmington Entities Defendants, Ianni and Wileczek undertook the Collateral Misrepresentations in order to deceive and to mislead Charles Bresler on a material provision of the Bresler Trust Policy Arrangement, and in negligent performance of their duties and obligations to Charles Bresler, and in breach of their special and fiduciary relationship to Charles Bresler, and with the knowing assistance of Highland Capital, and solely for the purpose of obtaining fees, compensation and other income, including the Wilmington Wealth Program Self-Interest.

Repeatedly thereafter, the Wilmington Entities Defendants, Ianni and Wileczek by telephone and in writing purported to communicate to Charles Bresler and to Shaiman refinements in the Bresler Trust Policy Arrangement, and continued to make the Collateral Misrepresentations.

On October 1, 2003, in a telephone conversation, Ianni confirmed that, even if the $44,000 payment is not made, the Wilmington Entities Defendants through the Wilmington Lending Facility would continue to make the premium payments.  On October 15, 2003, Ianni sent an email deleting the requirement for a $500,000 initial gift to the Bresler Trust because of "new metrics," and again failing to disclose internal Wilmington Entities Defendants

contemporaneous spreadsheets which described collateral requirements of over 50 million dollars.

In November 2003, the Wilmington Entities Defendants, Ianni and Wileczek raised with Shaiman for the first time the possible need for collateral, in a "minimal" amount, as a "formality," and in the worst case not to exceed $4.285 million dollars.  The Wilmington Entities Defendants, Ianni and Wileczek consciously and deliberately, and in an effort to deceive and mislead, directed Shaiman and Charles Bresler, as their client, to the issue of the client's control over the proceeds of the collateral, and to the likelihood that the collateral will never be "called," because "the increasing death benefit should more than satisfy the trust's outstanding loan," and asserted that the purpose of the collateral was to establish the bona fides of the to be created Bresler Trust.

On November 10, 2003 Ianni delivered to Shaiman a Wilmington Entities Defendants form of collateral pledge agreement and stated that "Charlie and Fleur may want to conveniently use a small portion of their Bresler family interests in this connection…."  In contrast to other Wilmington Entities Defendants collateral forms, the transmitted collateral pledge agreement does not clearly or otherwise provide for the right to demand additional collateral.  Later that month, the Wilmington Entities Defendants, Ianni and Wileczek  make a single, fleeting reference to collateral "review" in the context of the circumstances under which the collateral "becomes unrestricted," with accompanying assurances that the program requires no use of the clients' "capital," and with warnings about the closing of the narrow window of opportunity to secure the insurance policies.  The Wilmington Entities Defendants, through Ianni and Wileczek, agreed that the Wilmington Entities Defendants, through and including the Wilmington Lending Facility, would perform pursuant to the Bresler Trust Policy Arrangement if the Wilmington

Entities Defendants received only $3.7 million in collateral if the collateral is in the form of pledged bonds ( the "One-Time Collateral Transfer").

On the recommendation of the Wilmington Entities Defendants, and Ianni, and Wileczek, Charles Bresler agreed to the One-Time Collateral Transfer as a part of the Bresler Trust Policy Arrangement.  On or about January 12, 2004, Shaiman asked Ianni to send a collateral pledge agreement in the amount of $3.7 million and Ianni agreed. WT 000138.

At the suggestion of the Wilmington Entities Defendants, Shaiman, on behalf of Charles Bresler, used for purposes of preparation and review of the Bresler Trust document a law firm recommended and regularly used by the Wilmington Entities Defendants.

Throughout this period, the Wilmington Entities Defendants, Ianni and Wileczek, repeatedly stated, directly and through Highland Capital, to third parties that Charles and Fleur Bresler are valued clients of the Wilmington Entities Defendants, and the Wilmington Entities Defendants, Ianni and Wileczek stated to third parties and to Charles Bresler that they – the Wilmington Entities Defendants, Ianni and Wileczek – are serving as advisors, counselors and fiduciaries of Charles and Fleur Bresler.

Throughout this period, the Wilmington Entities Defendants, Ianni and Wileczek continued to make the Collateral Misrepresentations by omission.  As the Wilmington Entities Defendants have stated in court:

> In his overzealous sales efforts, however, Plaintiff (Ianni) overreached and misrepresented the requirements relating to the insurance products that he was seeking to sell.
>
> Among other misrepresentations, Plaintiff (Ianni) was asked by one or more clients whether, if they agreed to purchase insurance using the technique called premium financing the Plaintiff was touting, there would ever be any need for them to pledge additional collateral to cover the loans made to the clients' Trusts.

When asked about the potential need for additional collateral, Plaintiff (Ianni) either misrepresented that there would be no need for additional collateral or provided misleading and unresponsive answers, all of which were designed to induce the clients to agree to purchase the insurance so Plaintiff (Ianni) could receive the incentive compensation.

Solely as a result of Plaintiff's (Ianni's) aforesaid misrepresentation, one or more clients of Wilmington Trust Company have raised concerns about their need to pledge additional collateral.

As a result of Plaintiff's (Ianni's) misrepresentation, Defendant Wilmington Trust Company has paid, to date, a total of $425,000 in order to resolve one complaint by a client who directly implicated plaintiff Ianni and his misrepresentations or misleading statements. Defendant Wilmington Trust is aware of another client who has made a similar complaint, and other clients of Plaintiff are similarly situated.

Plaintiff Ianni made false or misleading statements to clients with the intent of inducing them to authorize the purchase of insurance, so that Ianni would receive incentive compensation on the insurance sales.

Plaintiff Ianni intentionally, recklessly or negligently concealed the misrepresentations he made to clients in order to induce Wilmington Trust Company to pay him incentive compensation on the said insurance sales.

Plaintiff Ianni, as an officer of Wilmington Trust Company, had a fiduciary duty to disclose his misrepresentations to Wilmington Trust Company, but failed to do so.

As a result of its reliance on Plaintiff Ianni's misrepresentations, Wilmington Trust Company has paid money to Plaintiff that should not have been paid, has been required to settle a substantial claim of a client, may need to settle similar claims with other clients, has sustained damage to its relationships with its clients who were deceived by Ianni, and has sustained damage to its business reputation.

(The "Wilmington Ianni Fraud Admissions").

Relying on the Wilmington Entities Defendants, Ianni and Wileczek, and the

documentation that they drafted ostensibly for the benefit of their clients, Charles and Fleur

10

Bresler, Charles Bresler signed in or about January 2004 the Irrevocable Trust, the Investment Management Agreement, and the collateral pledge agreement, which itself references a promissory note which did not exist, and to which no promissory note was attached (the "2004 Bresler Trust Documentation").  As a result, Wilmington Trust became the Trustee of the Bresler Trust, and, until 2010, the designated personal representative for Charles Bresler's estate upon his death ( the "Appointments").

Prior to the ratification of the 2004 Bresler Trust Documentation, and the Appointments of Wilmington Trust, the Wilmington Entities Defendants entered into a special, confidential and fiduciary relationship with Charles Bresler, in his own behalf and on behalf of Fleur Bresler. Pursuant to that relationship, Charles Bresler placed trust and confidence in the Wilmington Entities Defendants, Ianni and Wileczek.  The Wilmington Entities Defendants, Ianni, Wileczek and Highland knew and fully understood that the Wilmington Entities Defendants, Ianni and Wileczek were, at their own request, in a special, confidential and fiduciary relationship of trust, and that as a consequence they owed to Charles and Fleur Bresler duties of good faith, diligence, loyalty, candor, disclosure, and avoidance of self-dealing.

Prior to the ratification of the 2004 Bresler Trust Documentation, the Wilmington Entities Defendants, Ianni, Wileczek and Highland knew of the Policy Deficiencies, and the Policy Deficiency Misrepresentations, and failed and refused to correct the Policy Deficiencies, and failed to correct the Policy Deficiency Misrepresentations.

Prior to the ratification of the 2004 Bresler Trust Documentation, and the Appointments, the Wilmington Entities Defendants, Ianni and Wileczek knew of the Collateral Misrepresentations, and the potential adverse tax consequences associated with the Internal

Collateral Component and the Collateral Misrepresentations, and failed and refused to correct the circumstances threatening the adverse tax consequences, or the Collateral Misrepresentations.

As of and pursuant to the Appointments, the Wilmington Entities Defendants, Ianni and Wileczek assumed additional fiduciary duties. As a consequence they owed to Charles and Fleur Bresler duties of good faith, diligence, loyalty, candor, disclosure, and avoidance of self-dealing.

Continuously thereafter, the Wilmington Entities Defendants, Ianni – until his termination – and Wileczek – until his termination – repeatedly failed to correct the Policy Deficiencies, the Policy Deficiency Misrepresentations, or the Collateral Misrepresentations, and failed to disclose the Wilmington Ianni Fraud Admissions. The Wilmington Entities Defendants, Ianni and Wileczek also took multiple and dishonest and fraudulent actions to conceal from Charles Bresler the Policy Deficiencies, the Policy Deficiency Misrepresentations, and the Collateral Misrepresentations, and, through this date, have actively interfered with efforts by the plaintiffs to investigate and to secure relevant facts and information, and affirmatively and out of self-dealing, and negligence, failed to analyze, disclose or propose alternatives or solutions or partial alternatives or partial solutions to the Policy Deficiencies, and negligently and in violation of their duties and responsibilities and out of self-interest, including the Wilmington Wealth Program Self-Interest, proposed to Charles Bresler actions designed to conceal their wrongdoing, and further designed to churn policies and insurance products in order to generate fees for the Wilmington Entities Defendants, Ianni and Wileczek, and to avoid the possibility that the undisclosed commissions would be disgorged or recaptured.

On or about January 16, 2004, Waschull became involved in the Bresler Trust Policy Arrangement (the "Waschull Involvement Date"). WT 000165. No later than February 2, 2005, Waschull assumed or undertook responsibility for the Bresler Wilmington Wealth Program, and

12

the special, confidential and fiduciary relationship of trust. No later than the Waschull Involvement Date, or a reasonable period thereafter, Waschull knew or should have known of the Policy Deficiencies, the Policy Deficiency Misrepresentations, the Collateral Misrepresentations, and the potential adverse tax consequences associated with the Internal Collateral Component and the Collateral Misrepresentations. As of the Waschull Involvement Date, Waschull took multiple and dishonest and fraudulent actions to conceal from Charles Bresler and Sidney Bresler the Policy Deficiencies, the Policy Deficiency Misrepresentations, and the Collateral Misrepresentations, and actively interfered with efforts by the plaintiffs to investigate and to secure relevant facts and information, and affirmatively and out of self-dealing, and negligence, failed to analyze, disclose or propose alternatives or solutions or partial alternatives or partial solutions to the Policy Deficiencies, and negligently and in violation of his duties and responsibilities and out of self-interest proposed to Charles Bresler and Sidney Bresler actions designed solely to churn policies and insurance products in order to generate fees for himself, the Wilmington Entities Defendants and others, and to prevent disgorgement or recovery of commissions.

## PARTIES

1.     Plaintiffs Fleur S. Bresler and Sidney M. Bresler are the co-personal representatives of the Estate of Charles S. Bresler (the "Estate").  Fleur S. Bresler and Sidney Bresler were certified as co-personal representatives to administer the Estate on November 18, 2010 by the Montgomery County Register of Wills for Montgomery County, Maryland Estate No. W66983. Fleur S. Bresler and Sidney M. Bresler are residents and citizens of Montgomery County, Maryland. Charles S. Bresler died in Montgomery County, Maryland on October 22, 2010.

Charles Bresler was, at all times mentioned in this Second Amended Complaint, a citizen, over the age of 65 years old, of and residing in Montgomery County, State of Maryland.

2.      Plaintiff Sidney Bresler is, and at all times mentioned was, a citizen of and residing in Montgomery County, State of Maryland.

3.      Sidney Bresler is the named Trust Adviser of the Bresler Trust and a named Beneficiary of the Bresler Trust.

4.      Upon information and belief, Wilmington Trust is a corporation duly organized and existing under the laws of the State of Delaware, with its principal place of business in Wilmington, Delaware and with offices in Maryland.  Wilmington Trust offers various banking services, including trust and fiduciary services.  Wilmington Trust is licensed to do business, and is transacting the business of banking and investment advice in the State of Maryland, including Montgomery County.

5.      Upon information and belief, Wilmington Brokerage is a corporation duly organized and existing under the laws of the State of Delaware, with its principal place of business in Wilmington, Delaware and with offices in Maryland.  Wilmington Brokerage is the registered broker-dealer and wholly-owned subsidiary of Wilmington Trust and a member of the Financial Industry Regulatory Authority ("FINRA").  Wilmington Brokerage is licensed to do business, and is transacting business, in the State of Maryland, including Montgomery County.  Wilmington Brokerage is authorized and licensed to sell insurance policies, annuities, securities, and mutual funds and provides investment advice in Maryland and Delaware.

6.      Upon information and belief, Highland Capital is a corporation duly organized and existing under the laws of the State of Delaware, with its principal place of business in Birmingham, Alabama, and with offices in Maryland.  Upon information and belief, Highland

Capital, though an affiliated company, the Summit Group, had an Interim Consulting and Service Agreement with Wilmington Brokerage to help customers of the Wilmington Entities Defendants purchase insurance products as a part of estate planning, employee benefit and other business and personal financial arrangements. Highland Capital is licensed to do business, and is doing and transacting business, in the State of Maryland, including Montgomery County. Highland Capital is authorized and licensed to sell insurance policies, annuities, securities, and mutual funds in Maryland and Delaware. Highland Capital is a registered broker, offering investment advice, and a member of FINRA.

7.      Upon information and belief, Defendant Ianni is a resident of Wilmington, Delaware. From 2003 through or about July 2005, Ianni was a Vice President of Wilmington Trust and/or a Client Advisor for Wilmington Trust and Wilmington Brokerage. At all relevant times, Ianni was authorized by Wilmington Trust and Wilmington Brokerage to conduct business, involving insurance products and investment advisory services, for Wilmington Trust and Wilmington Brokerage. At certain relevant times, Ianni was not licensed to sell insurance products.

8.      Upon information and belief, Defendant Wileczek is a resident of Sewell, New Jersey. Wileczek is a NASD and FINRA registered broker and investment advisor. Wileczek is a Certified Trust and Financial Planner. From 2003 through 2007, Wileczek was a Vice President, Wealth Advisory Services ("WAS") of Wilmington Trust and/or a Client Advisor for the Wilmington Entities Defendants. At all relevant times, Wileczek was authorized and licensed by the States of Delaware and Maryland to conduct, and was indeed conducting business, involving insurance products and investment advisory services, for Wilmington Trust and Wilmington Brokerage.

9.      Upon information and belief, Defendant Waschull is a resident of Wilmington, Delaware. Waschull is a Certified Trust and Financial Planner.  From 2003 through 2007, Waschull was a Vice President of Wilmington Trust and/or a Client Advisor for the Wilmington Entities Defendants.  At all relevant times, Waschull was authorized and licensed by the State of Delaware to conduct, and was indeed conducting business, involving insurance products and investment advisory services, for the Wilmington Entities Defendants.

**JURISDICTION AND VENUE**

10.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 (a)(1), because the matter in controversy exceeds the sum of $75,000, exclusive of interest and costs, and is between citizens of different states.

11.      Venue is proper pursuant to 28 U.S.C. § 1391(a)(2) and(3).

12.      This Court has personal jurisdiction over each of the Defendants pursuant to the Maryland Long Arm Statute because each of the Defendants:  (a) transacted business and/or performed work or service in Maryland by soliciting and/or contracting to insure certain Maryland residents; (b) contracted to provide goods and services in Maryland to Maryland residents; and (c) caused tortious injury in Maryland to Maryland residents by an act or omission in Maryland.  Md. Cts. & Jud. Proc. Code Ann. § 6-103(b)(1)-(3).  In addition, upon information and belief, this Court has jurisdiction over each of the Defendants because each of the Defendants caused tortious injury in Maryland or outside of Maryland by an act or omission outside Maryland and each of the Defendants either regularly does or solicits business or derives substantial revenue from goods and services used in Maryland.  Id. § 6-103(b)(4).

      Wilmington Trust does not challenge this Court's personal jurisdiction.      Wilmington Brokerage does not challenge this Court's personal jurisdiction.

Highland Capital does not challenge this Court's personal jurisdiction.

Minimum contacts of the remaining defendants in Maryland are established by the following:

Ianni, *see* Second Amended Complaint at ¶¶ 25, 26, 33, 34, 35, 36, 39, 43, 44, 45, 46, 47, 48, 50, 51, 52, 53, 59, 60, 61, 62, 63,78, 83, 85, 86, 88, 91.

Wileczek, *see* Second Amended Complaint at ¶¶ 25, 26, 34, 35, 39, 43, 44, 45, 48, 60, 62, 63, 78, 83, 85, 86, 88, 91, 103, 105, 111, 112, 113.

Waschull:  Waschull: wrote to Charles Bresler in Maryland on August 15, 2005, announcing that Waschull "will oversee the relationship now.";  forwarded to plaintiffs in Maryland in or about May 2006 a premium financing proposal that and Wileczek prepared; met in Maryland about the matter on or about May 30, 2006; discussed the matter with the Breslers in the summer of 2006 and on or about August 28, 2006; and e-mailed Sidney Bresler and Shaiman on or about October 18, 2006 about the matter.

13.    In further support that personal jurisdiction is proper, Wilmington Trust, Wilmington Brokerage and Highland Capital are registered to and continue to transact business in Maryland and Defendant Wileczek held, at the relevant times, licenses to transact business in Maryland as insurance producers.  At the relevant time, each of the Defendants solicited the Plaintiffs who are Maryland residents, and transacted business, as described herein, and committed certain of the described tortious acts within Montgomery County, State of Maryland.  Plaintiffs' claims against each of the Defendants arises out of the Defendants' forum-related contacts.

## FACTS RELEVANT TO ALL COUNTS

A.      **Wilmington Trust, Wilmington Brokerage and Highland Capital Promise Expert Advice.**

14.     Wilmington Brokerage's website states that it provides "expert advice from our Client Advisors" and "Client Advisors work with you to develop and implement a plan of action that considers your financial circumstances - time horizon, goals, liquidity needs, and others.  Our fully licensed Client Advisors provide the research and insight you need to make the most informed investment decisions."

15.     In its advertising, Wilmington Trust states:  "Our approach is simple - develop customized strategies for our clients with the utmost integrity, intelligence, and expertise.  You're assured that your performance expectations and aspirations for the future are always paramount to us."  Wilmington Trust's code of conduct is publicly disseminated and states as follows:

> Conduct business activities free of perceived or actual personal conflicts of interest, and when a conflict exists, disclose and resolve the conflict
>
> Deal truthfully and respectfully with prospects, clients, staff members, vendors, and competitors.
>
> Promote compliance with laws, rules, regulations, and company standards in all markets and business activities. Disclosures in documents filed with the U.S. Securities and Exchange Commission and in other public communications must be timely, full, fair, accurate, and understandable.
>
> Promote ethical conduct and vigorously protect the company's reputation by reporting any observed or suspected illegal or unethical behavior.

16.     At the relevant times as described herein, Ianni, Wileczek and Waschull held themselves out as Client Advisors for the Wilmington Entities Defendants.

17.     The Highland Capital website states:

> Highland Capital Brokerage was formed with one purpose – to become the premier value added wholesaler of financial products

18

and services in the nation. Our member firms were selected based on their dedication to professional excellence, prominence in their respective business market, and extensive industry experience. Today, Highland Capital Brokerage's scope has grown to include 26 sales offices and over 80 sales professionals. We provide products and services to leading independent, corporate and institutional financial services organizations across the nation. Our substantial growth and continued success is a result of our commitment to delivering unparalleled service and sales support to our valued clients. With unrivaled resources and unique expertise, our mission is to assist successful financial advisors and insurance professionals in growing their business with High Net-Worth clients.

18.     Upon information and belief, the Wilmington Entities Defendants and Highland Capital (collectively "Affiliates") are affiliated for common purposes, including the sale of life insurance policies and estate planning strategies to the clients of the Wilmington Entities Defendants. Highland was privy to the Wilmington Wealth Program Self-Interest, and by affiliating with the Wilmington Entities Defendants aided and abetted the Wilmington Entities Defendants in pursuing the Wilmington Wealth Program Self-Interest.

19.     At relevant times and as set forth herein, Ianni, Wileczek, and Waschull were employees and/or agents of the Wilmington Entities Defendants.

20.     Highland Capital assisted in generating and/or providing the various life insurance illustrations and spreadsheets given to Charles Bresler and/or Sidney Bresler from 2003 through 2008.  Highland Capital served as general agent in conjunction with the sale of the Bresler Trust Policies.

21.     Upon information and belief, Highland Capital served as Wilmington Trust's designated "insurance counsel" and as general agent and/or broker for life insurance policies solicited and sold by the employees of the Wilmington Entities Defendants, including the Bresler Trust Policies.

19

22.     Highland Capital provided support and actively participated in the solicitation process and sale of insurance products to Wilmington Entities Defendant clients, including generating illustration and spreadsheets, contacting and negotiating with life insurance companies, and serving as general agent in conjunction with actual sale of various life insurance policies to Wilmington Trust's clients, including the Bresler Trust Policies.

23.     The Wilmington Entities Defendants, Ianni, Wileczek and Highland Capital  received compensation, including undisclosed direct and/or indirect insurance commissions, from each and every sale of life insurance product by the Wilmington Entities Defendants, through Ianni and Wileczek, to Wilmington Trust's clients, including the Bresler Trust Policies.

24.     Commencing in early 2003, Wilmington Entities Defendants, Ianni, Wileczek, and Highland Capital, and no later than February 2005, defendant Waschull, were agents of each other, acting within the purpose and scope of said agency, and, with knowledge, actively participated in, and/or subsequently ratified and adopted, each and all acts, conduct and/or omissions alleged herein.

**B.      The Wilmington Defendants, Ianni, Wileczek, and Highland Capital Solicited Charles Bresler in Maryland for the Bresler Trust Policy Arrangement.**

25.     In early 2003, Charles Bresler was neither interested in, nor seeking, life insurance, estate planning advice, or tax and estate planning strategies, and Charles Bresler had neither asked nor directed anyone on his behalf to seek or provide such products, advice or strategies. In early 2003, employees of Wilmington Trust and/or Wilmington Brokerage solicited and began advising and counseling Charles Bresler about the Wilmington Wealth Program.  The initial contact began in February 2003 with conversations between Shaiman and employees of Wilmington Trust, including Ianni, regarding Wilmington Trust becoming the personal representative of Charles Bresler's estate. In that conversation, the Wilmington Entities

Defendants were aware, or were made aware, that Charles Bresler was a resident of Montgomery County, Maryland.

26.     Ianni and Wileczek followed up on that initial contact with Shaiman with numerous letters and telephone calls to Shaiman and to Charles Bresler throughout 2003 in connection with their efforts to advise and counsel Charles Bresler.

27.     On or about March 14, 2003, Ianni sent a letter to Shaiman following up on a conversation of that date between Ianni, Wileczek and Shaiman.  The letter describes a "Tax-Saving Wealth Creation Preservation Strategy for Mr. and Mrs. Charles Bresler" with a $40 million increasing death benefit permanent survivorship insurance policy to be owned by a newly created trust.  The letter attached a spreadsheet showing the alleged metrics of the strategy, which proposed an initial $9.9 million contribution from Charles Bresler to the trust. The letter also attached a life insurance policy illustration presented by Ralph Wileczek.  That proposal was not given any consideration by Charles Bresler because it contained the Spring 2003 Proposal Deficiencies.

28.     On or about April 3, 2003, Ianni sent another letter to Shaiman regarding and enclosing a proposal for an "Alternative Tax-Saving Wealth Creation and Preservation Strategy for Mr. and Mrs. Bresler" prepared by Ianni and Wileczek ("April 2003 package").  In the April 2003 package, Ianni advised Charles Bresler to participate in a life insurance program through setting up an irrevocable life insurance trust and then using premium financing to pay for the trust-owned life insurance policies.

29.     The April 2003 package included a Summary and Structure booklet containing:  1) illustrations for life insurance policies through Midland Life Insurance Company presented by Wileczek; 2) spreadsheets demonstrating leveraged wealth creation; and 3) biographies for Ianni

and Wileczek.  The spreadsheets in the April 2003 package differ from the one sent on March 14 in that the initial contribution from Charles Bresler to the newly created trust drops from $9.9 million to $4 million.

30.     In the April 2003 package, Wilmington Trust described Ianni as a Vice President of Wilmington Trust who "manages and develops strategic alliances and counsels clients, attorneys and other professional advisors across the country and abroad on wealth management and related financial and business matters" and represented his unique credentials and abilities to customize financial plans.  In the marketing materials, Ianni represented himself as an attorney with special expertise in the estate and tax planning areas.

31.     In the April 2003 package, Wilmington Trust described Wileczek as having expertise, involving premium financing, investment advice, and life insurance, with credentials as a Certified Financial Planner, Certified Public Accountant, Certified Trust and Financial Advisor, and a NASD Series 7 Certified Investment Advisor. That proposal was not given any consideration by Charles Bresler because it contained the Spring 2003 Proposal Deficiencies.

32.     From April 15 through May 13, Ianni made numerous calls to Shaiman to follow up on the April 2003 package.

33.     On May 15, 2003, Ianni had a telephone call with Charles Bresler.  Ianni's notes indicate that he had a one-hour discussion with Charles Bresler in which they discussed insurance trust planning and during which Ianni allegedly explained what he and Wileczek were proposing. Ianni also offered to come down to Rockville, Maryland to meet with Charles Bresler. Unless otherwise stated herein, Charles Bresler was in Maryland –either at his Montgomery County home or his Montgomery County office – for all telephone calls.

34.     On or about May 19, 2003, Ianni and Wileczek sent another package from Wilmington, Delaware to Charles Bresler at his Rockville, Maryland home (the "May 2003 package"). The May 2003 package included an executive summary letter to Charles Bresler, as well as a spreadsheet showing the alleged metrics of another proposal. The spreadsheet in the May 2003 package differs, in pertinent part, from the spreadsheets previously sent in that the initial contribution from Charles Bresler to the newly-created structure has fallen to just $500,000 – down from $9.9 million (March 2003) and $4 million (April 2003).

35.     In all three proposals sent (March, April and May), there is no mention by Wilmington Trust, Ianni or Wileczek of any collateral requirement or collateral account.

36.     During summer 2003, according to Ianni's notes, Ianni called Charles Bresler at least six times.

37.     On or about June 9, 2003, representatives of the Wilmington Entities Defendants, namely, Wileczek, S. Allen Snook ("Snook"), and Mike DiGregorio ("DiGregorio"), met with representatives of Highland Capital, namely Richard Biborosch ("Biborosch") and Paul Pistilli ("Pistilli"). In an e-mail on June 10, 2003 at 4:10 p.m., Pistilli wrote: "As we discussed we want our role to be viewed as that of partner and support person. Dick and I look forward to helping you on your cases."

38.     On June 11, 2003 at 10:55 a.m., Wileczek responded to Pistilli's e-mail, with copies to Snook, DiGregorio and Biborosch, by referencing their agreement and by asking for policy illustrations for various individuals, including Charles and Fleur Bresler. Upon information and belief, these illustrations were used in connection with the Wilmington Wealth Program promoted and touted by the Wilmington Entities Defendants, through Ianni and Wileczek, to Charles Bresler, and Highland Capital knew and understood that the illustrations were to be used

for that purpose, and for the further purpose of securing the Wilmington Wealth Program Self-Interest.

39.     In early August 2003, Charles and Fleur Bresler underwent medical exams in Montgomery County Maryland, arranged by Ianni and Wileczek, and necessary to apply for the insurance Ianni and Wileczek had proposed for the implementation of the Wilmington Wealth Program.

40.     At approximately 10:10 a.m. on September 3, 2003, according to Ianni's notes, Ianni had a conference with Wileczek regarding the Bresler strategy.  Ianni's notes indicate that at that meeting, he and Wileczek had discussed the issue of collateral for the Bresler strategy indicating that the deal would require an initial amount of $7.1MM as collateral:

> Ralph:  $50MM ↑death benefit perm. w/ PacLife
> = better #s
> $7.1MM initial collateral; Glenn said the
> collateral can be w/ someone else
> Glenn is committed t[o] 200 b.p. over LIBOR
> lend $4.9MM (closer t[o] $5MM)
> target= $2.8MM (of which $2.268 MM →WT)
>                 NET OF SUMMIT

Ianni's Notes, WT-0000959.

41.     Ianni's notes of that conference continue and show that the deal they were structuring contemplated a net collateral requirement of $31.5 million over ten years:

> NET Collateral reqmt in 10yrs
>         (by 2012) = $31.5MM
>                 (i.e., $81MM total collateral needed
>                       for $49MM in policy (surrender values)
>                 $31.5MM needed collateral.

Ianni's Notes, WT-0000959

42.     Later that morning on September 3, at approximately 11:10 a.m., Ianni and Wileczek had a conference with another Wilmington Trust employee, Glenn Best ('Best").  At that conference,

as Ianni's notes detail, various options regarding the collateral required were discussed.  One

option set forth annual collateral contributions of approximately $3 to $4 million for the first two

years, while an alternative involved a one-time, lump-sum collateral contribution of $9.5 million.

The notes state:

> Glenn:  ins. policy would have cash value of $3.2 MM in 1st yr
>              i. need $4MM of collateral in 1st yr
>              2nd yr:  need ADDIT'L $3MM collateral []
>              ALT:  If U put aside $9.5 MM
>                          INITIALLY AS COLLATERAL,
>                          WON'T ever need t[o]
>                          ADD collateral

Ianni Notes, WT-0000960.

43.     At approximately 11:42 a.m. on that same day, Ianni's notes indicate that Ianni and

Wileczek called Shaiman on his cell phone.  They learned that Shaiman was on his way to meet

with Charles Bresler in Rockville, Maryland.  They then faxed a letter from Wilmington,

Delaware to Charles Bresler's offices in Rockville, Maryland ("September 3 letter").  The

September 3 letter stated that Wilmington Trust preliminarily had approved the loans necessary

to purchase the insurance policies.  It also attached new and revised spreadsheets illustrating the

metrics for the proposed Bresler Trust.

44.   These spreadsheets reflect two possible scenarios:  (a) a $50 million increasing death

benefit permanent life insurance policy being placed into the Trust; and (b) a $40 million

increasing death benefit permanent life insurance policy being placed into the to-be-created

trust.  In each case, the spreadsheets show an aggregate annual gift exclusion of $44,000 and an

initial contribution from Charles Bresler to the trust of $500,000.  The September 3 Letter

stated:

> We also have preliminary commitment from Wilmington Trust to extend lending
> to the ILIT for the purpose of acquiring and maintaining the policy in the ILIT.

The attached spreadsheets reflect two possible scenarios along the lines we discussed: (a) a $50 million increasing death benefit permanent placement life insurance policy being placed into the Trust; and (b) a $40 million increasing death permanent life insurance policy being placed into the Trust. In each case, only an aggregate annual gift tax exclusion of $44,000 will be used by Charlie and Fleur, and a $500K initial gift into the Trust, as we discussed, will be needed. Given the favorable metrics of these structures, Wilmington Trust would be willing to loan interest, as well as principal, to the Trust from the first year forward.

45. In the September 3 letter, Ianni also states:

You will note that the metrics of each structure are very favorable. The $50MM ILIT scenario produces a better net payment to the Trust that is closer to Charlie's and Fleur's estate/wealth planning bogey of $40MM that you indicated than the other scenario. In that case, Wilmington Trust would loan to the Trust approximately $4.9MM for the annual amount of premium plus allowable overfunding. Through age 100 (i.e. 2028), for example the net cash benefit from the policy to the Trust (i.e. after satisfaction of the Wilmington Trust's outstanding loan to Trust) ranges from $36.8MM to $61MM – estate tax-free, saving Charlie and Fleur up to $29MM or more in estate tax alone (in addition to income tax savings).

Nowhere in the September 3 letter or the attachments thereto is any mention made of any requirement of annual collateral contributions or a lump-sum collateral contribution in the amounts as discussed that very morning between and among Ianni, Wileczek and Best. If the Wilmington Entities Defendants, Ianni, Wileczek or any other person told Charles Bresler that the deal would require a collateral contribution in the range of $3 million per year or a lump sum of $9.9 million, Charles Bresler never would have agreed to the Bresler Trust Policy Arrangement. On September 3, 2003, the Wilmington Entities Defendants, Ianni and Wileczek knew that any request for collateral in the amount discussed in the September 3, 2003 Meetings would result in immediate termination by Charles Bresler of the discussions on the Bresler Trust Policy Arrangements. On September 3, 2003, the Wilmington Entities Defendants, Ianni and Wileczek, knew that any proposed Program which permitted the possibility of cash or collateral payments from Fleur Bresler after the death of Charles Bresler, or which contained the Spring

2003 Proposal Deficiencies, would result in the immediate termination by Charles Bresler of the discussion on the Bresler Trust Policy Arrangements.

46.     Two days later, on September 5, 2003, Ianni followed up with an e-mail to Shaiman and copied to Charles Bresler with two new spreadsheets illustrating revised metrics for two new policy scenarios. In each case, the metrics assume a $44,000 annual Crummey gift and a $500,000 initial contribution from Charles Bresler into the to-be-created trust. WT-0001043-045. There is no mention of a collateral requirement.

47.     On or about September 12, 2003, Ianni sent another e-mail to Shaiman and copied to Charles Bresler ("September 12, 2003 e-mail"). In the September 12, 2003 e-mail, Ianni described an allegedly new and better insurance product: "Like the other insurance products that we have discussed, this new product will be a permanent joint survivorship life insurance policy (on the lives of Charlie and Fleur). It similarly would be a $50MM increasing death benefit permanent policy… In addition, this new product would have a lower internal cost of insurance than the previous products." This proposal also assumed a $44,000 annual gift and a $500,000 initial gift into the Trust. There is no reference to a collateral requirement.

48.     On or about October 1, 2003, Ianni and Wileczek had a conference call with Charles Bresler and Shaiman. WT-0001001-02. During that call, there was discussion of the proposal which assumed a $44,000 Crummey Gift and a $500,000 initial contribution from Charles Bresler into the trust, but no mention of a collateral requirement.

49.     On or about October 14, 2003, Ianni received from Glenn Best a revised spreadsheet showing a 10-year projection of the metrics of the deal they were proposing to Charles Bresler. WT-0000722. Among other things, that spreadsheet shows a line for "Required Collateral" over the years from 2004-2014 ranging from approximately $6.4MM in the first year accumulating to

$52.14MM in year 10.  The Wilmington Entities Defendants, Ianni and Wileczek did not
communicate this information about "Required Collateral" to Charles Bresler.

50.     On or about October 14, 2003, Ianni sent another letter from Wilmington, Delaware to
Charles Bresler in Rockville, Maryland.  This letter enclosed paperwork for Charles and Fleur
Bresler to complete in connection with their application for the insurance policies Wilmington
Trust was recommending for purchase, but made no mention of the October 14, 2003
spreadsheet, or its provision for "Required Collateral."

51.     On or about October 15, 2003, Ianni sent an e-mail to Shaiman, copied to Charles Bresler
and Wileczek, attaching yet another spreadsheet.  In response to a request from Shaiman, Ianni
"re-ran the metrics for the Breslers' new Delaware ILIT for the same $50 million increasing
death benefit permanent survivorship policy, financed by Wilmington Trust, but assuming only a
$44K annual gift (and deleting the initial $500K contribution to trust.).."  WT-0000681-82   Like
the spreadsheets previously sent to Charles Bresler, neither the cover e-mail nor the spreadsheet
indicated any collateral requirement.

52.     On or about November 4, 2003, Ianni sent another e-mail to Shaiman, copied to Charles
Bresler and Wileczek, attaching still another spreadsheet.  Like the spreadsheets previously sent
to Charles Bresler, neither the cover e-mail nor the spreadsheet indicated any collateral
requirement.  WT-0000784-5.

53.     On or about November 4, 2003, Ianni sent another letter to Charles Bresler in Rockville,
Maryland.  This letter enclosed additional paperwork for Charles and Fleur Bresler to complete
in connection with their application for the insurance policies the Wilmington Entities
Defendants, Ianni and Wileczek were recommending for purchase.

54.      On our about November 6, 2003, at approximately 1:55 p.m., Ianni had a meeting with Best and Wileczek, who participated by phone, at which, according to Ianni's notes, there was some discussion about collateral.  WT-0000824.

55.      On or about November 6, 2003, at approximately 3:00 p.m., Ianni had a meeting with Best, Wileczek, and Snook, at which, according to Ianni's notes, there was some discussion about the collateral.  These notes indicate comments attributed to "R," which, upon information and belief, refers to Ralph Wileczek.  The notes reflect statements by "R" about wanting to keep the collateral required "as minimal as possible" and "1st year collateral should be $1M; MAX: $3.2MM/<8yrs from now!).  WT-0000824-27.

56.      Later that day, at approximately 4:25 p.m. on November 6, 2003, Ianni called Shaiman to discuss the Bresler deal.  Ianni's notes of that conversation indicate some discussion of collateral:

> NOTE:  I explained
>> need i from dy 1
>> need very simple fin. stat. indicatg [sic] source of collateral
>> AMT of req'd collateral will DEPEND
>> e.g., whether LLC interests and/or B&R stock
>> worse case (assuming all [] equities);
>>> $4.285MM

WT-0000822-23.

57.      On November 7, 2003, Shaiman e-mailed Ianni saying that this is the first that he has heard about a collateral requirement and that Charles Bresler is unhappy about it.  WT-000397.

58.      On November 10, 2003, Ianni e-mailed Shaiman and explained that the collateral is simply a "pledge" and a "mere formality."  He stated that the risk of a call on the collateral is manageable by various exit strategies and that the amount required is "minimal."

59.      On or about November 21, 2003, Ianni sent a letter from Wilmington, Delaware to Charles Bresler in Rockville, Maryland (the "November 2003 letter").  The second paragraph of

that letter stated: "We are sorry for any misunderstanding of the collateral pledge aspect of this structure. Hopefully this letter also will better clarify that in addition to summarizing the other features you requested."

60.     In the November 2003 letter, Ianni set forth further details regarding the Bresler Trust Policy Arrangement, including an aggregate annual Crummey gift, of $44,000, and stated: "This is a unique opportunity for you and Fleur to avoid substantial (eight-figure) estate and income tax and create substantial (eight-to nine-figure) capital and liquidity without investing your own capital…" The November 2003 letter made a fleeting reference to collateral "review," in the context of the circumstances under which the collateral "becomes unrestricted," with accompanying assurances that the program requires no use of the clients' "capital," and with warnings about the closing of the narrow window of opportunity to secure the insurance policies. The Wilmington Entities Defendants, through Ianni and Wileczek, agreed that they will require only $3.7 million in collateral if the collateral is in the form of pledged bonds. Neither Charles Bresler nor Shaiman construed, or should have construed, the letter to be a discussion of the right to, or the likelihood of material collateral obligations after the posting of the initial collateral.

61.     In conversations in November and December 2003, Ianni further explained to Charles Bresler that, as long as the Bresler Trust Policies performed as expected, Charles Bresler would not need to pledge any further collateral. Other than the initial collateral, Ianni advised Charles Bresler that, as long as the Bresler Trust Policies performed as expected, Charles Bresler would not need to make any further significant cash infusions, other than the $44,000 annual Crummey Gift. As Ianni explained those statements, if the policies performed as expected, Charles Bresler would receive back the collateral posted at the ratification of the 2004 Bresler Trust Documentation, August 31, 2010 Deposition of Charles Bresler, at 176, and that "you're never

going to have to put up another dime." Id., at 151.  As Charles Bresler made clear, if Ianni told

him that there was a possibility that he would have to put up additional collateral, "I wouldn't

have been there." Id.  Charles Bresler stated that he was not going to commit himself or his wife

or his family to putting up substantial sums of money after the initial collateral contribution.  Id.,

at 135-142.

62.     During  2003, the Wilmington Entities Defendants, Ianni and Wileczek, collectively

generated and provided multiple spreadsheet projections and policy illustrations, including those

sent in March, April, May, September and October 2003, using various assumptions

demonstrating the possible leverage to be created by borrowing premiums and loan interest due

with the expectation that Charles Bresler would incur little, if any, out-of-pocket costs over time.

From June 2003 forward, Highland Capital assisted the Wilmington Entities Defendants, Ianni

and Wileczek with generating and providing spreadsheet projections and policy illustrations to

tout the Bresler Trust Policy Arrangement to Charles Bresler.  The spreadsheets presented to

Charles Bresler inaccurate, incomplete, vague and misleading.  Policy illustrations often were

not given to Charles Bresler or were incomplete.  Charles Bresler relied upon the expertise and

representations made to him by the Wilmington Entities Defendants, Ianni and Wileczek, with

the assistance of Highland Capital.

63.     The spreadsheets presented to Charles Bresler were developed and intended by the

Wilmington Entities Defendants, Ianni, Wileczek and Highland Capital to induce Charles Bresler

to rely upon the expertise and representations made to him by the Wilmington Entities

Defendants, Ianni and Wileczek, with the assistance of Highland Capital.

64.     Highland Capital, the Wilmington Entities Defendants, Ianni and Wileczek contacted

various life insurance companies, reviewed the various aspects of each life insurance company

and life insurance product, and selected the life insurance products for use with the premium

financing arrangement. Ianni described that process as an element of his and the Wilmington

Entities Defendants' "fiduciary" responsibilities. OBJV 000372.

65.     In deciding to participate in the Bresler Trust Policy Arrangement, Charles Bresler relied

upon the advice and expertise of the Wilmington Entities Defendants, Ianni and Wileczek, and,

indirectly, of Highland Capital as the undisclosed agent, or "partner" of the Wilmington Entities

Defendants, and as an agent or subagent of Charles Bresler

> ### C.    On Wilmington Trust's Advice and Direction, Charles Bresler Completed Initial Documents for the Bresler Trust Policy Arrangement.

66.     Based upon this reliance, Charles Bresler took certain actions at the direction of and

based on the information provided by the Wilmington Entities Defendants, Ianni, Wileczek, and

Highland Capital to implement and finalize the Bresler Trust Policy Arrangement.

67.     On or about early January 2004, Wilmington Trust arranged for Charles Bresler to obtain

trust documents to set up the Bresler Trust, through representation by Young Conaway Stargatt

& Taylor, LLP ("Young Conaway").   Young Conaway routinely served this function for clients

of Wilmington Trust and also acted as Wilmington Trust's outside counsel.

68.     On or about January 8, 2004, Charles Bresler signed the "Charles S. Bresler Irrevocable

Insurance Trust" ("Bresler Trust Document") in Montgomery County, Maryland.

69.     On or about January 12, 2004, Ianni signed the "Charles S. Bresler Irrevocable Insurance

Trust" on behalf of Wilmington Trust.

70.     The Bresler Trust Document named Wilmington Trust as Trustee and a fiduciary of the

trust, and Sidney Bresler as the initial Trust Adviser.

71.     The Bresler Trust Document gives the Trustee the power to invest in life insurance and

requires the Trustee to act in the best interests of the beneficiaries.

72.     The Bresler Trust Document gives the Trust Adviser the authority to review and monitor actions of the Trustee and even remove the appointed Trustee.

73.     Sidney Bresler was not notified until about 2006 that he was the Trust Adviser to the Bresler Trust.

74.     On or about January 13, 2004, Ianni faxed to Shaiman a letter:  (1) attaching the Investment Management Agreement between Charles Bresler and Wilmington Trust for signature by Charles Bresler; (2) discussing the transfer arrangements for the $3,700,000 of funds for the bond portfolio for the collateral pledge account; and (3) attaching Wilmington Trust's current fee schedule and discounting the investment management fee schedule. The facsimile also directed Shaiman to "note that the collateral pledge agreement specifies only this new IA account … as the designated collateral account in connection with WT's financing the $50 million of permanent joint survivorship life insurance for the new …ILIT." SDB 000759.

75.     On or about January 13, 2004, Wilmington Trust faxed from Wilmington, Delaware an Investment Management Agreement to Charles Bresler.  The Investment Management Agreement disclosed certain compensation to the investment agent, Wilmington Trust.  Charles Bresler signed and executed the Investment Management Agreement.  Ianni signed on behalf of Wilmington Trust.

76.     The Investment Management Agreement lists various compensation/fee arrangements for Wilmington Trust, Wilmington Brokerage and other subadvisors and the ownership interest of the investment agent in the sub-advisors but stating:  "[a]s a result of these ownership interests, Investment Agent benefits indirectly from any compensation paid to these sub-advisors. However, no additional compensation or fees will be charged to principal as a result of these sub-advisory arrangements."

77.     Relying on the advice and the counsel of the Wilmington Entities Defendants, Ianni and

Wileczek, and their representations regarding collateral, on January 15, 2004, Charles Bresler

signed and executed a "Collateral Security Agreement" in his D.C. office.  Ianni signed on behalf

of Wilmington Trust.  The Collateral Security Agreement pledged Account Number XXXXX-X

("Collateral Account") as collateral for the Bresler Trust. Though the Collateral Security

Agreement identified as the debt "a Promissory Note dated January 15, 2004," no such note

exists. No promissory note was appended to the Collateral Security Agreement, or provided to

Charles Bresler, or executed by Charles Bresler.  A promissory note dated  January 20, 2004,

signed by Ianni for Wilmington Trust, as ILIT trustee, payable to Wilmington Trust as lender, in

the face amount of $6,000,000, BRES 002519-2521, does not identify any security, collateral or

pledge, even though the Wilmington Entities Defendants' form promissory note contains a

provision for description of any security, collateral or pledge. A promissory note dated February

1, 2005, signed by Wileczek for Wilmington Trust, as ILIT trustee, payable to Wilmington Trust

as lender, in the face amount of $6,800,000, describes the collateral as the three life insurance

policies. BRES 002522. At least subsequent two promissory notes were demand notes, all of

which were signed by employees of Wilmington Trust, and the face amounts of those notes is in

substantial excess of the payments made for premiums on the Bresler Trust Policies and the

interest accrued on the loans therefor.

    The Collateral Security Agreement did not on its face clearly or otherwise provide to the

lender the right to demand additional collateral. The Collateral Security Agreement did not

contain any merger or integration clause.

    Any provision in any agreement which would have empowered the Wilmington Entities

Defendants to demand and receive additional collateral, other than the Crummey Gifts, would

have been materially inconsistent with the promises, agreements, covenants and representations of the Wilmington Entities Defendants, Ianni and Wileczek, and would have been procured by, and as part of,  a fraud, and negligence, and in breach of their fiduciary, confidential, and special relationship duties of trust, and would not, as was known and understood by the Wilmington Entities Defendants, Ianni and Wileczek,  have been agreed to by Charles Bresler.

78.     On or about January 16, 2004, at the direction of the Wilmington Defendants, Ianni and Wileczek, Charles Bresler authorized a wire transfer for $3,700,000 from his Wachovia account to Wilmington Trust for deposit into the Collateral Account, in part performance of the Bresler Trust Policy Arrangement. On or about January 22, 2004, the Wilmington Entities Defendants loaned approximately $5,500,000 to the Bresler Trust in order to facilitate the payment of full premiums for the Bresler Trust Policies, in partial performance of their obligations under the Bresler Trust Policy Arrangements.

       **D.     The Wilmington Defendants, Ianni and Wileczek Direct the Purchase of the Three Bresler Trust Policies**

79.     As part of the estate planning strategy and premium financing designed by the Wilmington Defendants, Ianni, Wileczek, and Highland Capital, the Bresler Trust purchased three survivorship universal life policies on the lives of Charles and Fleur Bresler:  (1) Midland National Life Insurance Company Policy #1592008600, with a death benefit of $7,000,000 ("Midland Policy"); (2) Sun Life Assurance Company of Canada Policy #020095131, with a death benefit of $18,000,000 ("Sun Life Policy"); and (3) Travelers Life and Annuity Company Policy #7423290, with a death benefit of $25,000,000 ("Travelers Policy") (collectively, "Bresler Trust Policies").

80.     The Wilmington Entities Defendants, Ianni, Wileczek, and Highland Capital recommended and directed the purchase of the Bresler Trust Policies.  The commissions paid as

a result of procuring those policies, independent of future commissions, were approximately $2,043,000. WT 008065.   The split between Ianni and Wileczek was 60%/40% respectively for sales credit and incentive payments, entitling Ianni to 24% of the Wilmington Entities Defendants commission and Wileczek to 16% of the Wilmington Entities Defendants commission.

81.     The Bresler Trust Policies list the Bresler Trust as owner and beneficiary.  The Bresler Trust funded the Bresler Trust Policies through a premium financing arrangement as conceptualized, marketed, and advised by the Wilmington Entities Defendants, Ianni and Wileczek, with assistance from Highland Capital.

82.     Wilmington Trust not only served as trustee for the Bresler Trust with the associated fees, Wilmington Trust also was listed and signed as owner and beneficiary of the Bresler Trust Policies, held the investment account as a pledged collateral account, collected investment fees from the investment account, and collected loan fees and interests from the premium financing loans.

83.     The Midland Policy listed the General Agent as Wilmington Brokerage and the Soliciting Agent as Wileczek.  Ianni, for Wilmington Trust, Trustee, signed the majority of the forms as proposed owner.  The Midland Policy's application indicates signature by Ianni and Wileczek at "Wilmington, DE" on January 20, 2004.  The Breslers did not sign the application in Delaware; instead they signed in D.C. and Maryland.  The medical portions of the application indicate signature by Charles and Fleur Bresler at Rockville, Maryland.

84.     Although Charles Bresler never met with Biborosch, the Midland Policy lists Biborosch as an agent with 10% credit.  Although Biborosch is not listed as an agent on the other Bresler

36

Trust Policies, upon information and belief, he and his principal, Highland Capital, shared

indirectly and/or directly in the insurance commissions for the Bresler Trust Policies.

85.     The Sun Life Policy application listed the Agents as Wileczek and Pistilli.  Ianni, for

Wilmington Trust, Trustee, signed the majority of the forms as proposed owner.  The Sun Life

Policy application indicates signature by Ianni and Wileczek at "Wilmington, DE" on January 9,

2004.  The Breslers did not sign the application in Delaware; instead they signed the applications

in the District of Columbia and Maryland.  The medical portions of the application indicate

signature by Charles and Fleur Bresler at Rockville, Maryland.

86.     The Travelers Policy application listed the Agents as Wileczek, and Pistilli.  Ianni, for

Wilmington Trust, Trustee, signed the majority of the forms as proposed owner.  The Travelers

Policy application indicates signature by Ianni and Wileczek at "Wilmington, DE" on January 9,

2004.  The Breslers did not sign the application in Delaware; instead they signed the applications

in the District of Columbia and Maryland.  The medical portions of the application indicate

signature by Charles and Fleur Bresler at Rockville, Maryland.

87.     The Wilmington Entities Defendants, Ianni, Wileczek, and Highland Capital did not

furnish complete versions of the Bresler Trust Policies to Sidney or Charles Bresler upon

issuance of the Bresler Trust Policies.  Sidney Bresler requested complete copies in or about

2007.  The Plaintiffs did not receive complete versions of the Bresler Trust Policies until

approximately late May 2007. Moreover, Plaintiffs were unaware of Pistilli's involvement on

behalf of Highland Capital until July 2010, as a consequence of document production in this

case.

Plaintiffs relied upon the advice, counsel and expertise of the Wilmington Defendants, Ianni, Wileczek, and Highland Capital as to the specifics of the marketed life insurance policies, the Bresler Trust Policies, and the Bresler Trust Policy Arrangement.

**E.    Further Performance and Breach Under the Bresler Trust Policy Arrangement**

88.     In correspondence and conversations with the Wilmington Defendants from January 2004 though 2006, the Wilmington Defendants, Ianni and Wileczek told Charles Bresler, and later Sidney Bresler, that the Bresler Trust Policies were performing as well as or better than expected.

89.     On or about February 15, 2005, Ianni sent a letter to Shaiman stating:  "You will recall that this Trust was structured to accommodate financing of the $50 million increasing joint survivorship life insurance (issued by Midland National, Travelers and Sun Life) through loans by Wilmington Trust.  As you know, as of this past fall 2004, the aggregate amount has this insurance death benefit has grown nicely to $55,138,294.24."

90.     On or about March 3, 2005, Ianni sent another letter to Shaiman enclosing duplicates of correspondence pertaining to the financing of the Bresler Trust.  The letter noted the good performance of the Bresler Trust Policies and that Charles Bresler had not yet sent the annual $44,000 Crummey Gift to the Bresler Trust as contemplated in the November 2003 letter.

91.     In March 2005, the Wilmington Entities Defendants, Ianni and Wileczek explicitly abandoned, withdrew and surrendered any request for, or assertion of any need for, any additional collateral requirement, and in so doing acknowledged the absence of any right to demand any such additional collateral from Charles Bresler or the Bresler Trust.  In a letter dated February 3, 2006, and as part of package sent in May 2006, from Delaware by Wileczek, Waschull and Highland Capital to Charles and Sidney Bresler in Maryland ("February 2006

letter"), Wileczek noted that on or about March 2005: "[i]t had been determined that additional collateral would not be needed for the upcoming policy year and that is still the case."

92.     Until at the earliest December 2006, the Wilmington Entities Defendants never asserted any right to demand additional collateral, and until that time, did not raise again with Plaintiffs any concern about collateral. The Wilmington Entities Defendants have never asserted any right to demand additional collateral under any security agreement or pledge agreement, or any other agreement, or as part of the Bresler Trust Policy Arrangement, or otherwise.

93.     No document produced by the Wilmington Entities Defendants in discovery or otherwise contains any internal assertion of any right to demand additional collateral under any security agreement or pledge agreement, or any other agreement, or as part of the Bresler Trust Policy Arrangement, or otherwise.

94.     On or about March 30, 2005, the Wilmington Entities defendants, without notice to Charles Bresler, failed and refused to make a full premium payment on the Bresler Trust Policies, or failed to lend to the Bresler Trust funds sufficient to enable the Bresler Trust to pay the full premiums on the Bresler Trust Policies, and each year since that date the Wilmington Entities Defendants, without notice or timely notice to Charles Bresler, failed and refused to make full premium payments on the Bresler Trust Policies, and such failures constitute material breaches of the Bresler Trust Policy Arrangement.

95.     The Wilmington Entities Defendants, Ianni and Wileczek failed to disclose to Mr. Bresler that their failure to make full premium payments adversely affected the CSV and the value and the viability of the Bresler Trust Policies, and rendered the projections and the spreadsheets inaccurate and inapplicable.

96.     Sometime in or about 2005, the Wilmington Defendants, Ianni and Wileczek represented that the "annual $44,000 Crummey Gift" as represented in the November 2003 letter was instead an "annual $110,000 Crummey Gift" that Charles Bresler needed to gift to the Bresler Trust.

97.     As previously disclosed to the Wilmington Entities Defendants, Ianni and Wileczek in 2003, the Wilmington Defendants  knew or should have known that with the structure of the Bresler Trust, Charles Bresler could not make an annual $110,000 Crummey Gift as he had made and was making certain gifts outside the Bresler Trust.

98.     On the advice of the Wilmington Entities Defendants, Ianni and Wileczek, in 2005, Charles Bresler made an additional $1,300,000 million deposit to the Collateral Account to cover the present value of the annual Crummey Gifts for approximately the next ten years.

99.     The mechanism, advised by the Wilmington Defendants, Ianni and Wileczek, of gifting at once Crummey Gifts for approximately the next ten years is not possible under gift tax law.

100.     Upon information and belief, the reason that the Wilmington Defendants, Ianni and Wileczek requested an annual $110,000 Crummey Gift instead of the original annual $44,000 Crummey Gift and then further requested the additional deposit to cover the present value of the annual Crummey Gifts for approximately the next ten years was solely driven by the internal need or preference of the Wilmington Entities Defendants or the Wilmington Lending Facility for additional collateral, and to conceal from plaintiffs the Collateral Misrepresentations and the Policy Deficiencies, and the Policy Deficiency Misrepresentations, and constitute Continued Collateral Misrepresentations and continued Policy Deficiency Misrepresentations.

101.     In or about July 2005, Ianni left, or was terminated by, the Wilmington Entities Defendants.

102.     On August 15, 2005, Wilmington Trust, though Waschull, sent Charles Bresler a letter saying that he had oversight responsibility for the Bresler relationship.  The Wilmington Entities Defendants, Waschull and Wileczek did not disclose the reasons that Ianni's relationship with the Wilmington Entities Defendants had terminated.

### F.     Further Misconduct Under the Bresler Trust Policy Arrangement

103.     On or about May 2006, Wileczek and Waschull forwarded a "Premium Financing Revision Proposal" from Wilmington, Delaware to Charles Bresler and Sidney Bresler in Maryland with:  (1) the February 2006 letter as a letter of explanation; (2) a projection of benefits and collateral with Travelers Life Insurance; (3) a projection of benefits and collateral with Pacific Life Insurance; and (4) a premium financing article authored by Wileczek (collectively, the "May 2006 package").

104.     The May 2006 package proposed a combined transaction of a life settlement and the purchase of an additional $25,000,000 of life insurance.

105.     In the May 2006 package, Wileczek, Waschull and the Affiliates did not disclose the fees or commissions involved with the original and/or proposed "revised" arrangement.

106.     The letter of explanation in the May 2006 package states:  "We have concluded that the net in trust can likely be increased with a combined transaction of a life settlement and the purchase of an additional $25,000,000 of insurance."

107.     In discussions with Sidney Bresler in or about the Summer of 2006, Waschull represented that Highland Capital was an insurance expert and independent consultant that was assisting with the life settlement and purchase of additional life insurance.  Waschull also represented that Highland Capital was a disinterested third party and that Highland's role was to represent the best interests of the Plaintiffs in the potential revised arrangement involving the life settlement and purchase of additional life insurance.

108.    Wileczek, Waschull, the Wilmington Entities Defendants and Highland Capital never disclosed that Highland Capital and its agents Biborosch and Pistilli were involved in the original placement of the Bresler Trust Policies and had received compensation and/or commission related to the Bresler Trust Policies.

109.    Prior to or in the May 2006 package or in conversations in the summer of 2006, Wileczek, Waschull and the Affiliates never disclosed the Policy Deficiencies, the Policy Deficiency Misrepresentations, the Collateral Misrepresentations, the Wilmington Ianni Fraud Admissions, or the seriousness of the deficiencies with the Bresler Trust Policy Arrangement in operation, and with the Bresler Trust Policy Arrangement as marketed and promised to Charles Bresler.

110.    In the May 2006 package or conversations in the summer of 2006, Wileczek, Waschull and the Affiliates never disclosed the fees or commissions involved with the original and/or proposed revised arrangement.

111.    On or about November 3, 2006, Wileczek sent a letter from Wilmington, Delaware to Charles Bresler and Sidney Bresler in Maryland, with a copy to Waschull proposing more revisions to the premium financing structures.  Among the various proposed revisions were:  (1) purchasing an additional life insurance policy;
(2) overfunding the existing Sun Life policy; and (3) forming an Irrevocable Grantor Trust (IGT) and selling assets to this trust in order to merge it with the ILIT ("November 2006 letter").  The Wilmington Entities Defendants,  Wileczek and Waschull once again did not disclose commissions or fees associated with these revisions.

112.    On or about December 15, 2006, Wileczek, faxed a letter dated December 14, 2006 from Wilmington, Delaware to Charles Bresler and Sidney Bresler in Rockville, Maryland noting

outstanding questions from the last meeting regarding:  (1) "How much extra collateral would a

CD garner?"; (2) "How long do we have before we need another call?"; (3) "How is the interest

from a sale to an IDGT treated?"; and (4) "What is the status of the underwriting?" In this letter,

for the first time, Wileczek states that, "on April 1, 2007, we will require an additional $400,000

of collateral."

113.    On or about December 21, 2006, Wileczek sent a letter to Sidney Bresler.   For the first

time ever, the letter set forth to the Breslers the present value of the required collateral and the

additional collateral needed for years 2007 through 2014.

114.    Until at the earliest December 2006, Charles Bresler and Sidney Bresler did not know,

and could not and should not have reasonably known, of the Policy Deficiencies, the Policy

Misrepresentations, the Collateral Misrepresentations, or the Wilmington Ianni Fraud

Admissions.

      **G.**     **In 2007, Plaintiffs Begin To Discover the Misrepresentation/Frauds.**

115.    On or about March 20, 2007, Shaiman sent a letter to Wilmington Trust noting that:

> Our client, Charles S. Bresler, strongly believes that he was misled by
> representatives of Wilmington Trust Company ("WTC") who presented to
> him the plan to purchase through WTC a large amount of last to die life
> insurance.  Edmond M. Ianni in describing the program indicated that
> WTC would finance all future premium payments and would collaterize
> the loans with the insurance policies and the principal in a new trust to be
> established for this purpose.  The materials presented indicated that Mr.
> Charles Bresler was to place approximately $3,700,000 in the trust at
> inception and contribute to the trust an additional $110,000 per year.  This
> amount was suggested by Mr. Ianni as a way of mitigating gift tax.  Mr.
> Bresler would also permit all interest, dividends and gains from the assets
> held in trust to accumulate as additional collateral.
>
> To Mr. Bresler's great surprise, well after this plan was put into place, he
> was advised by a WTC lending officer that he would have to make
> additional contributions to the trust to support premium payment loans.
> He was also advised that because of the initial life insurance policy
> expense incurred by the carriers, primarily large commissions paid to the
> WTC that the program was under water.  In the event he refused to make

the additional contributions the policies would be cancelled and the cash from the cancellation and most if not all of the funds in the trust would be taken by WTC to pay off the loan.

We then learned that Edmond Ianni who had presented and then pushed this program to Mr. Bresler, suddenly left the bank under undisclosed circumstances.

116.    On or about early 2007, the Plaintiffs requested full copies of the Bresler Trust Policies.

117.    On or about May 23, 2007, Patricia Wilson, a Wilmington Trust Fiduciary Advisor, sent a letter from Wilmington, Delaware to Laurence Shaiman stating that Wileczek recently had left Wilmington Trust Company.  With her letter, she enclosed the requested copies of the Bresler Trust Policies.  This is the first time that Charles Bresler and/or Sidney Bresler received full and complete copies of the Bresler Trust Policies.

118.    On or about May 24, 2007, the Plaintiffs discovered the Wilmington Ianni Fraud Admissions, including that, on or about July 20, 2006, Ianni filed a verified complaint against Wilmington Trust, Waschull and others in the state court of Delaware ("Ianni Complaint").  Only a redacted version of the Ianni Complaint is available to the public.

119.    The Ianni Complaint describes Wilmington Trust's and Wilmington Brokerage's previously undisclosed relationship with Highland Capital.

120.    The Ianni Complaint describes Highland Capital as Wilmington Trust's designated outside insurance counsel and that in cases involving the sale of an insurance policy to a Wilmington Trust client, the Client advisors, such as Ianni and Wileczek, received incentive compensation from the Wilmington Entities Defendants and Highland Capital based upon the amount of the revenue, including direct and/or indirect insurance commission, generated to Wilmington Trust from that sale.

121.    In the Ianni Complaint, Ianni alleged in Paragraph 9 that:

In cases where a client's Delaware direction trust was to acquire life insurance, and the client's advisor sought such insurance from Wilmington Trust, WAS's policy was to have the insurance policies arranged through a separate company, Highland Capital, serving as Wilmington Trust's designated independent insurance counsel.  Highland Capital would receive its compensation from the sales of those insurance policies separately from the insurance commissions to Wilmington Trust or its affiliate, Wilmington Brokerage Services ("Wilmington Brokerage").  In those cases involving the sale of a life insurance policy to the client's trust, the client's PCA (i.e., relationship manager) receives incentive compensation from Wilmington Brokerage based on the amount of the revenue (i.e., commission) generated to Wilmington Brokerage/WT from that sale.

122.    In the Ianni Complaint, Ianni alleged in Paragraph 10 that:

Wilmington Trust's WAS directed Mr. Ianni to obtain a life insurance license in order to foster business development.  Mr. Ianni complied.  As a licensed PCA, he was authorized to sign the documents required by Highland Capital in order to effectuate insurance-related transactions for his clients.

123.    Upon information and belief, as described in the Ianni Complaint, Wilmington Trust directed Ianni and its Client Wilmington Trust, Ianni and Wileczek to obtain and/or maintain life insurance licenses so they could share in and receive insurance commissions.

124.    The Ianni Complaint described transactions similar to the Bresler Trust Policy Arrangement and the resulting insurance sale that resulted in undisclosed insurance commissions indirectly and/or directly paid to the Wilmington Defendants, Ianni and Wileczek.

125.    Highland Capital and the Wilmington Entities Defendants each directly and/or indirectly received a portion of the insurance commissions from the sale of insurance products to Wilmington Trust's clients, including the sale of the Bresler Trust Policies.

126.    As described in the Ianni Complaint and as previously undisclosed to Plaintiffs, the Wilmington Entities Defendants retained 65% of its portion of the insurance commission from the sale of any insurance product, including the Bresler Trust Policies, with the Client Advisor/s receiving the remaining 35% of the insurance commissions.

127.    On or about May 24, 2007, the Plaintiffs also discovered that, on or about August 25,

2006, Young Conaway, on behalf of Wilmington Trust, filed an answer and counterclaim to the

Ianni Complaint ("Wilmington Trust Counterclaim").

128.    On or about May 24, 2007, the Plaintiffs further discovered previously unknown and

undisclosed facts about the sale of insurance products by Wilmington Trust by reviewing the

Wilmington Trust Counterclaim.

129.    Although Young Conaway  had undertaken to represent Charles Bresler,  and prepared

the trust documents in conjunction with the Bresler Trust and Bresler Trust Policy Arrangement,

Young Conaway never disclosed to Plaintiffs any of the matters discussed in the Ianni Complaint

and/or the litigation involving Ianni, and the Wilmington Entities Defendants, through

DiGregorio and others, interfered with and continue to interfere with plaintiffs efforts to obtain

that information from Young Conaway.

130.    The Wilmington Defendants, Ianni, Wileczek, Waschull, and Highland Capital  never

disclosed to Plaintiffs any of the matters discussed in the Ianni Complaint and/or the litigation

involving Ianni.

131.    The Wilmington Entities Defendants, Ianni, Wileczek and Highland Capital directly

and/or indirectly received at least some portion of commissions from the sale of the Bresler Trust

Policies.

132.    Ianni and Wileczek received incentive compensation related to the sale of insurance

products, including the sale of the Bresler Trust Policies, even though Ianni did not have an

insurance license and did so in violation of the Delaware Insurance Code.

133.    In the Wilmington Trust Counterclaim, Wilmington Trust alleged in Paragraph 57 that:

> In the last half of 2003 and thereafter, Plaintiff began working with the person
> designated in his Complaint as "Co-Worker," who was an insurance expert.  The

two worked together successfully on several accounts, with Co-Worker supplying
insurance expertise that Plaintiff did not possess.

134.   Wilmington Trust also alleged in paragraph 59 that:

Plaintiff (Ianni), along with Co-Worker, sold insurance products to various clients
of Defendant Wilmington Trust Company during 2003 and 2004.  If sales had
been properly and lawfully accomplished by plaintiff, he would have been entitled
to additional compensation.

135.   Upon information and belief, the "Co-Worker" described in the Ianni Complaint and

Wilmington Trust Counterclaim is Wileczek.

136.   In the Wilmington Trust Counterclaim, Wilmington Trust alleged in paragraph 60 that:

In his overzealous sales efforts, however, Plaintiff (Ianni) overreached and
misrepresented the requirements relating to the insurance products that he
was seeking to sell.

137.   In the Wilmington Trust Counterclaim, Wilmington Trust alleged in paragraph 61 that:

Among his misrepresentations, Plaintiff (Ianni) was asked by one or more clients
whether, if they agreed to purchase insurance using the technique called premium
financing the Plaintiff was touting, there would ever be any need for them to
pledge additional collateral to cover the loans made to the clients' Trusts.

138.   In the Wilmington Trust Counterclaim, Wilmington Trust alleged in paragraph 62 that:

When asked about the potential need for additional collateral, Plaintiff (Ianni)
either misrepresented that there would be no need for additional collateral or
provided misleading and unresponsive answers, all of which were designed to
induce the clients to agree to purchase the insurance so Plaintiff (Ianni) could
receive the incentive compensation.

139.   In the Wilmington Trust Counterclaim, Wilmington Trust alleged in paragraph 64 that:

Solely as a result of Plaintiff's (Ianni's) aforesaid misrepresentation, one
or more clients of Wilmington Trust Company have raised concerns about
their need to pledge additional collateral.

140.   In the Wilmington Trust Counterclaim, Wilmington Trust alleged in paragraph 65 that:

As a result of Plaintiff's (Ianni's) misrepresentation, Defendant Wilmington Trust
Company has paid, to date, a total of $425,000 in order to resolve one complaint
by a client who directly implicated plaintiff Ianni and his misrepresentations or
misleading statements.  Defendant Wilmington Trust is aware of another client

who has made a similar complaint, and other clients of Plaintiff are similarly situated.. [ sic ]

141.    In the Wilmington Trust Counterclaim, Wilmington Trust alleged in paragraph 70 that:

Plaintiff Ianni made false or misleading statements to clients with the intent of inducing them to authorize the purchase of insurance, so that Ianni would receive incentive compensation on the insurance sales.

142.    In the Wilmington Trust Counterclaim, Wilmington Trust alleged in paragraph 71 that:

Plaintiff Ianni intentionally, recklessly or negligently concealed the misrepresentations he made to clients in order to induce Wilmington Trust Company to pay him incentive compensation on the said insurance sales.

143.    In the Wilmington Trust Counterclaim, Wilmington Trust alleged in paragraph 72 that:

Plaintiff Ianni, as an officer of Wilmington Trust Company, had a fiduciary duty to disclose his misrepresentations to Wilmington Trust Company, but failed to do so.

144.    In the Wilmington Trust Counterclaim, Wilmington Trust alleged in paragraph 73 that:

Wilmington Trust Company relied on Plaintiff's misrepresentations in authorizing the insurance sales, and in paying incentive compensation to Ianni.

145.    In the Wilmington Trust Counterclaim, Wilmington Trust alleged in paragraph 74 that:

As a result of its reliance on Plaintiff Ianni's misrepresentations, Wilmington Trust Company has paid money to Plaintiff that should not have been paid, has been required to settle a substantial claim of a client, may need to settle similar claims with other clients, has sustained damage to its relationships with its clients who were deceived by Ianni, and has sustained damage to its business reputation.

146.    In the Wilmington Trust Counterclaim, Wilmington Trust alleged in paragraph 77 that:

Plaintiff Ianni's actions as aforesaid were the direct cause of a monetary settlement between Wilmington Trust Company and one of its clients.

147.    Wilmington Trust never disclosed to Plaintiffs or, upon information and belief, the

similarly situated clients of Ianni, the issues and allegations involving Ianni, the Ianni Complaint,

and/or Wilmington Trust's Counterclaim.

148.    In the Wilmington Trust Counterclaim, Wilmington Trust alleged that Ianni received

incentive compensation as a result of his sale of insurance products.

149.    Prior to 2006, or the disclosures in the Ianni Complaint and Wilmington Trust

Counterclaim, the Plaintiffs had no knowledge of Highland Capital and its role with the

Wilmington Entities Defendants.

150.    The Wilmington Entities Defendants never disclosed to the Plaintiffs the arrangement

among the Wilmington Entities Defendants, Ianni, Wileczek, and Highland Capital for

commissions and incentive compensation based upon insurance commissions.

151.    On or about 2007, the Wilmington Entities Defendants made the unilateral decision not to

advance further additional premium loans to pay the annual premiums on the Bresler Trust

Policies.  Wilmington Trust's actions resulted in dissipating the CSVs of the Bresler Trust

Policies.  Wilmington Trust also unilaterally made decisions that have and/or will result in the

lowering of the face value of the Bresler Trust Policies.  Wilmington Trust did not notify

Plaintiffs of these actions until after the fact.

152.    As a result of Wilmington Trust's unilateral actions that resulted in the lowering of the

net death benefit of the Bresler Trust Policies versus the higher increasing net death benefit

marketed by the Wilmington Entities Defendants, Ianni and Wileczek, Plaintiffs are unable to

reinstate the higher net death benefit of the Bresler Trust Policies as originally planned, marketed

and promised by the Wilmington Entities Defendants, Ianni and Wileczek.  Currently, the

Bresler Trust Policies are using the cash values of the policies to sustain the policies, which will

over time further decrease the death benefit, and will ultimately result in the expiration of the

policies.

153.     On October 4, 2007, Charles Bresler and Wilmington Trust, including its subsidiaries, affiliates and assigns, entered into a tolling agreement ("Tolling Agreement").  Wilmington Trust drafted the Tolling Agreement.

154.     In the Tolling Agreement, Wilmington Trust specifically waived the defense of the statute of limitations for Wilmington Trust and its subsidiaries, affiliates and assigns, including Wilmington Brokerage.

155.     The Tolling Agreement waived and extended the statute of limitations available to Charles Bresler with respect to any available claim regarding the transaction.

156.     The Tolling Agreement had been extended through December 31, 2009.

### H.     The Plaintiffs Discover Further Misrepresentations and Misconduct

157.     As the Bresler Trust Arrangement continued to deteriorate, the Plaintiffs began to discover in 2007 that the Wilmington Entities Defendants, Ianni and Wileczek, with assistance from Highland Capital, misrepresented the suitability, underlying parameters, requirements and other material terms relating to the insurance products and premium financing arrangement that they were selling, including the Policy Deficiencies and the Policy Deficiencies and the Policy Deficiency Misrepresentations.

158.     Among the misrepresentations, the Wilmington Entities Defendants, Ianni and Wileczek misled Charles Bresler to understand that, if he agreed to purchase insurance using the technique called premium financing that they were touting, there would never be any need, as long as the Bresler Trust Policies performed as marketed, for Charles Bresler to pledge additional collateral to cover the loans made by the Wilmington Entities Defendants, through the Wilmington Lending Facility, to the Bresler Trust.

159.     The materials, illustrations and spreadsheets prepared by the Wilmington Entities Defendants, Ianni, Wileczek and Highland Capital and presented to Mr. Bresler  to Charles

Bresler were vague, incomplete and misleading, and were negligently prepared and presented, in that they failed to identify collateral requirements.

160. The materials, illustrations and spreadsheets prepared by the Wilmington Entities Defendants, Ianni, Wileczek and Highland Capital and presented to Charles Bresler were vague, incomplete and misleading, and were negligently prepared and presented, in that they failed to present all of the material information contained in the materials, illustrations and spreadsheets exchanged between and among Wilmington Entities Defendants, Ianni, Wileczek and Highland Capital.

161. The materials, illustrations and spreadsheets prepared by the Wilmington Entities Defendants, Ianni, Wileczek and Highland Capital and presented to Charles Bresler were vague, incomplete and misleading and were negligently prepared and presented in that they failed tom account for or otherwise explain the effect of costs of insurance and other expenses, including fees, commissions, administrative charges, and tax costs on the invested account balances and on the rate of return.

162. The materials, illustrations and spreadsheets prepared by the Wilmington Entities Defendants, Ianni, Wileczek and Highland Capital and presented to Charles Bresler were vague, incomplete and misleading and were negligently prepared and presented in that they failed disclosed the actual rate of return.

163. The Wilmington Defendants failed to timely provide anniversary statements disclosing material information including COI, expenses, and rate of return.

164. More suitable life insurance policies were available and with lower commissions than the joint and survivor universal life insurance policies marketed and sold by the Wilmington Entities Defendants, Ianni, Wileczek, and Highland Capital.

165.     The improper advice given by the Wilmington Defendants and Highland, through the Wilmington Defendants, was in part due to the higher commissions available with the insurance products used versus the commissions associated with other available and more suitable insurance products.

166.      SunLife had executive life products available that would have yielded lower commissions and been a better vehicle for the Bresler Trust Policy Arrangement than the universal life policies selected.

167.     In various conversations with Charles Bresler occurring in part in Maryland, Delaware and/or the District of Columbia from 2003 to 2004, the Wilmington Entities Defendants, Ianni and Wileczek specifically represented to Charles Bresler that the Bresler Trust Policy Arrangement was suitable as an estate planning strategy for Charles Bresler.

168.     The Wilmington Entities Defendants, Ianni and Wileczek marketed themselves as having specialized expertise in premium financing.

169.     The Wilmington Entities Defendants, Ianni and Wileczek did not properly perform due diligence investigations and/or failed to comply with the results of any due diligence investigations in advising on a premium financing arrangement.

170.     The failures of the Wilmington Entities Defendants, Ianni and Wileczek regarding their due diligence included, but are not limited to, investigating, and giving incomplete and/or misleading advice regarding exit strategies, performance issues, universal life insurance policies, annual Crummey Gifts, and related tax and estate issues.

171.     Joint-life, survivorship universal life products generally will not provide the necessary returns to make a premium financing arrangement work.

172.    The Wilmington Defendants, Ianni, Wileczek, and Highland Capital knew or should have known that joint and survivor universal life policies were unsuitable in a premium financing arrangement.

173.    When the Wilmington Entities Defendants, Ianni and Wileczek, with the assistance of Highland Capital, advised and counseled Charles Bresler to purchase the joint and survivor universal life insurance policies for the Bresler Trust, they did not advise correctly or in conformity with industry standards and practices on a suitable insurance product in conjunction with the premium financing arrangement.

174.    Further, the Wilmington Defendants, Ianni and Wileczek did not properly perform the required due diligence involved, did not fully explain the premium financing arrangement, and made misrepresentations regarding the premium financing, in pursuit of larger commissions payable to the Wilmington Defendants, Ianni and Wileczek, and Highland Capital.

175.    Charles Bresler was led to believe by the Wilmington Entities Defendants, Ianni and Wileczek that the compensation to be received by the Wilmington Entities Defendants, Ianni, Wileczek and Highland was going to be as disclosed in the Investment Management Agreement, which does not disclose in full the insurance commissions received or to be received as a result of the Bresler Trust Policies.

176.    The Wilmington Entities Defendants, Ianni, Wileczek, and Highland Capital  received at least $1,700,000 in undisclosed commissions the first year and more than $100,000 annually when the further premium payments were made.

177     Ianni, Wileczek, and Highland Capital failed to disclose to Plaintiffs that they would receive insurance commissions on the sale of the Bresler Trust Policies.

I.      **The Misrepresentations and Concealments in The 2006 Attempt To Sell Replacement Policies.**

178.    In 2006, unknown to Plaintiffs, the Wilmington Entities Defendants, Waschull, Wileczek and Highland Capital made misrepresentations and/or omissions in the May 2006 package, conversations in the summer of 2006, and November 2006 letter.

179.    When a life insurance policy owner replaces that policy with another policy, the issuance of the new policy is often characterized as a "replacement" transaction.  Typically, in a replacement transaction, the CSV in the replaced policy is used to pay the premium on the new policy.  This most often leaves the policyholder with a smaller cash value in the new policy because of sales commissions paid in connection with the replacement and because a surrender charge was assessed in connection with the surrender of the replaced policy.  Seldom is a replacement policy in the best interest of a policyholder as most of the first-year premium is swallowed up in commission.  The premium is higher because the insured is older, and, the "waiting" periods begin anew.

180.    Improper policy replacement is called "churning" and is a widely condemned practice employed in life insurance sales.

181.    "Churning" the policies of a policyholder produces large new commissions for the agent at the expense of the policyholder.

182.    As a result, state insurance law imposes certain requirements designed to ensure that the policyholder has made an informed decision regarding the replacement policy.  These requirements include providing certain disclosures, prohibiting misleading comparisons of old and new respective policies, and giving the replaced insurance company information about the replacement transaction, which would provide it with the opportunity to communicate with the policyholder regarding the advisability of proceeding with the proposed replacement.

54

183.     Notwithstanding that the Bresler Trust Policy Arrangement was materially flawed from inception, except to the extent that it would generate fees for the Wilmington Entities Defendants, Ianni, and Wileczek, and Highland Capital, the Wilmington Entities Defendants, Wileczek, and Waschull, with the knowing assistance of Highland Capital,  proposed actions which would  "churn" the policies when the Bresler Trust Policy Arrangement began to deteriorate, and which  offered more commissions and compensation to the Wilmington Entities Defendants, Wileczek, Waschull and Highland Capital, in proposals that would do result in more harm to plaintiffs..

184.     The Wilmington Entities Defendants, Wileczek and Waschull's May 2006 package proposed a life settlement and a replacement policy, resulting in direct and/or indirect commissions on both sides of the transaction to be received directly and/or indirectly by the Wilmington Entities Defendants, Highland Capital, Waschull and/or Wileczek.

185.     Upon information and belief, the Wilmington Entities Defendants, Wileczek, Waschull and Highland Capital conspired to and attempted the activities as outlined in the May 2006 package to deliberately conceal the Policy Deficiencies, the Policy Deficiency Misrepresentations, the Collateral Misrepresentations,  the Wilmington Ianni Fraud Admissions, the flawed nature of the Bresler Trust Policies, and the Bresler Trust Policy Arrangement, and conspired to churn the Bresler Trust Policies in anticipation of additional compensation, commissions and fees.

186.     The Wilmington Entities Defendants, Wileczek, Waschull and Highland Capital failed to disclose material information associated with churning the policies as described in the May 2006 package, including related fees, charges, commissions, and surrender charges.

187.    The Wilmington Entities Defendants, Wileczek, Waschull and Highland Capital failed to disclose information, required by the Delaware Insurance Code, associated with churning the policies as described in the May 2006 package including related fees, charges, commissions, and surrender charges.

188.    The Wilmington Entities Defendants, Wileczek, Waschull and Highland Capital did not fulfill their obligations to the Bresler Trust, Charles Bresler and Sidney Bresler in advising on the replacement policy and life settlement proposals, or alternatives thereto.

##### J.    The Tax and Estate Issues

189.    At varying times from 2003 through the present, the Wilmington Entities Defendants, Ianni, Wileczek, and Waschull misrepresented and failed to disclose various material terms regarding the fees, tax status, gift tax implications and other estate issues associated with the Bresler Trust Policy Arrangement.

190.    Certain actions by the Wilmington Entities Defendants, Ianni and Wileczek may have endangered favorable estate tax provisions.

191.    The Wilmington Entities Defendants, Ianni and Wileczek advised Charles Bresler to take actions that compromise favorable gift and estate tax outcomes, including but not limited to depositing the one-time lump sum $1,300,000 Crummey Gift into the Collateral Account to cover the Crummey Gifts for approximately the next ten years.  The one-time lump sum $1,300,000 Crummey Gift was never properly gifted.

192.    Charles Bresler specifically relied on such representations by the Wilmington Entities Defendants, Ianni and Wileczek to his detriment and agreed to participate in the Bresler Trust Policy Arrangement because of representations that this specific insurance product and investment strategy was suitable for his estate planning needs.

193.    Following the ratification of the 2004 Bresler Trust Documentation, the Wilmington

Entities Defendants, Ianni and Wileczek, and, as of the Waschull Involvement Date, Waschull,

continued their misrepresentations as to estate and tax issues.

194.    The Wilmington Entities Defendants, Ianni and Wileczek initially misrepresented the

need for Crummey Gifts by first representing in 2003 the need as $44,000 annual Crummey

Gifts, then, after the purchase of the Bresler Trust Policies, changing the annual amount in 2004

to $110,000, and then in 2005, advising a one-time $1,300,000 Crummey Gift.

195.    In 2005, the Wilmington Entities Defendants, Ianni and Wileczek directed Charles

Bresler to deposit a one-time Crummey Gift into the Collateral Account to cover all future

annual Crummey Gifts.  The structure and deposit of the one-time Crummey Gift into the

Collateral Account destroyed the tax advantages of the future annual Crummey Gifts.

196.    The Wilmington Entities Defendants, Ianni and Wileczek knew or should have known

that their advice regarding the Crummey Gift destroyed the tax advantages associated with the

annual Crummey Gift.  Under both then and current laws,   Crummey Gifts cannot be aggregated

over multiple years.

197.    The reason that the Wilmington Entities Defendants, Ianni and Wileczek requested an

annual $110,000 Crummey Gift instead of the original annual $44,000 Crummey Gift and then

further requested the additional $1,300,000 deposit to cover the present value of the annual

Crummey Gifts for approximately the next ten years was driven by the need for extra collateral.

198.    Upon information and belief, the Wilmington Entities Defendants, Ianni and Wileczek

directed  Charles Bresler to deposit the one-time Crummey Gift into the Collateral Account to

conceal from bank regulators the Policy Deficiencies, the Policy Deficiency Misrepresentations,

the Collateral Misrepresentations, the Wilmington Ianni Fraud Admissions, and the flawed

nature of the Bresler Trust Policy Arrangement.

> **K.    The Defendants Continuously Breached Their Duties and Obligations
> and Concealed Material Information Regarding Their Misdeeds**

199.    Following the ratification of the 2004 Bresler Trust Documentation, and  the entry into

the Bresler Trust Policy Arrangement and the purchase of the Bresler Trust Policies, the

Wilmington Defendants failed to correct the Collateral Misrepresentations, and the Policy

Deficiency Misrepresentations, and failed to disclose the Wilmington Ianni Fraud Admissions,

and failed to meet their duties and obligations to perform pursuant to the Bresler Trust Policy

Arrangement, and failed to meet their duties and their obligations to correct the Policy

Deficiencies.

200.    Each of the Defendants conspired and actively took actions to conceal from the Plaintiffs

activities undertaken that were in direct breach of the obligations they owed to Plaintiffs.

201.    The Wilmington Entities Defendants, Ianni (2003-2005), Wileczek, (2003-2007),

Waschull (2005-forward), and Highland Capital deliberately withheld and misrepresented

material information regarding the fees, tax status, charges, and surrender charges from the

Plaintiffs, as well as the Policy Deficiencies, the Policy Deficiency Misrepresentations, the

Collateral Misrepresentations, and the Wilmington Ianni Fraud Admissions.

202.    The Wilmington Entities Defendants, Ianni, Wileczek, and Waschull failed to investigate

the Misrepresentations and the Admissions, and failed to take prudent, reasonable and necessary

steps to correct or mitigate the damages from the Policy Deficiencies and the potential adverse

tax consequences of their management and administration of the  Bresler Trust Policy

Arrangement, and failed to perform in conformity with their agreement with Charles Bresler, and

Wilmington Trust, as trustee of the Bresler Trust, failed to initiate the appropriate legal actions

and proceedings against Ianni, Wileczek, Waschull, Highland Capital, and the Wilmington Entities Defendants.

203.     Despite that the Wilmington Entities Defendants, Wileczek and Waschull were on notice from the various conversations and letters from Plaintiffs in 2007 of the Deficiencies and Misrepresentations as marketed and promised versus actual performance and operation, the Wilmington Entities Defendants, Wileczek and Waschull did not fully investigate or respond, and failed to take remedial or curative action, or to mitigate damages, in part because such action, if prudently undertaken, would have required the return of some or all of the undisclosed commissions.

204.     Although the Wilmington Entities Defendants, Wileczek and Waschull were on notice of the Deficiencies, Misrepresentations and Admissions as early as 2003, and as to Waschull as early as 2005, and no later than August 2006, they did not and have not disclosed to the Plaintiffs their knowledge regarding the Deficiencies and the Misrepresentations and the Admissions in the marketing and sale of insurance product and investment strategy to Wilmington Trust clients, including Plaintiffs.

205.     On November 22, 2005, Waschull sent an email to Wileczek and others that it would be "disastrous" if additional collateral were needed because "we are simultaneously trying to regain credibility."

206.   On November 23, 2005, Waschull sent an email to Wileczek and others that "we just need to also keep Peter informed, as he was always concerned about this one."

207.     By their conduct in the investigation of Plaintiffs' claims and their actions after discovering the Wilmington Ianni Fraud Admissions, the Wilmington Entities Defendants,

Wileczek and Waschull ratified the misconduct of the Wilmington Entities Defendants, Ianni and Wileczek.

208.    The misrepresentations, non-disclosures, concealments, and lack of proper supervision of Ianni and Wileczek by Wilmington Entities Defendants constitute a willful pattern of misconduct towards consumers and the Plaintiffs.

**L.    Wilmington Trust Fails in Its Duties To Maintain the Bresler Trust Policies As Promised**.

209.    The Wilmington Entities Defendants covenanted and agreed, for consideration,  in 2003 with Charles Bresler that they would make loans, and specifically would loan interest, as well as principal, to the Bresler Trust from the first year forward to cover the premium payments for the Bresler Trust Policies.

210.    Beginning in or about 2005, the Wilmington Entities Defendants failed and  refused to make the full promised loans to the Bresler Trust to cover the premium payments for the Bresler Trust Policies,  thereby reducing the CSV, shortening the existence of each of the Bresler Trust Policies and placing in peril the policy death benefits.

211.    In or about 2006, without prior notice to the Plaintiffs, the Wilmington Entities Defendants have taken, repeatedly and in violation of their agreements, duties and obligations, actions that have significantly have decreased the CSV and the amount of the death benefit of the Bresler Trust Policies.

212.    The current death benefits of the Bresler Trust Policies are, and will continue to be, significantly less than marketed and promised by the Wilmington Entities Defendants, Ianni and Wileczek.  Currently, the Bresler Trust Policies are using the policy funds to sustain the Bresler Trust Policies, which over time will decrease and eliminate the death benefit.

213.    The Bresler Trust Policies are in danger of lapsing.

214.    As a consequence, plaintiffs have been compelled to expend substantial sums to mitigate the damages caused by, and threatened to be caused by, the misconduct of defendants.

## FIRST CAUSE OF ACTION
### (NEGLIGENCE)

**PLAINTIFFS FLEUR S. BRESLER AND SIDNEY M. BRESLER AS THE CO-PERSONAL REPRESENTATIVES OF THE ESTATE OF CHARLES S. BRESLER, AND SIDNEY BRESLER, INDIVIDUALLY**

**v.**

**DEFENDANTS WILMINGTON TRUST, WILMINGTON BROKERAGE, HIGHLAND CAPITAL, EDMOND IANNI, RALPH WILECZEK, MATTHEW WASCHULL**

215.  Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 214 above, as if fully set forth herein.

216.    The Wilmington Entities Defendants, Ianni, Wileczek, and Highland Capital  held themselves out as having special expertise in the type of investment and transaction that the Wilmington Entities Defendants, Ianni, Wileczek  marketed and recommended to Charles Bresler, including the Wilmington Wealth Program.

217.    In 2003 through 2005, the Wilmington Entities Defendants, Ianni and Wileczek represented to Plaintiffs, in conversations and letters, that they had expert and intimate knowledge of estate planning, life insurance policies and premium financing.

218. Touting their expertise, the Wilmington Defendants, Ianni and Wileczek solicited Charles Bresler to become a Program Client and to participate in the Wilmington Wealth Program.

219.    The Wilmington Defendants, Ianni, Wileczek and Waschull agreed to provide Program Services, including fiduciary services, trustee services, insurance services, investment advice, banking services, and financial brokering services with requisite professional skill and care, for

the benefit of Plaintiffs, in exchange for disclosed valuable consideration paid by Charles Bresler.

220.    Highland Capital, Wilmington Brokerage and Wileczek are independent insurance agents/brokers that represent several insurance companies.

221.    Highland Capital, Wilmington Brokerage and Wileczek contacted, and received information from, various life insurance companies.

222.    Highland Capital, the Wilmington Entities Defendants, Ianni and Wileczek solicited for and deliberately undertook the responsibility of finding an insurance policy or policies to specifically suit Plaintiffs' needs.

223.    As Charles Bresler's agent and insurance broker, Wilmington Brokerage, Wileczek, and Highland Capital had a duty to use reasonable skill and care in providing advisory and insurance services, including Program Services to Bresler Program Clients.

224.    As Charles Bresler's  agent and financial advisor, Wilmington Trust, Ianni, Wileczek and Waschull had a duty to use reasonable skill and care in providing advisory, investment, and insurance services, including Program Services, to Plaintiffs and the Bresler Trust.

225.    As financial and investment advisors, Wilmington Trust, Ianni, and Wileczek had a duty to review facts regarding Charles Bresler and determine whether the Bresler Trust Policies were suitable for Charles Bresler and whether the underlying universal life policies were suitable for a premium financing arrangement.

226.    The National Association of Securities Dealers ("NASD") requires that all advertisements and other sales material issued by brokers and broker dealers be fair, balanced and not misleading.  Wilmington Brokerage and Highland Capital are registered NASD broker dealers.

227.    Wilmington Brokerage's website states that it provides "expert advice from our Client Advisors" and "Client Advisors work with you to develop and implement a plan of action that considers your financial circumstances - time horizon, goals, liquidity needs, and others.  Our fully licensed Client Advisors provide the research and insight you need to make the most informed investment decisions."

228.    In its advertising, Wilmington Trust states:  "Our approach is simple - develop customized strategies for our clients with the utmost integrity, intelligence, and expertise.  You're assured that your performance expectations and aspirations for the future are always paramount to us."

229.    Defendants owed a duty to Plaintiffs to act consistent with their own codes of ethics, industry standards, standards promulgated by the Delaware Insurance Code, regulations of FINRA and NASD, and their assumed role of commitment to honesty and integrity.

230.     At all relevant times herein, the Wilmington Entities Defendants, Ianni, Wileczek and, from the Waschull Involvement date Waschull, owed a duty to Plaintiffs to obtain and maintain the Bresler Trust Policy Arrangement, including the Bresler Trust Policies, as represented and communicated to Plaintiffs.

231.    At all relevant times herein, the Wilmington Entities Defendants, Ianni, Wileczek, Highland and, from the Waschull Involvement date Waschull, owed a duty to Plaintiffs to obtain suitable life insurance policies.

232.    Defendants the Wilmington Entities Defendants, Ianni, Wileczek, Highland and, from the Waschull Involvement date Waschull owed a duty to Plaintiffs to respond accurately to Plaintiffs' requests, not to make misrepresentations and not to omit material information.

233.    Defendants owed a duty and a fiduciary duty to Plaintiffs to perform their responsibilities with good faith and appropriate skill.

234.    Defendants by their acts, assumed a duty of care to Plaintiffs and acted as agents for Plaintiffs.

235.    The Wilmington Entities Defendants, Ianni, Wileczek, Waschull, and Highland Capital had a duty to act in the best interests of the Plaintiffs.

236.    In addition, the duties and standards that the Wilmington Defendants, Ianni, Wileczek, Waschull and Highland Capital failed to satisfy include, among other things:

     a.     Obligations of full and accurate disclosure;

     b.     Obligations of honesty and fair dealing;

     c.     Obligations to provide accurate and appropriate advice;

     d.     Obligations to correct their clients' misconceptions;

     e.     Obligations to not engage in self-dealing;

     f.     Obligations of undivided loyalty, utmost good faith, due care and fidelity;

     g.     Obligations set forth by industry standards;

     h.     Obligations set forth by their internal standards;

     i.     Obligations to perform due diligence in advising;

     j.     Obligations to sell products that are appropriate and suitable to their clients' needs; and

     k.     Obligations not to ignore their clients when events turn out differently than the clients had reasonably expected.

(collectively, the "Duties and Obligations").

237.    The Wilmington Entities Defendants, Ianni and Wileczek breached the Duties and Obligations by, among other things:

a.      their actions and inactions resulting in and causing the Policy Deficiencies;

b.      making the Policy Deficiency Misrepresentations, and continuously failing to

        correct the Policy Deficiency Misrepresentations;

c.      making the Collateral Misrepresentations, and failing to correct the Collateral

        Misrepresentations;

d.      failing to disclose the Wilmington Ianni Fraud Admissions;

e.      failing to perform pursuant to the terms of the Bresler Trust Policy Arrangement;

f.      failing to procure and maintain the Bresler Trust Policy Arrangement as

        represented to Plaintiffs;

g.      obtaining what was, at best, a deficient and unsuitable insurance product;

h.      failing to properly advise and disclose and/or concealing material information on

        the actual tax status of the Bresler Trust Policy Arrangement and Bresler Trust

        Policies;

i.      failing to properly advise and disclose and/or concealing material information

        regarding the need for collateral associated with the Bresler Trust Policy

        Arrangement and Bresler Trust Policies;

j.      failing to properly advise and disclose and/or concealing material information

        regarding Crummey Gifts and gift tax issues associated with the Bresler Trust

        Policy Arrangement and Bresler Trust Policies;

k.      Failing to properly advise, disclose and/or concealing material information on all

        charges and fees regarding the Bresler Trust Policy Arrangement and Bresler

        Trust Policies;

l.      Failing to properly advise, disclose and/or concealing material information regarding premium financing;

m.      Failing to disclose and/or concealing fees and commissions;

n.      Failing to use reasonable skill and care in marketing and procuring the Bresler Trust Policy Arrangement and Bresler Trust Policies; and

o.      Failing to identify and/or alert Plaintiffs to all material facts regarding the Bresler Trust Policy Arrangement and Bresler Trust Policies.

p.      placing the Wilmington Wealth Program Self-Interest ahead of the interests of plaintiffs.

q.      failing to identify or recommend or take actions to mitigate or correct the Policy Deficiencies;

r.      taking actions ostensibly designed to correct one or more Policy Deficiencies but which were in fact designed to generate additional fees and revenues to the Wilmington Defendants and Highland. (collectively, the "Wilmington Entity/Ianni/Wileczek Misconduct").

238.    In addition, Wilmington Trust, as Trustee of the Bresler Trust, breached the Duties and Obligations by failure to initiate legal proceedings asserting the claims set out in this Second Amended Complaint against each defendant (the "Additional Wilmington Trust Misconduct").

239.    In addition, the Wilmington Entities Defendants breached the Duties and Obligations  to Plaintiffs also by failing to properly investigate, supervise, and monitor Highland Capital, Ianni, Wileczek and  Waschull ( the "Additional Wilmington Entities Defendants Misconduct")

240.    Waschull breached the Duties and Obligations by, among other things:

a.      continuously failing to correct the Policy Deficiency Misrepresentations;

b.      failing to correct the Collateral Misrepresentations;

c.      failing to disclose the Wilmington Ianni Fraud Admissions;

d.      failing to properly advise and disclose and/or concealing material information on the actual tax status of the Bresler Trust Policy Arrangement and Bresler Trust Policies;

e.      failing to properly advise and disclose and/or concealing material information regarding the need for collateral associated with the Bresler Trust Policy Arrangement and Bresler Trust Policies;

f.      failing to properly advise and disclose and/or concealing material information regarding Crummey Gifts and gift tax issues associated with the Bresler Trust Policy Arrangement and Bresler Trust Policies;

g.      Failing to properly advise, disclose and/or concealing material information on all charges and fees regarding the Bresler Trust Policy Arrangement and Bresler Trust Policies;

h.      Failing to properly advise, disclose and/or concealing material information regarding premium financing;

i.      Failing to disclose and/or concealing fees and commissions;

j.      Failing to identify and/or alert Plaintiffs to all material facts regarding the Bresler Trust Policy Arrangement and Bresler Trust Policies.

k.      placing the Wilmington Wealth Program Self-Interest ahead of the interests of plaintiffs.

l.      failing to identify, recommend or take actions to mitigate or correct the Policy Deficiencies;

    m.      taking actions ostensibly designed to correct one or more Policy Deficiencies but which were in fact designed to generate additional fees and revenues to the Wilmington Defendants and Highland  (collectively, the "Waschull Misconduct").

241.   Highland Capital breached the Duties and Obligations by, among other things:

    a.      their actions and inactions resulting in and causing the Policy  Deficiencies;

    b.      continuously failing to correct the Policy Deficiency Misrepresentations;

    c.      continuously failing to correct the Collateral Misrepresentations;

    d.      failing to disclose the Wilmington Ianni Fraud Admissions;

    e.      obtaining what was, at best, a deficient and unsuitable insurance product;

    f.      failing to properly advise and disclose and/or concealing material information regarding the need for collateral associated with the Bresler Trust Policy Arrangement and Bresler Trust Policies;

    g.      failing to properly advise, disclose and/or concealing material information on all charges and fees regarding the Bresler Trust Policy Arrangement and Bresler Trust Policies;

    h.      failing to properly advise, disclose and/or concealing material information regarding premium financing;

    i.      failing to disclose and/or concealing fees and commissions;

    j.      failing to use reasonable skill and care in procuring the Bresler Trust Policies;

    k.      failing to identify and/or alert Plaintiffs to all material facts regarding the Bresler Trust Policy Arrangement and Bresler Trust Policies.

l.      placing its interests and the Wilmington Wealth Program Self-Interest ahead of
the interests of plaintiffs.

m.      failing to identify or recommend  actions to mitigate or correct the Policy
Deficiencies;

n.      taking actions ostensibly designed to correct one or more Policy Deficiencies but
which were in fact designed to generate additional fees and revenues to the
Wilmington Defendants and Highland.  (collectively, the "Highland Capital
Misconduct," and collectively with the Wilmington Entity/Ianni/Wileczek
Misconduct, the Additional Wilmington Trust Misconduct, the Additional
Wilmington Entities Defendants Misconduct and the Waschull Misconduct the
"Defendants' Misconduct and Breach of Duties and Obligations." )

242.    The Wilmington Defendants and Highland Capital s failed to satisfy even the most

minimal standards, applicable to life insurance agents/brokers and investment managers,

pursuant to industry standards; standards promulgated by the Delaware Insurance Code, NASD,

and FINRA; and even Defendants' own internal standards.

243.    The Defendants' Misconduct and Breach of Duties and Obligations constitute a

conscious disregard of the rights of the Plaintiffs.

244.    The Defendants' Misconduct and Breach of Duties and Obligations constitute a failure to

meet the applicable standard of care, and to meet the industry standards applicable to

Defendants, and constitute negligence and to meet general and accepted financial, tax and estate

advisory and insurance industry usage and practice.

245.    As a direct and proximate result of Defendants' negligence and Defendants' Misconduct

and Breach of Duties and Obligations, plaintiffs have incurred significant expenses, including

additional out-of-pocket costs to hire consultants to review the Bresler Trust Policy Arrangement and to determine the flaws as the Bresler Trust Policy Arrangement, and to secure alternative insurance.

246.    As a direct and proximate result of Defendants' failure to fulfill their duties to Plaintiffs, Defendants caused damages to Plaintiffs in excess of $10,000,000 in connection with the present Action, the exact amount to be proven at trial.

247.    As a direct and proximate result of Defendants' failure to fulfill their duties to Plaintiffs, Defendant have placed at risk the Bresler Trust Policy Arrangement and the Bresler Trust Policies.

**SECOND CAUSE OF ACTION**
**(PROFESSIONAL NEGLIGENCE)**


**PLAINTIFFS FLEUR S. BRESLER AND SIDNEY M. BRESLER AS THE CO-PERSONAL REPRESENTATIVES OF THE ESTATE OF CHARLES S. BRESLER, AND SIDNEY BRESLER, INDIVIDUALLY**

**v.**

**DEFENDANTS WILMINGTON TRUST, WILMINGTON BROKERAGE, HIGHLAND CAPITAL, EDMOND IANNI, RALPH WILECZEK, MATTHEW WASCHULL**

248.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 247 above, as if fully set forth herein.

249.    The Wilmington Defendants represented that they had special expertise in trustee, fiduciary, advisory, investment, and insurance services, including insurance transactions involving life insurance policies, such as the Wilmington Wealth Program, the Bresler Trust Policies and the Bresler Trust.

250.     Highland Capital also represented to the public that it has special expertise in assisting financial advisors and insurance professionals in matters such as the Wilmington Wealth Program and the Bresler Trust Policies.

251.     At all relevant times herein, Wilmington Brokerage, Wileczek and Highland Capital had a heightened professional duty as insurance agents/brokers and owed professional duties to Plaintiffs.

252.     Plaintiffs specifically relied upon the professional financial, investment and insurance expertise of the Wilmington Entities Defendants, Ianni, Wileczek, and later, Waschull, and Highland Capital.

253.     The representations and conduct of the Wilmington Defendants was calculated and intended to foster Plaintiffs' confidence and trust in Defendants as it related to the trustee, fiduciary, advisory, investment, and insurance services provided by Defendants to Plaintiffs, including the Wilmington Wealth Program, the Bresler Trust Policies and the Bresler Trust.

254.     Because of the Wilmington Defendants' representations about Defendants' superior knowledge and skill concerning their advisory, investment, trustee, and insurance services, including the Wilmington Wealth Program, the Bresler Trust Policies and the Bresler Trust, Plaintiffs placed their confidence and trust in Defendants.

255.     Defendants knew or should have known that Plaintiffs had placed confidence and trust in Defendants and Defendants accepted the confidence and trust placed in them by Plaintiffs.

256.     Defendants sought and created a heightened professional relationship between Defendants and Plaintiffs no later than May 2003.

257.     The Defendants' Misconduct and Breach of Duties and Obligations constitute a failure to meet the heightened standard of care, and to meet the industry standards applicable to

Defendants as professionals, and constitute professional negligence and the general and accepted financial, tax and estate advisory and insurance industry usage and practice.

258    As a direct and proximate result of Defendants' professional negligence and Defendants' Misconduct and Breach of Duties and Obligations, plaintiffs have incurred significant expenses, including additional out-of-pocket costs to hire consultants to review the Bresler Trust Policy Arrangement and to determine the flaws as the Bresler Trust Policy Arrangement, and to secure alternative insurance.

259.    As a direct and proximate result of Defendants' failure to fulfill their professional duties to Plaintiffs, Defendants caused damages to Plaintiffs in excess of $10,000,000 in connection with the present Action, the exact amount to be proven at trial.

260.    As a direct and proximate result of Defendants' failure to fulfill their duties to Plaintiffs, Defendant have placed at risk the Bresler Trust Policy Arrangement and the Bresler Trust Policies.

## THIRD CAUSE OF ACTION
### (BREACH OF FIDUCIARY DUTY)

**PLAINTIFFS FLEUR S. BRESLER AND SIDNEY M. BRESLER AS THE
CO-PERSONAL REPRESENTATIVES OF THE ESTATE OF CHARLES S. BRESLER,
AND SIDNEY BRESLER, INDIVIDUALLY**

**v.**

**DEFENDANTS WILMINGTON TRUST,
WILMINGTON BROKERAGE, HIGHLAND CAPITAL,
EDMOND IANNI, RALPH WILECZEK,
MATTHEW WASCHULL**

261.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 260 above, as if fully set forth herein.

262.    The Wilmington Entities defendants assumed a fiduciary duty to plaintiffs no later than May 2003, and that duty has existed continuously through this date.

263.    Ianni assumed a fiduciary duty to plaintiffs no later than May 2003, and that duty existed through his departure from the Wilmington Entities.

264.    Wileczek assumed a fiduciary duty to plaintiffs no later than May 2003, and that duty existed through his departure from the Wilmington Entities.

265.    Highland Capital assumed a fiduciary duty to plaintiffs no later than May 2003, and that duty has existed continuously through this date.

266.    Waschull assumed a fiduciary duty to plaintiffs on the Waschull Involvement Date, and that duty has existed through February 2007.

267.    Those fiduciary duties included duties of good faith, diligence, skill, loyalty, candor, disclosure, and avoidance of self-dealing

268.    The Defendants' Misconduct and Breach of Duties and Obligations constituted and constitute breaches of the fiduciary duty owed to plaintiffs.

269.  The following acts and inactions, to the extent not already identified in the preceding paragraph, also constituted and constitute breach of the fiduciary duty owed to plaintiffs.

      a.     failing to represent the interests of Charles Bresler, and solely the interests of Charles Bresler, in providing advisory, investment, and brokering services;

      b.     failing to disclose to Charles Bresler all material terms, including need for collateral, costs, fees and insurance commissions in connection with the placement of the Bresler Trust Policy Arrangement;

      c.     representing the interests of Defendants rather than the best interests of Plaintiffs;

      d.     participating in undisclosed self-dealing transactions;

     e.      failing to represent the interests of Plaintiffs, and solely the interests of Plaintiffs, in providing Program Services and in advisory, investment, and brokering services to Plaintiffs;

270.    Defendants and each of them have breached their fiduciary duties to Plaintiffs.

271    As a direct and proximate result of the Defendants' failures to discharge their fiduciary duty to Plaintiffs, Plaintiffs have sustained damages in excess of $10,000,000, the exact amount to be proven at trial.

272.    Moreover, because the actions by Defendants were grossly negligent, reckless, willful, outrageous, wanton and/or malicious, Plaintiffs are entitled to an award of punitive damages in an amount to be determined at trial.

**FOURTH CAUSE OF ACTION**
**(BREACH OF FIDUCIARY DUTY)**

**SIDNEY BRESLER, INDIVIDUALLY**

**v.**

**DEFENDANTS WILMINGTON TRUST, AS TRUSTEE OF THE BRESLER TRUST**

273.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 272 above, as if fully set forth herein.

274.    As of the date of the ratification of the Bresler Trust 2004 Documentation, and the Appointment, Wilmington Trust, as Trustee of the Bresler Trust, assumed fiduciary duties to all beneficiaries of the Bresler Trust, including Sidney Bresler who has direct and derivative claims with respect thereto.

275.    Those fiduciary duties included duties of good faith, diligence, skill, loyalty, candor, disclosure, and avoidance of self-dealing

Case 8:05-cv-02957-PJM Document 168 Filed 12/03/10 Page 76 of 106

276.    The Wilmington Entities Defendant/Ianni/Wileczek Misconduct, the Additional Wilmington Trust Misconduct, and the Additional Wilmington Trust Misconduct constituted and constitute breaches of the fiduciary duty owed to Sidney Bresler by Wilmington Trust as Trustee of the Bresler Trust.

277.  The following acts and inactions, to the extent not already identified in the preceding paragraph, also constituted and constitute breach of the fiduciary duty owed by Wilmington Trust as Trustee of the Bresler Trust to Sidney Bresler

    a.      failing to represent the interests of Charles Bresler, and solely the interests of Charles Bresler, in providing advisory, investment, and brokering services;

    b.      failing to disclose all material terms, including need for collateral, costs, fees and insurance commissions in connection with the placement of the Bresler Trust Policy Arrangement;

    c.      representing the interests of Defendants rather than the best interests of the beneficiaries of the Bresler Trust;

    d.      participating in undisclosed self-dealing transactions;

    e.      failing to represent the interests of the beneficiaries of the Bresler Trust, and solely the interests of the beneficiaries of the Bresler Trust, in managing and administering the Bresler Trust;

    f.      failing to initiate legal proceedings asserting the claims set out in this Second Amended Complaint against each defendant

278.    Wilmington Trust breached its fiduciary duties to Sidney Bresler.

279.    As a direct and proximate result of Wilmington Trust's failures to discharge its fiduciary

duty as Trustee, Sidney Bresler has sustained damages in excess of $2,000,000, the exact amount

to be proven at trial.

280.    Moreover, because the actions by Wilmington Trust were grossly negligent, reckless,

willful, outrageous, wanton and/or malicious, Sidney Bresler is entitled to an award of punitive

damages in an amount to be determined at trial.

**FIFTH CAUSE OF ACTION**
**(BREACH OF CONTRACT)**

**PLAINTIFFS FLEUR S. BRESLER AND SIDNEY M. BRESLER AS THE**
**CO-PERSONAL REPRESENTATIVES OF THE ESTATE OF CHARLES S. BRESLER,**

**v.**

**DEFENDANTS WILMINGTON TRUST,**
**WILMINGTON BROKERAGE**

281.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through

280 above, as if fully set forth herein.

282.    Commencing in May 2003 through February 2004, the Wilmington Entities Defendants

engaged in contract negotiations, culminating in an agreement with Charles Bresler.

283.    The agreement provided that:  the Wilmington Entities Defendants would provide

Program Services, including specifically Wilmington Wealth Program Services to Charles

Bresler; the Wilmington Entities Defendants would take all steps necessary to implement the

Bresler Trust Policy Arrangement; the Wilmington Entities Defendants would loan to an ILIT

created by Charles Bresler for his beneficiaries, including Sidney Bresler, the funds necessary to

pay in full all premiums required to obtain and maintain in full force and effect the Bresler Trust

Policies; and Wilmington Trust would serve and fulfill all of its duties and obligations as trustee

Case 8:05-cv-02957-PJM   Document 163   Filed 12/03/10   Page 78 of 106

of the Bresler Trust, including but not limited to securing the funds for and paying the full premiums for the Bresler Trust Policies.

284.    Pursuant to the agreement, Charles Bresler agreed to form the ILIT, and to appoint Wilmington Trust as the Trustee of the Bresler Trust, and to make a transfer of the One-Time Collateral Transfer.

285.    The mutual promises constituted good and valuable consideration.

286.    The agreement was memorialized in whole or in part by various letters, emails, and documentation as described or referenced above.

287.    Charles Bresler performed in full pursuant to the agreement.

288.    The Wilmington Entities Defendants performed in part pursuant to the agreement.

289.    Despite notice and demand, the Wilmington Entities failed to perform pursuant to the agreement.  Specifically, commencing in March 2005 and continuously thereafter, the Wilmington Entities failed and refused to loan monies to enable the Bresler Trust to pay the full premiums for the Bresler Trust Policies, and Wilmington Trust as Trustee of the Bresler Trust failed and refused to pay the full premiums for the Bresler Trust Policies, and, the Wilmington Entities Defendants engaged in the Wilmington Entities Defendants Misconduct and the Additional Wilmington Entities Defendants Misconduct and the Additional Wilmington Trust Misconduct.

290. The Wilmington Entities Defendants' failure to perform their contractual obligations constitutes a breach of contract for which they are liable.

291    As a direct, foreseeable, consequential and proximate result of those breaches, the Estate has been damaged..

292.    As a direct, foreseeable, consequential  and proximate result of those breaches, Plaintiffs have sustained damages in excess of $10,000,000 in connection with the present Action, the exact amount to be proven at trial.

## SIXTH CAUSE OF ACTION
### (SPECIFIC PERFORMANCE)

### PLAINTIFFS FLEUR S. BRESLER AND SIDNEY M. BRESLER AS THE CO-PERSONAL REPRESENTATIVES OF THE ESTATE OF CHARLES S. BRESLER,

### v.

### DEFENDANTS WILMINGTON TRUST, WILMINGTON BROKERAGE

293.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 292 above, as if fully set forth herein.

294.    Charles Bresler performed in full under the terms of his agreement with the Wilmington Entities Defendants, and no conditions of any kind remain to be performed by him or by the Estate, by and through its co-personal representatives.

295.    The Wilmington Entities Defendants have failed and refused to perform pursuant to the agreement, in part by failing and refusing to make loans to enable the Bresler Trust to make loans sufficient to  pay full premiums on the Bresler Trust Policies, and by failing and refusing to pay the full premiums.

296.    In the event that money damages for those failures are inadequate, or incomplete, or not capable of calculation, the Estate, by and through its co-personal representatives, is entitled to an order, judgment and decree directing the Wilmington Entities Defendants to make loans sufficient to pay full premiums on the Bresler Trust Policies, and directing Wilmington as Trustee of the Bresler Trust to pay the full premiums in order to preserve the death benefits and the CSV.

78

## SEVENTH CAUSE OF ACTION
## (NEGLIGENT MISREPRESENTATION)

## PLAINTIFFS FLEUR S. BRESLER AND SIDNEY M. BRESLER AS THE
## CO-PERSONAL REPRESENTATIVES OF THE ESTATE OF CHARLES S. BRESLER,
## AND SIDNEY BRESLER, INDIVIDUALLY

### v.

## DEFENDANTS WILMINGTON TRUST,
## WILMINGTON BROKERAGE, HIGHLAND CAPITAL,
## EDMOND IANNI, RALPH WILECZEK,
## MATTHEW WASCHULL

297.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through

296 above, as if fully set forth herein.

298.    Defendants owed a duty of care and a duty to ensure that their representations to the

Plaintiffs relating to the Wilmington Wealth Program, the Bresler Trust Policy Arrangement and

the Bresler Trust Policies were complete and true.

299.    The Wilmington Defendants' duty of care results from their special and fiduciary

relationship with Charles Bresler.

300.    Wilmington Trust's duty of care also results from its status as Trustee of the Bresler

Trust.

301.    Highland Capital's duty of care results from its role as agent or subagent.

302.    The Wilmington Defendants knew, and should have known that the representations that

they made to Charles Bresler and Sidney Bresler would be relied upon by Charles Bresler and

Sidney Bresler.

303.    Highland Capital knew and should have known that the information that it provided to

the Wilmington Defendants would be transmitted to Charles Bresler and Sidney Bresler and that

Charles Bresler and Sidney Bresler would rely on that information.

79

304.   Material portions of those representations and information were false and were wrong and inaccurate and defendants knew or should have known that those representations and information were inaccurate and wrong (the "Misrepresentations.")

Defendants negligently made the Misrepresentations intending that plaintiffs would act on the Misrepresentations, and knowing that plaintiffs were likely to rely on the Misrepresentations which, if erroneous, would cause loss or injury.

305.   The content of the Misrepresentations includes the following:

    a.   misrepresenting and/or failing to disclose material information regarding the Bresler Trust Policy Arrangement, including the Bresler Trust Policies, as forth set above;

    b.   misrepresenting and/or failing to disclose the need for additional collateral, as forth set above;

    c.   misrepresenting and/or failing to disclose material terms, regarding tax and estate implications of the Bresler Trust Policy Arrangement, as forth set above;

    d.   misrepresenting and/or failing to disclose material terms, regarding Crummey Gifts, as forth set above;

    e.   misrepresenting and/or failing to disclose material information on the collateral account, as forth set above;

    f.   misrepresenting and/or failing to disclose material information on the actual tax status of the Bresler Trust Policy Arrangement, including the Bresler Trust Policies, as forth set above;

    g.   misrepresenting and/or failing to disclose material information on all fees regarding the Bresler Trust Policy Arrangement, including the Bresler Trust Policies, as forth set above;

h. misrepresenting and/or failing to disclose all fees and commissions paid to Defendants when asked about fees and setting forth fees, as forth set above;

i. misrepresenting that the Bresler Trust Policies were suitable for Plaintiffs, as forth set above;

j. misrepresenting the Bresler Trust Policy Arrangement as a suitable investment and estate   strategy to Plaintiffs, as forth set above;

k. Misrepresenting and/or failing to disclose material information regarding the purchase of a replacement policy and/or sale of one or more of the Bresler Trust Policies, as forth set above; and

l. Failing to identify and/or alert Plaintiffs to all material facts regarding the Bresler Trust Policy Arrangement, including the Bresler Trust Policies, as forth set above.

m. making the Policy Deficiency Misrepresentations;

n. failing to correct the Policy Deficiency Misrepresentations;

o. making the Collateral Misrepresentations;

p. failing to correct the Collateral Misrepresentations;

q. failing to disclose the Wilmington Ianni Fraud Admissions.

306. The Wilmington Defendants and Highland Capital made the Misrepresentations when they failed to disclose to plaintiffs:

a. The correct and complete spreadsheets and illustrations;

b. The Internal Collateral Component; and

c. The Wilmington Ianni Fraud Admissions.

307. The Wilmington Defendants and Highland Capital made the Misrepresentations to plaintiffs by:

    a.   continuously failing to correct the Policy Deficiency Misrepresentations; and

    b.   continuously failing to correct the Collateral Misrepresentations; and

    c.   continuously failing to correct the Misrepresentations.

308.     The Wilmington Entities Defendants, Ianni and Wileczek made the Misrepresentations to plaintiffs by:

    a.   making the Policy Deficiency Misrepresentations; and

    b.   making the Collateral Misrepresentations.

309.     The Misrepresentations, including the maker, the recipient, and the date and the place of the transmission of the Misrepresentations, are set out in the Second Amended Complaint at ¶¶ 20, 26, 27, 28, 29, 30, 31, 32, 33, 34, 35, 36, 38, 40, 41, 42, 43, 44, 45, 46, 47, 48, 49, 50, 51, 52, 54, 55, 56, 57, 58, 59, 60, 61, 62, 63, 74, 77, 88, 89, 90, 95, 96, 97, 102, 103, 104, 105, 106, 107, 108, 109, 110, 111, 130, 136, 137, 138, 139, 140, 141, 145, 150, 158, 159, 160, 161, 162, 163, 167, 175, 177, 178, 184, 185186, 187, 189, 190. 191, 192, 193, 194, 199, 200 and 201.

310.     Charles Bresler and Sidney Bresler were misled and deceived by the Misrepresentations and did in fact rely on those Misrepresentations.

311.     Their reliance on those Misrepresentations was reasonable and foreseeable.

312.     As a direct, proximate and foreseeable consequence of that reliance plaintiffs sustained loss, injury and damage.

313.     As a direct, foreseeable, and proximate result of the Misrepresentations, Plaintiffs have sustained damages in excess of $10,000,000, the exact amount to be proven at trial.

**EIGHTH CAUSE OF ACTION**
**(FRAUD, DECEIT AND MISREPRESENTATION)**

**PLAINTIFFS FLEUR S. BRESLER AND SIDNEY M. BRESLER AS THE**
**CO-PERSONAL REPRESENTATIVES OF THE ESTATE OF CHARLES S. BRESLER,**
**AND SIDNEY BRESLER, INDIVIDUALLY**

**v.**

**DEFENDANTS WILMINGTON TRUST,**
**WILMINGTON BROKERAGE, HIGHLAND CAPITAL,**
**EDMOND IANNI, RALPH WILECZEK, MATTHEW WASCHULL**

314.  Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through

313 above, as if fully set forth herein.

315.  Defendants owed a duty of care and a duty to ensure that their representations to the

Plaintiffs relating to the Wilmington Wealth Program, the Bresler Trust Policy Arrangement

and the Bresler Trust Policies were complete and true.

316.  The Wilmington Defendants' duty of care results from their special and fiduciary

relationship with Charles Bresler.

317.  Wilmington Trust's duty of care also results from its status as Trustee of the Bresler

Trust.

318.  Highland Capital's duty of care results from its role as agent or subagent.

319.  The Wilmington Defendants knew, and should have known that the representations that

they made to Charles Bresler and Sidney Bresler would be relied upon by Charles Bresler and

Sidney Bresler.

320.  Highland Capital knew and should have known that the information that it provided to

the Wilmington Defendants would be transmitted to Charles Bresler and Sidney Bresler and

that Charles Bresler and Sidney Bresler would rely on that information.

83

321.   Material portions of those representations and information were false and was wrong and inaccurate and defendants knew that those representations and information were inaccurate and wrong (the "Misrepresentations.")

Defendants fraudulently made the Misrepresentations intending that plaintiffs would act on the Misrepresentations, and knowing that plaintiffs were likely to rely on the Misrepresentations which, if erroneous, would cause loss or injury.

322.   The content of the Misrepresentations includes the following:

a.   misrepresenting and/or failing to disclose material information regarding the Bresler Trust Policy Arrangement, including the Bresler Trust Policies, as forth set above;

b.   misrepresenting and/or failing to disclose the need for additional collateral, as forth set above;

c.   misrepresenting and/or failing to disclose material terms, regarding tax and estate implications of the Bresler Trust Policy Arrangement, as forth set above;

d.   misrepresenting and/or failing to disclose material terms, regarding Crummey Gifts, as forth set above;

e.   misrepresenting and/or failing to disclose material information on the collateral account, as forth set above;

f.   misrepresenting and/or failing to disclose material information on the actual tax status of the Bresler Trust Policy Arrangement, including the Bresler Trust Policies, as forth set above;

g.   misrepresenting and/or failing to disclose material information on all fees regarding the Bresler Trust Policy Arrangement, including the Bresler Trust Policies, as forth set above;

h.  misrepresenting and/or failing to disclose all fees and commissions paid to Defendants when asked about fees and setting forth fees, as forth set above;

i.  misrepresenting that the Bresler Trust Policies were suitable for Plaintiffs, as forth set above;

j.  misrepresenting the Bresler Trust Policy Arrangement as a suitable investment and estate strategy to Plaintiffs, as forth set above;

k.  Misrepresenting and/or failing to disclose material information regarding the purchase of a replacement policy and/or sale of one or more of the Bresler Trust Policies, as forth set above; and

l.  Failing to identify and/or alert Plaintiffs to all material facts regarding the Bresler Trust Policy Arrangement, including the Bresler Trust Policies, as forth set above.

m.  making the Policy Deficiency Misrepresentations;

n.  failing to correct the Policy Deficiency Misrepresentations;

o.  making the Collateral Misrepresentations;

p.  failing to correct the Collateral Misrepresentations;

q.  failing to disclose the Wilmington Ianni Fraud Admissions.

323.  The Wilmington Defendants and Highland Capital made the Misrepresentations when they failed to disclose to plaintiffs:

a.  The correct and complete spreadsheets and illustrations;

b.  The Internal Collateral Component; and

c.  The Wilmington Ianni Fraud Admissions.

324.  The Wilmington Defendants and Highland Capital made the Misrepresentations to plaintiffs by:

    a.   continuously failing to correct the Policy Deficiency Misrepresentations; and

    b.   continuously failing to correct the Collateral Misrepresentations; and

    c.   continuously failing to correct the Misrepresentations.

325.    The Wilmington Entities Defendants, Ianni and Wileczek made the Misrepresentations to plaintiffs by:

    a.   making the Policy Deficiency Misrepresentations; and

    b.   making the Collateral Misrepresentations.

326.    The Misrepresentations, including the maker, the recipient, and the date and the place of the transmission of the Misrepresentations, are set out in the Second Amended Complaint at ¶¶ 20, 26, 27, 28, 29, 30, 31, 32, 33, 34, 35, 36, 38, 40, 41, 42, 43, 44, 45, 46, 47, 48, 49, 50, 51, 52, 54, 55, 56, 57, 58, 59, 60, 61, 62, 63, 74, 77, 88, 89, 90, 95, 96, 97, 102, 103, 104, 105, 106, 107, 108, 109, 110, 111, 130, 136, 137, 138, 139, 140, 141, 145, 150, 158, 159, 160, 161, 162, 163, 167, 175, 177, 178, 184, 185186, 187, 189, 190. 191, 192, 193, 194, 199, 200 and 201.

327.    Charles Bresler and Sidney Bresler did in fact rely on those Misrepresentations .

328.    Their reliance on those Misrepresentations was reasonable and foreseeable.

329.    Defendants made the Misrepresentations with the intent to defraud and deceive the Plaintiffs, and to induce Plaintiffs' reliance on the Misrepresentations to plaintiffs' injury, harm, loss and detriment, and plaintiffs were in fact misled and deceived by the Misrepresentations, and in fact reasonably relied on the Misrepresentations.

330.    The Misrepresentations were false and fraudulent, and were known by Defendants to be false and fraudulent when made, and thereafter, and were made with reckless indifference and disregard for the truth or falsity of the Misrepresentations.

331.    As a direct, proximate and foreseeable consequence of that reliance plaintiffs sustained

loss, injury and damage.

332.    As a direct, foreseeable, and proximate result of the Misrepresentations, Plaintiffs have

sustained damages in excess of $10,000,000, the exact amount to be proven at trial.

## NINTH CAUSE OF ACTION
### (VIOLATION OF THE DELAWARE CONSUMER FRAUD ACT "DCFA")


**PLAINTIFFS FLEUR S. BRESLER AND SIDNEY M. BRESLER AS THE
CO-PERSONAL REPRESENTATIVES OF THE ESTATE OF CHARLES S. BRESLER,
AND SIDNEY BRESLER, INDIVIDUALLY**

**v.**

**DEFENDANTS WILMINGTON TRUST,
WILMINGTON BROKERAGE, HIGHLAND CAPITAL,
EDMOND IANNI, RALPH WILECZEK,
MATTHEW WASCHULL**

333.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through

332 above, as if fully set forth herein.

334.    In 2003 and 2004, the Wilmington Defendants, Ianni, Wileczek, Highland Capital and

Biborosch participated in marketing the Bresler Trust Policy Arrangement to Charles Bresler.

335.    In 2006, the Wilmington Defendants, Wileczek, Waschull and Highland Capital

participated in marketing additional life insurance policies in connection with the Bresler Trust

Policy Arrangement to Charles Bresler and Sidney Bresler.

336.    Defendants used the Bresler Trust Policy Arrangement to facilitate the sale of life

insurance policies, a premium financing arrangement and investment accounts to Charles Bresler

and Sidney Bresler.

337.    In pertinent part, the DCFA provides:

> The act, use or employment by any person of any deception, fraud, false pretense,
> false promise, misrepresentation, or the concealment, suppression, or omission of

any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale, lease or advertisement of any merchandise, whether or not any person has in fact been misled, deceived or damaged thereby, is an unlawful practice.

6 Del. C. § 2513.

338.    DCFA, 6 Del. C. § 2511 states in paragraph 6 that " 'Merchandise' means any objects, wares, goods, commodities, intangibles, real estate, or services." In paragraph 8 it states that, " 'Sale' means any sale, offer for sale or attempt to sell any merchandise for any consideration."

339.    The Defendants participated in the sale of merchandise as defined in DCFA, 6 Del. C. § 2511(6) to Charles Bresler and Sidney Bresler.

340.    The Wilmington Entities Defendants, Highland Capital, Ianni and Wileczek made oral and written representations concerning this merchandise upon which it intended consumers, including Charles Bresler, to rely.

341.    While working for and/or on behalf of Wilmington Trust, Wilmington Brokerage and Highland Capital, Ianni and Wileczek created and provided numerous documents, including but not limited to the incomplete, inaccurate and misleading spreadsheets and illustrations as described more fully above, which were false and misleading with the intent that Charles Bresler and others would rely upon them in connection with the Wilmington Wealth Program and Bresler Trust Policy Arrangement.

342.    The Wilmington Entities Defendants, Ianni and Wileczek made misleading statements to Charles Bresler about various material terms regarding the Bresler Trust Policy Arrangement, including the Policy Deficiency Misrepresentations, the Collateral Misrepresentations, the suitability of the Bresler Trust Policies, premium financing, aspects of the Bresler Trust Policies, the amount of the associated death benefits with the Bresler Trust Policies, the collateral account, the need for further collateral, Crummey Gifts, estate and tax issues, fees, and commissions.

343.    The Wilmington Defendants and Highland Capital omitted or concealed evidence about

the misconduct of Ianni and Wileczek, and concealed the Wilmington Ianni Fraud Admissions

344.    In 2003 and in to 2004, the Wilmington Entities Defendants, Ianni and Wileczek, with

the assistance of Highland Capital, engaged in unfair business practices and/or unfair, deceptive,

untrue or misleading advertising or statements, by providing misleading and incomplete

information as to material terms, and by not fully disclosing material aspects of the Bresler Trust

Policy Arrangement and the Bresler Trust Policies, and by making the Policy Deficiency

Misrepresentations, and the Collateral Misrepresentations.

345.    In 2006, the Wilmington Defendants, Wileczek, and Waschull, with the assistance of

Highland Capital, engaged in unfair business practices and/or unfair, deceptive, untrue or

misleading advertising or statements, by providing misleading and incomplete information as to

material terms, fees, charges and commissions and surrender charges in connection with the sale

of one or more of the Bresler Trust Policies and the purchase of another insurance policy for the

Bresler Trust Policy Arrangement.

346.    Defendants' acts were misleading in a material way as set forth above.

347.    Defendants' deceptive acts and practices occurred in part in the State of Delaware.

348.    Certain of the misleading letters and marketing materials were generated in and mailed

from Delaware.

349.    The Wilmington Entities Defendants, Ianni, Wileczek and Highland Capital  made

representations concerning merchandise sold  to Charles Bresler which were false, misleading, or

omitted material facts with the intent that others would rely upon those representations.

350.    Defendants used deception, fraud, false pretense, false promise, misrepresentation, and

the concealment, suppression, and omission of material facts with intent that others rely upon

such concealment, suppression or omission in connection with the sale and advertisement of merchandise in violation of DCFA, 6 Del. C. § 2513(a).

351.    The Defendants' misrepresentations constitute a violation of the DCFA.

352.    As a direct and proximate result of the Defendants' wrongful conduct to Plaintiffs, Plaintiffs have sustained damages in excess of $10,000,000, the exact amount to be proven at trial.

353.    As a result of the Defendants' wrongful conduct, the Estate of Charles Bresler, who was over 65 years of age in 2003, by and through its co-personal representatives, and Sidney Bresler, individually, are entitled to costs of suit and reasonable attorney fees pursuant to the DCFA.

354.    As a result of the Defendants' wrongful conduct, the Estate, by and through its co-personal representatives, is entitled to treble damages because, If a private cause of action is brought by the victim of a violation of the DCFA, and said victim was 65 years of age or older or a disabled person when the violation occurred, the victim shall be entitled to recover 3 times the amount of the victim's compensatory damages if a violation of the DCFA is established.  Such treble damages shall be in addition to any other damages to which the victim is entitled pursuant to common law or other provisions of the Delaware Code.

**TENTH CAUSE OF ACTION**
**(FRAUDULENT CONCEALMENT)**
**PLAINTIFFS FLEUR S. BRESLER AND SIDNEY M. BRESLER AS THE**
**CO-PERSONAL REPRESENTATIVES OF THE ESTATE OF CHARLES S. BRESLER,**
**AND SIDNEY BRESLER, INDIVIDUALLY**

**v.**

**DEFENDANTS WILMINGTON TRUST,**
**WILMINGTON BROKERAGE, HIGHLAND CAPITAL,**
**EDMOND IANNI, RALPH WILECZEK,**
**MATTHEW WASCHULL**

355.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 354 above, as if fully set forth herein.

356.    The Wilmington Defendants had a duty as a result of their special and fiduciary relationship with Charles Bresler to disclose to plaintiffs all material facts related to the Wilmington Wealth Program, the Bresler Trust Policies and the Bresler Trust Policy Arrangement.

357.    Wilmington Trust had and has a duty as a result of its status as Trustee of the Bresler Trust to disclose to Sidney Bresler all material facts related to the Wilmington Wealth Program, the Bresler Trust Policies and the Bresler Trust Policy Arrangement.

358.    Highland Capital had a duty as a result of its role as agent or subagent to disclose to plaintiffs all material facts related to the Wilmington Wealth  Program, the Bresler Trust Policies and the Bresler Trust Policy Arrangement.

359.    The Wilmington Defendants and Highland Capital failed to disclose the following material facts to plaintiffs:

      a.    The correct and complete spreadsheets and illustrations;

      b.    The Internal Collateral Component; and

      c.    The Wilmington Ianni Fraud Admissions.

91

360.    The Wilmington Defendants and Highland Capital failed to disclose material facts to plaintiffs by:

    a.  continuously failing to correct the Policy Deficiency Misrepresentations; and

    b.  continuously failing to correct the Collateral Misrepresentations; and

    c.  continuously failing to correct the Misrepresentations.

361.    The Wilmington Entities Defendants, by and through Digregorio and others, concealed material facts from plaintiffs by interfering with the efforts of plaintiffs to secure information related to the Ianni litigation, and by entering into and enforcing a confidentiality agreement designed to prevent plaintiffs and others from discovering that Ianni had defrauded them.

362.    The Wilmington Entities Defendants, Ianni and Wileczek failed to disclose material facts to plaintiffs by:

    a.  making the Policy Deficiency Misrepresentations; and

    b.  making the Collateral Misrepresentations.

363.    Each such failure to disclose was the result of the defendants' intent to defraud or deceive plaintiffs.

364.    Plaintiffs took action in justifiable reliance on the concealment, including delaying efforts to seek alternatives to the Bresler Trust Policies, and delaying the initiation of litigation, and suffered damages as a result of the concealment.

365.    As a direct and proximate result of the concealments, and plaintiffs' justifiable reliance thereon, plaintiffs have sustained damages in excess of $10,000,000, the exact amount to be proven at trial.

366.    Moreover, because the actions by Defendants were reckless, willful, outrageous, wanton and/or malicious, plaintiffs are entitled to an award of punitive damages in an amount to be determined at trial.

### ELEVENTH CAUSE OF ACTION
### (CIVIL CONSPIRACY)
### PLAINTIFFS FLEUR S. BRESLER AND SIDNEY M. BRESLER AS THE CO-PERSONAL REPRESENTATIVES OF THE ESTATE OF CHARLES S. BRESLER, AND SIDNEY BRESLER, INDIVIDUALLY

### v.

### DEFENDANTS WILMINGTON TRUST, WILMINGTON BROKERAGE, HIGHLAND CAPITAL, EDMOND IANNI, RALPH WILECZEK, MATTHEW WASCHULL

367.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 366 above, as if fully set forth herein.

368.    Defendants and each of them combined  by agreement and understanding to accomplish an unlawful act and to use unlawful means to accomplish an act not itself illegal in furtherance of Defendants' conspiratorial agreement.

369.    Commencing in 2003, the Wilmington Entities Defendants, Ianni, Wileczek, and Highland Capital entered into an unlawful conspiracy to fraudulently induce Charles Bresler into becoming a Program Client, and into participating in the Wilmington Wealth Program, and into agreeing to the Bresler Trust Policy Arrangement. Waschull joined the conspiracy as of the Waschull Involvement Date.

370.  The co-conspirators participated in the conspiracy in order to obtain fees and commissions, and in order to enable the Wilmington Defendants to pursue and obtain the Wilmington Wealth Program Self-Interest.

371.     Pursuant to and in furtherance of the conspiracy, the co-conspirators made misrepresentations, including the Policy Deficiency Misrepresentations and the Collateral Misrepresentations and failed to correct or cure those Misrepresentations, all as set forth above.

372.     This conspiracy continued into 2005 through the acts of the Wilmington Entities Defendants, Ianni and Wileczek to misrepresent, omit and conceal material information regarding the Bresler Trust Policies and the Bresler Trust Policy Arrangement, including but not limited to information regarding the collateral requirements, fees, tax status, gift tax implication and other estate issues associated with the Bresler Trust Policy Arrangement.

373.     This conspiracy continued into 2006 through the acts of the Wilmington Entities Defendants, Wileczek, Waschull and Highland Capital to misrepresent, omit and conceal material information regarding misconduct by the Wilmington Defendants and Highland Capital in connection with the creation of the Bresler Trust Policy Arrangement and the attempted churning of one of the Bresler Trust Policies.

374.     As a consequence of participation in this conspiracy, defendants and each of them are liable for the misconduct of the other members of the conspiracy.

## TWELFTH CAUSE OF ACTION
### (AIDING AND ABETTING TORTIOUS CONDUCT)
### PLAINTIFFS FLEUR S. BRESLER AND SIDNEY M. BRESLER AS THE
### CO-PERSONAL REPRESENTATIVES OF THE ESTATE OF CHARLES S. BRESLER,
### AND SIDNEY BRESLER, INDIVIDUALLY

### v.

### DEFENDANTS WILMINGTON TRUST,
### WILMINGTON BROKERAGE, HIGHLAND CAPITAL,
### EDMOND IANNI, RALPH WILECZEK,
### MATTHEW WASCHULL

375.     Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 374 above, as if fully set forth herein.

376.    Each defendant knowingly aided and abetted every other defendant by engaging in acts of encouragement and assistance with the actual knowledge that the encouragement and the assistive conduct would contribute to the fraud, deceit and misrepresentation, and the breaches of fiduciary duty, and the violations of statutes as is set forth above, and that the fraud, deceit and misrepresentation, and the breaches of fiduciary duty, and the violations of statutes would be the natural consequences of the encouragement and the assistive conduct.

377.    Each defendant knowingly aided and abetted tortuous breaches of fiduciary duty, and tortuous fraud, deceit and misrepresentation, and tortuous violation of statutes, as set forth above.

378.    As a consequence of aiding and abetting, defendants and each of them are liable for the fraud, deceit and misrepresentation, and the breaches of fiduciary duty, and the violations of statutes misconduct of the other defendants.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, respectfully request judgment against the above named Defendants as follows:

I.    With Respect to the First Cause of Action:

(i)    Judgment in favor of Plaintiffs and against Defendants, jointly and severally;

(ii)    Damages in an amount no less than $10,000,000, the exact amount of which to be determined at trial;

(iii)    Pre-judgment and post-judgment interest at the maximum rate allowed by law;

(iv)    Such other, further and different relief as this Court deems just and proper.

II.    With Respect to the Second Cause of Action:

(i)    Judgment in favor of Plaintiffs and against Defendants, jointly and severally;

Case 8:05-cv-01557-PJM   Document 168   Filed 12/03/10   Page 97 of 106

       (ii)     Damages in an amount no less than $10,000,000, the exact amount to be determined at trial;

       (iii)    Pre-judgment and post-judgment interest at the maximum rate allowed by law;

       (iv)    Such other, further and different relief as this Court deems just and proper.

III.    With Respect to the Third Cause of Action:

       (i)      Judgment in favor of Plaintiffs and against Defendants, jointly and severally;

       (ii)     Damages in an amount no less than $10,000,000, the exact amount to be determined at trial;

       (iii)    Pre-judgment and post-judgment interest at the maximum rate allowed by law;

       (iv)    Punitive damages in an amount to be determined at trial; and

       (v)     Such other, further and different relief as this Court deems just and proper.

IV.    With Respect to the Fourth Cause of Action:

       (i)      Judgment in favor of Plaintiffs and against Defendants;

       (ii)     Damages in an amount no less than $10,000,000, the exact amount to be determined at trial;

       (iii)    Punitive damages in an amount to be determined at trial; and

       (iv)    Such other, further and different relief as this Court deems just and proper.

V.    With Respect to the Fifth Cause of Action:

       (i)      Judgment in favor of Plaintiffs and against the Wilmington Entities Defendants;

       (ii)     Damages in an amount no less than $10,000,000, the exact amount to be determined at trial;

       (iii)    Pre-judgment and post-judgment interest at the maximum rate allowed by law;

    (iv)     Such other, further and different relief as this Court deems just and proper.

VI.    With Respect to the Sixth Cause of Action.

    (i)     An order, judgment and decree in favor of Plaintiffs and against the Wilmington Entities Defendants directing those defendants to perform pursuant to their agreement;

    (ii)     Damages in an amount no less than $10,000,000, the exact amount to be determined at trial;

    (iii)     Pursuant to the DCFA, reasonable attorneys' fees, the costs of suit and all expense and disbursements incurred in this action;

    (iv)     Pre-judgment and post-judgment interest at the maximum rate allowed by law;

    (v)     Pursuant to the DCFA, treble damages in addition to any other damages to which the victim is entitled pursuant to common law or other provisions of the statutory code; and

    (vi)     Such other, further and different relief as this Court deems just and proper.

VII.    With Respect to the Seventh Cause of Action:

    (i)     Judgment in favor of Plaintiffs and against Defendants;

    (ii)     Damages in an amount no less than $10,000,000, the exact amount to be determined at trial;

    (iii)     Pre-judgment and post-judgment interest at the maximum rate allowed by law;

    (iv)     Such other, further and different relief as this Court deems just and proper.

VIII.    With Respect to the Eighth Cause of Action:

    (i)     Judgment in favor of Plaintiffs and against Defendants;

    (ii)     Damages in an amount no less than $10,000,000, the exact amount to be determined at trial;

    (iii)     Pre-judgment and post-judgment interest at the maximum rate allowed by law;

(iv)     Punitive damages in an amount to be determined at trial; and

(v)      Such other, further and different relief as this Court deems just and proper.

IX.   With Respect to the Ninth Cause of Action:

(i)      Judgment in favor of plaintiffs and against defendants, jointly and severally;

(ii)     Damages in an amount no less than $10,000,000, the exact amount to be determined at trial;

(iii)    Pursuant to the DCFA, reasonable attorneys' fees, the costs of suit and all expense and disbursements incurred in this action;

(iv)     Pre-judgment and post-judgment interest at the maximum rate allowed by law;

(v)      Pursuant to the DCFA, treble damages in addition to any other damages to which the victim is entitled pursuant to common law or other provisions of the statutory code; and

(vi)     Such other, further and different relief as this Court deems just and proper.

X.    With Respect to the Tenth Cause of Action:

(i)      Judgment in favor of Plaintiffs and against Defendants, jointly and severally;

(ii)     Damages in an amount no less than $10,000,000, the exact amount to be determined at trial;

(iii)    Pre-judgment and post-judgment interest at the maximum rate allowed by law;

(iv)     Punitive damages in an amount to be determined at trial; and

(v)      Such other, further and different relief as this Court deems just and proper.

XI.   With Respect to the Eleventh Cause of Action, such relief as this Court deems just and proper.

XII.  With Respect to the Twelfth Cause of Action, such relief as this Court deems just and proper.

## ACCRUAL, DISCOVERY AND TOLLING

With Respect to the First Cause of Action:

With respect to the Wilmington Entities Defendants, this cause of action accrued no later than May 2003 and is continuing to accrue through this date.  Discovery of the cause of action took place no earlier than December 2006.

With respect to the Highland Capital, this cause of action accrued no later than May 2003 and is continuing to accrue through this date.  Discovery of the cause of action took place no earlier than December 2006.

With respect to Ianni, this cause of action accrued no later than May 2003 and continued to accrue through his departure from the Wilmington Entities Defendants in 2006.  Discovery of the cause of action took place no earlier than December 2006.

With respect to Wileczek, this cause of action accrued no later than May 2003 and continued to accrue through his departure from the Wilmington Entities Defendants in 2007.  Discovery of the cause of action took place no earlier than December 2006.

With respect to Waschull, this cause of action accrued no later than the Waschull Involvement Date and continued to accrue through his departure from the Wilmington Entities Defendants in 2007.  Discovery of the cause of action took place no earlier than December 2006.

With Respect to the Second Cause of Action:

With respect to the Wilmington Entities Defendants, this cause of action accrued no later than May 2003 and is continuing to accrue through this date.  Discovery of the cause of action took place no earlier than December 2006.

With respect to the Highland Capital, this cause of action accrued no later than May 2003 and is continuing to accrue through this date.  Discovery of the cause of action took place no earlier than December 2006.

With respect to Ianni, this cause of action accrued no later than May 2003 and continued to accrue through his departure from the Wilmington Entities Defendants in 2006. Discovery of the cause of action took place no earlier than December 2006.

With respect to Wileczek, this cause of action accrued no later than May 2003 and continued to accrue through his departure from the Wilmington Entities Defendants in 2007. Discovery of the cause of action took place no earlier than December 2006.

With respect to Waschull, this cause of action accrued no later than the Waschull Involvement Date and continued to accrue through his departure from the Wilmington Entities Defendants in 2007. Discovery of the cause of action took place no earlier than December 2006.

<u>With Respect to the Third Cause of Action</u>:

With respect to the Wilmington Entities Defendants, this cause of action accrued no later than May 2003 and is continuing to accrue through this date. Discovery of the cause of action took place no earlier than December 2006.

With respect to the Highland Capital, this cause of action accrued no later than May 2003 and is continuing to accrue through this date. Discovery of the cause of action took place no earlier than December 2006.

With respect to Ianni, this cause of action accrued no later than May 2003 and continued to accrue through his departure from the Wilmington Entities Defendants in 2006. Discovery of the cause of action took place no earlier than December 2006.

With respect to Wileczek, this cause of action accrued no later than May 2003 and continued to accrue through his departure from the Wilmington Entities Defendants in 2007. Discovery of the cause of action took place no earlier than December 2006.

With respect to Waschull, this cause of action accrued no later than the Waschull Involvement Date and continued to accrue through his departure from the Wilmington Entities Defendants in 2007. Discovery of the cause of action took place no earlier than December 2006.

With Respect to the Fourth Cause of Action:

With respect to Wilmington Trust, this cause of action accrued no later than the date of the Bresler Trust 2004 documentation, and the Appointment and is continuing to accrue through this date. Discovery of the cause of action took place no earlier than December 2006.

With Respect to the Fifth Cause of Action:

With respect to the Wilmington Entities Defendants, this cause of action accrued no later than Fall 2003 and continues to accrue through this date. Discovery of the cause of action took place no earlier than December 2006.

With Respect to the Sixth Cause of Action:

With respect to the Wilmington Entities Defendants, this cause of action accrued no later than Fall 2003 and continues to accrue through this date. Discovery of the cause of action took place no earlier than December 2006.

With Respect to the Seventh Cause of Action:

With respect to the Wilmington Entities Defendants, this cause of action accrued no later than May 2003 and is continuing to accrue through this date. Discovery of the cause of action took place no earlier than December 2006.

With respect to the Highland Capital, this cause of action accrued no later than May 2003 and is continuing to accrue through this date. Discovery of the cause of action took place no earlier than December 2006.

With respect to Ianni, this cause of action accrued no later than May 2003 and continued to accrue through his departure from the Wilmington Entities Defendants in 2006.  Discovery of the cause of action took place no earlier than December 2006.

With respect to Wileczek, this cause of action accrued no later than May 2003 and continued to accrue through his departure from the Wilmington Entities Defendants in 2007. Discovery of the cause of action took place no earlier than December 2006.

With respect to Waschull, this cause of action accrued no later than the Waschull Involvement Date and continued to accrue through his departure from the Wilmington Entities Defendants in 2007.  Discovery of the cause of action took place no earlier than December 2006.

<u>With Respect to the Eighth Cause of Action</u>:

With respect to the Wilmington Entities Defendants, this cause of action accrued no later than May 2003 and is continuing to accrue through this date.  Discovery of the cause of action took place no earlier than December 2006.

With respect to the Highland Capital, this cause of action accrued no later than May 2003 and is continuing to accrue through this date.  Discovery of the cause of action took place no earlier than December 2006.

With respect to Ianni, this cause of action accrued no later than May 2003 and continued to accrue through his departure from the Wilmington Entities Defendants in 2006.  Discovery of the cause of action took place no earlier than December 2006.

With respect to Wileczek, this cause of action accrued no later than May 2003 and continued to accrue through his departure from the Wilmington Entities Defendants in 2007. Discovery of the cause of action took place no earlier than December 2006.

With respect to Waschull, this cause of action accrued no later than the Waschull Involvement Date and continued to accrue through his departure from the Wilmington Entities Defendants in 2007.  Discovery of the cause of action took place no earlier than December 2006.

<u>With Respect to the Ninth Cause of Action</u>:

With respect to the Wilmington Entities Defendants, this cause of action accrued no later than May 2003 and is continuing to accrue through this date.  Discovery of the cause of action took place no earlier than December 2006.

With respect to the Highland Capital, this cause of action accrued no later than May 2003 and is continuing to accrue through this date.  Discovery of the cause of action took place no earlier than December 2006.

With respect to Ianni, this cause of action accrued no later than May 2003 and continued to accrue through his departure from the Wilmington Entities Defendants in 2006.  Discovery of the cause of action took place no earlier than December 2006.

With respect to Wileczek, this cause of action accrued no later than May 2003 and continued to accrue through his departure from the Wilmington Entities Defendants in 2007.  Discovery of the cause of action took place no earlier than December 2006.

With respect to Waschull, this cause of action accrued no later than the Waschull Involvement Date and continued to accrue through his departure from the Wilmington Entities Defendants in 2007.  Discovery of the cause of action took place no earlier than December 2006.

<u>With Respect to the Tenth Cause of Action</u>:

With respect to the Wilmington Entities Defendants, this cause of action accrued no later than May 2003 and is continuing to accrue through this date. Discovery of the cause of action took place no earlier than December 2006.

With respect to the Highland Capital, this cause of action accrued no later than May 2003 and is continuing to accrue through this date. Discovery of the cause of action took place no earlier than December 2006.

With respect to Ianni, this cause of action accrued no later than May 2003 and continued to accrue through his departure from the Wilmington Entities Defendants in 2006. Discovery of the cause of action took place no earlier than December 2006.

With respect to Wileczek, this cause of action accrued no later than May 2003 and continued to accrue through his departure from the Wilmington Entities Defendants in 2007. Discovery of the cause of action took place no earlier than December 2006.

With respect to Waschull, this cause of action accrued no later than the Waschull Involvement Date and continued to accrue through his departure from the Wilmington Entities Defendants in 2007. Discovery of the cause of action took place no earlier than December 2006.

**JURY DEMAND**

Plaintiffs demand trial by jury on all issues so triable.

Dated:  December 3, 2010                 By:  _____/s/_____

                                         Philip Musolino (pro hac vice)
                                         Rena Schild #04515
                                         MUSOLINO & DESSEL, PLLC
                                         1615 L Street, N.W., Suite 440
                                         Washington, D.C.  20036
                                         Telephone:  (202) 466-3883
                                         Fax:  (202) 775-7477
                                         pmusolino@musolinoanddessel.com

                                         ATTORNEYS FOR PLAINTIFFS

## CERTIFICATE OF SERVICE

I hereby certify that, on December 3, 2010, I served a true and accurate copy of the foregoing Second Amended Complaint by electronic service through the Court's electronic filing system on all parties of record.

                                         _____/s/_____
                                         Philip Musolino