# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

**FLEUR S. BRESLER, ET AL.,**     *

                 *

         Plaintiffs,     *

                 *

v.                       *        Civil No. **PJM 15-1557**

                 *

**WILMINGTON TRUST**     *

**COMPANY, ET AL.,**       *

                 *

         Defendants.     *

## <u>MEMORANDUM ORDER</u>

In Civil No. PJM 09-2957, Fleur Bresler and Sidney Bresler, as Co-Personal Representatives of the Estate of Charles ("Charlie") Bresler, sued Wilmington Trust Company and its subsidiary Wilmington Brokerage Services Company (collectively, "WTC") for alleged breaches by WTC of certain agreements designed to provide life insurance for Charlie and his wife Fleur.[1] [2] Sidney Bresler, the son of Charlie and Fleur, also sued WTC in his individual capacity. In addition to WTC, the Breslers sued Matthew Waschull and Ralph Wileczek, WTC employees, in several tort/fraud counts related to the transaction with WTC.[3]

In Civil No. PJM 12-3295, Fleur and Sidney, as Co-Personal Representatives of Charlie's Estate, brought a second suit against WTC, claiming that it breached a related agreement—specifically, an Investment Management Agreement—by refusing to return certain collateral to Charlie's estate that it allegedly promised to return upon his death. Because of the overlap of certain counts in PJM 09-2957 and PJM 12-3295, the Court consolidated the cases. ECF No. 481

---

[1] The policies were on the joint lives of the Breslers, payable upon the death of the survivor of the two.

[2] For the sake of simplicity and clarity, and without intending any disrespect, the Breslers will be referred to in this Opinion as either "the Breslers," "the Estate," or, where appropriate, by the first names of Plaintiffs.

[3] The Breslers also sued Highland Capital Brokerage, Inc., Edmond Ianni, and Richard Biborosch, all of whom were eventually dismissed as Defendants. ECF Nos. 226 & 412 in PJM 09-2957.

in the PJM 09-2957 docket.[4] At the same time, claims within the two consolidated cases were bifurcated to address the breach of contract claims against Defendants prior to addressing the non-contract claims against them. *Id.* The contract claims went forward in PJM 09-2957. The non-contract claims were assigned to a new docket, PJM 15-1557. These non-contract claims are the subject of the present Opinion.

First, however, some background on the contract claims:

Following a four-week trial on the contract claims in January, 2014, a jury concluded that WTC had breached its agreements with Charlie and awarded the Bresler Estate total damages in excess of $23 million. The Court also granted the Estate related equitable relief. On appeal, the Fourth Circuit affirmed. WTC's petition for certiorari to the United States Supreme Court was denied.

The parties now turn their attention to the Breslers' several non-contract claims against WTC, Waschull and Wileczek. On July 17, 2017, Sidney as an individual and Fleur and Sidney as Co-Personal Representatives of the Estate of Charlie, here filed a Motion for Partial Summary Judgment. ECF No. 26. WTC, Waschull, and Wileczek here filed their own Motions for Summary Judgment, ECF Nos. 27, 28, 32.

For the following reasons, the Breslers' Motion for Partial Summary Judgment (ECF No. 26) is **DENIED**, and WTC's Motion for Summary Judgment (ECF No. 27), Waschull's Motion for Summary Judgment (ECF No. 28), and Wileczek's Motion for Summary Judgment (ECF No. 32) are all **GRANTED**.

## I. FACTUAL AND PROCEDURAL HISTORY

### A. The Dispute

---

[4] Citations to docket entries in the parallel cases, PJM 09-2957 and PJM 12-3295, will note in which case the entry is located, but citations to docket entries in the present case, PJM 15-1557, need not reference the case number.

The facts of the case are as set forth in the two Opinions authored by this Court (ECF No. 658 & 660 in PJM 09-2957) and the Opinion of the Fourth Circuit Court of Appeals (*Bresler v. Wilmington Trust Company*, 855 F.3d 178 (4th Cir. 2017); *see also* ECF No. 708-1 in PJM 09-2957). For purposes of the pending Motions, the relevant facts are as follows.

In the Spring of 2003, WTC corporate vice presidents Edmond Ianni and Ralph Wileczek introduced Charlie to a life insurance plan known as "premium financing," whereby WTC would lend money to a trust owning life insurance policies on the joint lives of Charlie and Fleur, of which Sidney would be beneficiary; where the life insurance trust would pay annual premiums on the policies; WTC would be trustee; and, pursuant to a separate Investment Management Agreement, whereby WTC would manage any assets that Charlie might place with it, including any assets that might be placed as collateral for the loans WTC would make to the trust.

Negotiations regarding the premium financing plan, primarily involving Ianni and the Breslers' attorney Larry Shaiman, continued throughout 2003. Eventually, at the beginning of 2004, Charlie entered into three written agreements with WTC: (1) the Charles S. Bresler Irrevocable Life Insurance Trust Agreement (the "Trust Agreement" or ILIT); (2) the Investment Management Account (the "IMA"); and (3) the Collateral Pledge Agreement (the "Pledge Agreement," the three of which are collectively referred to as the "Agreements").

In 2004, the first year of the plan, things went forward without a hitch. WTC loaned funds to the Trust in the amount of $6 million, $5.5 million of which was used to purchase and overfund $50 million in increasing death benefits under three joint survivorship universal life policies on the lives of Charlie and Fleur. Charlie, for his part, posted $3.7 million worth of bonds with WTC as collateral for the first-year loan.

In 2005, the second year of the plan, a dispute arose over whether Charlie had assumed a continuing obligation to post collateral for the loans and whether WTC was obligated to lend a specific amount to the ILIT each year. In August of 2005, Matthew Waschull, who was a team

3

manager in WTC's wealth advisory services department, notified Charlie that he would be taking over the Bresler account, since Ianni was no longer employed by WTC.[5] ECF No. 27-5 at 126 (Aug. 15, 2005 Letter from M. Waschull to C. Bresler). Wileczek, a member of Waschull's team, continued to be involved in overseeing the Breslers' financing plan and attempting to resolve the dispute regarding collateral.

For four years, the parties tried to resolve their dispute over collateral, during which time Charlie and WTC signed an agreement to toll the statute of limitations. ECF No. 27-5 at 132. The tolling agreement, initially intended to last some 5 months, was extended several times. *Id.* at 134-147. Notably, however, neither Sidney nor Waschull nor Wileczek were signatories to the tolling agreement or to any of the extensions. *Id.* at 132-127.

In 2009, fearing that the life insurance policies might lapse if WTC refused to lend sufficient funds to the ILIT, Fleur went into the market and obtained "replacement" term insurance on her own life, which required annual payments between $1.4 and $1.5 million. And in 2009, Charlie brought this suit against WTC. After his death, Fleur and Sidney continued its prosecution and subsequently filed a separate suit against WTC (PJM 12-3295), claiming that WTC had breached the Investment Management Agreement by refusing to return certain collateral to Charlie's estate that it allegedly promised to return upon his death. As indicated, because of the overlap of certain counts in PJM 09-2957 and PJM 12-3295, the Court consolidated the cases and bifurcated the breach of contract claims in both cases from the non-contract claims. ECF No. 481 in PJM 09-2957. The breach of contract claims remained in PJM 09-2957, while the non-contract claims went forward in PJM 15-1557.

### B.  The Contract Action

---

[5] In point of fact, Ianni had been fired by WTC. Ianni later filed suit against WTC in Delaware, seeking commissions he claimed were owed to him. WTC counterclaimed, alleging that Ianni had in fact been improperly misrepresenting the terms of premium financing policies to customers—including Charlie by name—telling them that they would not need to post additional collateral. That case resulted in a confidential settlement, but WTC's counterclaim was cited against it in the contract case, PJM 09-2957.

After more than four years in litigation, a jury trial lasting most of January, 2014, was held on the contract claims. The Breslers argued to the jury that the premium financing plan only obligated Charlie to post $3.7 million in bonds as collateral in the first year of the arrangement, in exchange for which WTC would lend $5.5 million annually to the ILIT, both to pay the premiums on the insurance policies and to "overfund" them. Unlike typical life insurance policies, which only provide fixed death benefits, the ILIT policies consisted of two components: (1) a death benefit, and (2) an investment account which would increase in value each year according to an interest rate known as the "crediting rate," which in turn would increase the amount of the benefit payable on death. Since the crediting rate that the insurance companies would be paying on the policies was projected to be higher than the borrowing rate WTC proposed to charge for the loans it would make, the ILIT could profit simply by borrowing money from WTC at the lower interest rate while earning higher interest at the crediting rate. All of the "overfunding" would go into the interest-bearing component.[6]

According to the Breslers, instead of having its loans secured by the annual posting of collateral, WTC's "security" was the very insurance policies carried by the ILIT, the proceeds of which would pay all the accumulated principle and interest of the loans following Charlie's and Fleur's deaths. The beneficiary under the trust would take home the balance that had accrued in the tax-sheltered ILIT (the "Net-in-Trust"). Charlie refused WTC's demands that he post substantial collateral each year. In consequence, WTC limited the amount of its loans. Specifically, after 2004, it loaned only enough to make the minimum premium payments on the policies and provided no overfunding, depriving the Breslers of what they believed they were owed under the plan—namely, the money accrued in the interest-bearing portion of the insurance policies.

---

[6] In the Breslers' case, the ILIT purchased three policies with a combined death benefit of $50 million, with the potential to earn far more by "overfunding" the investment account components of each of the policies.

At trial, the Breslers called as their expert accountant Robert E. Pugh, who calculated what the Net-in-Trust would have been had WTC performed as they believed it should have. Pugh offered two sets of numbers. The first calculated what the Net-in-Trust should have been through the date of trial: $10,668,667 (the "Present Shortfall"); the second calculated what the Net-in-Trust would be through the end of Fleur's life which, based on mortality tables, was projected through 2019: $8,793,005 (the "Future Shortfall"). The Breslers also sought damages to compensate for the approximately $7.75 million Fleur would have spent through the end of 2014 to obtain and maintain her replacement term insurance policies.

The jury found in favor of the Breslers as to all these components, albeit awarding somewhat less than what Fleur sought for the cost of her term replacement policies, a total of $23,361,692 in damages. That amount was composed of three parts: (1) $10,668,687 in Present Shortfall damages; (2) $8,793,005 in Future Shortfall damages; and (3) $3.9 million for Fleur's replacement insurance policies.

The jury verdict, however, did not resolve all the issues related to the contract claims. Plaintiffs had also sought various forms of equitable relief to be decided by the Court—including specific performance and the possibility of a "tax gross-up" of the damages.[7] Accordingly, the Court deferred entering Judgment and instead, with the consent of the parties, afforded them an extensive briefing schedule, which was followed by an all-day motions hearing on August 8, 2014. *See* ECF No. 605 in PJM 09-2957 (Order setting briefing schedule). On March 24 and 25, 2015, the Court issued two separate Opinions and Orders addressing the parties' various post-trial motions, which denied WTC's Motion for Judgment as a Matter of Law, and ordered WTC to return the collateral held to the Breslers pursuant to the Investment Management Agreement. ECF Nos. 658 & 660 in PJM 09-2957.

---

[7] Plaintiffs advised the Court that they were not going forward with the "gross-up" claim, which in essence was a request that the Court should increase their damages award to cover the taxes that might be imposed on the award.

On August 18, 2015, the Court entered a Final Order of Judgment in favor of the Breslers in the amount of $28,274,253.79, consisting of (a) $19,461,692 in damages arising out of WTC's failure to make loans to cover the premiums on three life insurance policies held by the Charles S. Bresler Irrevocable Insurance Trust; (b) $3,900,000 in reimbursement of insurance policy premium payments Plaintiffs made with respect to the Fleur S. Bresler 2009 Preservation Trust; and (c) $4,912,561.79 as damages attendant to WTC's failure to timely return collateral to the Charles Bresler Estate. 688 in PJM 09-2957. With regard to the jury verdict of $23,361,692, the Court awarded post-judgment interest at the federal statutory rate from March 25, 2015—the date of the Court's entry of Partial Judgment in favor of Plaintiffs on the jury's verdict—to August 18, 2015. *Id.* The Final Order of Judgment awarded post-judgment interest at the federal statutory rate on $28,274,253.79 from August 18, 2015—the date of the Court's Final Order of Judgment—until paid or satisfied. *Id.*

Following WTC's appeal to the Fourth Circuit, on April 20, 2017, that court affirmed the judgment as well as other rulings this Court had made. *Bresler v. Wilmington Trust Company*, 855 F.3d 178 (4th Cir. 2017). WTC filed a petition for rehearing and rehearing *en banc* in the Fourth Circuit, both of which were denied on May 16, 2017. ECF No. 710 in PJM 09-2957. On August 17, 2017, WTC filed a petition for certiorari in the Supreme Court, which was denied on November 28, 2017. *Wilmington Trust Company v. Bresler*, 138 S.Ct. 470 (2017).

Following the appeal, WTC advised the Court that it had satisfied the judgment in full. ECF No. 65 (Dec. 20, 2017 Hr'g Tr. at 4:4-21). Specifically, WTC indicated that it had transferred approximately $19.4 million in cash into a WTC-managed account owned by the ILIT, inclusive of interest, and had returned to the Bresler Estate approximately $5 million for the unpaid collateral and approximately $4 million to reimburse Fleur for the cost of her replacement term insurance policy. *Id.*

**C. The Present Case**

Plaintiffs now seek to pursue their non-contract claims that, severed from the contract claims, were assigned to PJM 15-1557. Those claims include: negligence (Count I); professional negligence (Count II); breach of fiduciary duty (Count III); negligent misrepresentation (Count VII); fraud, deceit and misrepresentation (Count VIII); violation of the Delaware Consumer Fraud Act ("DCFA") (Count IX); fraudulent concealment (Count X); civil conspiracy (Count XI); and finally, aiding and abetting tortious conduct (Count XII). Second Amended Complaint ("SAC"), ECF No. 1. All these claims, brought on behalf of Charlie's Estate and Sidney individually, are against WTC, Waschull and Wileczek. In addition, Sidney has brought a single claim for breach of fiduciary duty against WTC (Count IV). *Id.*

Sidney as an individual, and Fleur and Sidney as representatives of Charlie's Estate, have filed a Motion for Partial Summary Judgment against WTC, asking the Court to find that WTC's employees made actionable misrepresentations to Charlie during the negotiations and performance of the Agreements. ECF No. 26. WTC has filed a Motion for Summary Judgment on the grounds that the Estate's remaining claims have been extinguished both by the trial on the contract claim and by the Estate's subsequent acceptance of payment of the judgment on the contract claim following that trial, and that, as to Sidney's claims, they are barred by the statute of limitations. ECF No. 27. Finally, Waschull and Wileczek have filed their own Motions for Summary Judgment on the grounds that all claims against them are barred by the statute of limitations. ECF Nos. 28 & 32. The Court heard oral argument on all the Motions on December 20, 2017.

## II. STANDARD OF REVIEW

Under Rule 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). This does not mean, however, that "*some* alleged factual dispute between the parties" defeats the motion for summary judgment. *Anderson v. Liberty*

*Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original). Rather, "the requirement is that there be no *genuine* issue of *material* fact." *Id.* (emphasis in original).

## III. ANALYSIS

As the Court observed in an earlier hearing, the "the ultimate issue in this case is what's the contract." Aug. 14, 2013 Hr'g Tr. at 21:9, ECF No. 551 in PJM 09-2957. A jury has now definitively held that the contract between the parties is precisely what Charlie always believed it to be; that is, WTC agreed to lend funds to the Bresler Life Insurance Trust to cover annual premiums on policies on Charlie and Fleur's lives for the duration of their joint lives, and that this commitment was not contingent upon Charlie posting collateral each year. Furthermore, WTC now has paid, and the Breslers have accepted, the full amount of the Judgment entered on the Jury Verdict, including interest, that was entered against WTC on the contract claim. The core issue for the Court at this juncture is whether any of the non-contract claims survive. In the Court's judgment, none do.

### A. Sidney Bresler's Claims

The Court begins by addressing what is perhaps the easier of the remaining claims—those brought by Sidney Bresler as an individual.

#### 1. Damages

Sidney is seeking punitive damages, treble damages under Delaware statutory law, and attorneys' fees, which he suggests are tied to the fact that he deferred filing his own law suit, suffered emotional damages during the pendency of the dispute, and was required to compensate his attorneys for years of litigation. During oral argument, Sidney's counsel clarified that these damages are not "independent of the damages . . . asserted elsewhere on behalf of the estate," but rather that Sidney is an "additional plaintiff who with respect to some of those claims arising out of the relationship between Wilmington as trustee on the one hand and Sidney Bresler as beneficiary on the other hand flow to him as well as to the estate." ECF No. 65 (Dec. 20, 2017

Hr'g Tr. at 8:8-14). Defendants respond that Sidney has suffered no cognizable damages because the Bresler Estate, as a result of satisfaction of the Judgment, has been made whole to compensate for past and future underfunding. *Id.* at 25:17-23. The Court agrees with WTC.

Sidney's claims as an individual arise from his role as the sole beneficiary of the Bresler Trust. As beneficiary, Sidney stood to lose millions from WTC's failure to overfund the trust, losses that would be incurred once the Trust was paid out upon Fleur's death. But, as it turns out, Sidney will never suffer those losses because the shortfalls in WTC's payments have been recouped by the jury verdict. By paying the trial judgment award in full, WTC placed Sidney in the exact position he would have been in had the agreement between Charlie and WTC gone forward as Charlie anticipated. Sidney's ultimate recovery as trust beneficiary has not been diminished. As an individual he has suffered no cognizable damages. At the time of Fleur's demise, he will receive precisely what Charlie intended him to receive. Accordingly, his claims fail.

### 2. Statute of Limitations

Even if Sidney could show that he has suffered damages independent of the underfunding of the Trust, his claims would be barred by the statute of limitations.

A federal court sitting in Maryland applies Maryland law with respect to procedural issues. *Doughty v. Prettyman*, 148 A.2d 438, 440 (Md. 1959). Statutes of limitations are generally considered procedural. *Pottratz v. Davis*, 588 F.Supp. 949, 952 (D.Md. 1984). Maryland's statute of limitations for a civil action is "three years from the date it accrues." Md. Code Ann., Md. Cts. & Jud. Proc. § 5-101 (West). Thus, the applicable statute of limitations as to all of Sidney's claims was three years from the date of their accrual.[8]

---

[8] Even if Delaware law were to apply, the result would be the same, since Delaware law provides for a three-year statute of limitations for most of the Tort Claims. Del. Code Ann. tit. 10 § 8106 (2016). Sidney's claims under Counts III and IV (breach of fiduciary duty) would be subject to a two-year statute of limitations. *See* Del. Code Ann. tit. 10 § 3585 (2016).

In determining the date of accrual, Maryland applies the "discovery rule," which provides that an action "accrues when the claimant in fact knew or reasonably should have known of the wrong." *Poffenberger v. Risser*, 431 A.2d 677, 680 (Md. 1981). The discovery rule considers "actual knowledge that is express cognition, or awareness implied from 'knowledge of circumstances which ought to have put a person of ordinary prudence on inquiry (thus, charging the individual) with notice of all facts which such an investigation would in all probability have disclosed if it had been properly pursued.'" *Id.* at 681 (internal citations omitted).

Incontrovertibly, the record shows that Sidney knew or should have known as early as March of 2005 that WTC and various of its personnel were insisting that Charlie post collateral for the loans on an annual basis. Sidney himself testified that, by "March of 2005 or so," he was aware that WTC would not loan another $5.5 million without a pledge of significant collateral. ECF No. 27-4 at 249 (S. Bresler Trial Test., Jan. 22, 2014 Tr. at 46:19-20). He also testified that "in early 2005," he became aware that "there had been written communication to [Charlie] advising him that if the premium and overfunding was to occur, that he was going to have to post several million dollars in additional collateral." *Id.* at 248-49 (S. Bresler Trial Test., Jan. 22, 2014 Tr. at 45:22-46:5). The record also shows that on or about March 11, 2005, Sidney was involved in a meeting with his father, Attorney Shaiman, Wileczek and others from WTC regarding the premium financing structure during which Charlie explicitly informed WTC that he refused to put up additional collateral beyond his initial pledge (the "March 2005 meeting"). ECF No. 27-5 at 19 (R. Wileczek Trial Test., Jan. 15, 2014 Tr. at 91:14-17); ECF No. 27-4 at 191-92 (C. Bresler Dep. at 252:21-253:12); ECF No. 27-5 at 21 (Mar. 16, 2005 E-mail and attachments from G. Best to S. Bresler). As a result of the meeting, Sidney himself transferred $1.3 million to WTC to serve as a "patch" while negotiations over the collateral issue continued. ECF No. 27-4 at 258-59, 273-74 (S. Bresler Trial Test., Jan. 22, 2014 Tr. at 57:5-58:6, 113:16-114:6).

Sidney continued to be involved in negotiations over the dispute later that year. In November of 2005, he joined his father and Attorney Shaiman in a meeting at the Pei Building in Delaware with WTC officers, including Waschull and Wileczek, in which he, his father and Attorney Shaiman all took the position that Ianni had misled Charlie on the key issue of collateral (the "November 2005 meeting"). ECF No. 27-5 at 58 (Nov. 16, 2005 E-mail from M. Waschull to S. Simonton, *et al.*); ECF No. 27-4 at 239 (S. Bresler Trial Test., Jan. 17, 2014 Tr. at 201:2-14).

Despite this evidence Sidney argues that he was lulled into thinking that the dispute had been settled in 2005 because WTC "abandoned" its claim to collateral. Sidney points to an agreement that Charlie and WTC reached following the March 2005 meeting where WTC waived the collateral requirement for 2006, which was confirmed at the November 2005 meeting. This argument cuts no ice.

Communications from Waschull and Wileczek unquestionably establish that WTC, despite waiving the collateral requirement in 2006, still expected collateral to be posted in the future. An internal email from Waschull to Wileczek and other WTC employees describing the November 2005 meeting reports that Wileczek "clearly indicated that no additional collateral was needed for the next year [2006], but that there would likely be a need in the future." ECF No. 27-5 at 58 (Nov. 16, 2005 E-mail from M. Waschull to S. Simonton, *et al.*). In another letter dated February 3, 2006 from Wileczek to Charlie, Wileczek states: "When we met on March 11, 2005, we reviewed the premium financing structure with you, Sid, and Larry. It was determined at that time that additional collateral would not be needed for the upcoming policy year and that is still the case." ECF No. 27-5 at 95 (Feb. 3, 2006 Letter from R. Wileczek to C. Bresler). True—Wileczek then proceeds to describe a new proposal for financing plan which would "greatly diminish[]" the "need for future collateral." *Id.* But, the letter does not say that future collateral is no longer required.

Additionally, in an October 11, 2006 letter, Wileczek told Charlie:

> In our last meeting we understood that you would like to avoid posting any additional collateral for the next five years and that the insurance should be at the same or better levels than currently projected. Based upon the feedback we have obtained from both the insurance and settlement markets, this does not seem likely.

ECF No. 27-5 at 100 (Oct. 11, 2006 Letter from R. Wileczek to C. Bresler).

Most conclusive of all, the record shows that Sidney was actually threatening legal action against WTC in the Spring of 2006 if WTC continued to demand additional collateral. In a May 8, 2006 email from Waschull to Wileczek and others, Waschull said, "I followed up again today, this time with Sid . . . . He stressed again the consequences of requesting more collateral." ECF No. 27-5 at 98 (May 8, 2006 Email from M. Waschull to R. Wileczek, *et al.*). When asked at his deposition whether "consequences" mean that there would be a lawsuit, Sidney replied, "Yes." ECF No. 27-5 at 12 (S. Bresler Dep. Tr. at 180:5-6).

This evidence is more than sufficient to find that Sidney knew about the dispute between Charlie and WTC by May of 2006 at the latest, so that, for limitations purposes, his causes of action accrued at that time. For Sidney's claims, whatever their viability, to have fallen within the three-year statute of limitations, he would have needed to file suit by May, 2009, well before September, 2009, the actual date on which this lawsuit was filed. He did not do so and as a result his claims are barred by limitations.

3. Tolling

Sidney asserts that, despite the three-year statute of limitations, his claims remain timely because he had a fiduciary relationship with Defendants that tolled limitations.[9] This argument does not change the Court's conclusion that the Court doors are closed to Sidney's remaining claims.

---

[9] As noted above, Sidney was not a party to the October 4, 2007 tolling agreement or any of its extensions signed by Charlie and WTC. ECF No. 27-5 at 132-147. Thus, his individual claims were not tolled by the agreement.

Generally, statutes of limitations for certain claims are tolled during the existence of a fiduciary relationship between the parties because the relationship "gives the confiding party the right to relax his or her guard and rely on the good faith of the other party so long as the relationship continues to exist." *Dual Inc. v. Lockheed Martin Corp.*, 857 A.2d 1095, 1107 (Md. 2004) (citing *Frederick Road Ltd. Partnership v. Brown & Sturm*, 756 A.2d 963, 974 (Md. 2000)). This rule, however, does not apply if a "party had knowledge of facts that would lead a reasonable person to undertake an investigation that, with reasonable diligence, would have revealed wrongdoing on the part of the fiduciary." *Id.* at 1108.

Here, the record not only shows that Sidney had "knowledge of facts that would lead a reasonable person to undertake an investigation," he had actual knowledge of wrongdoing by March of 2005 at the earliest, and May of 2006 at the latest. Accordingly, even though Sidney may have had a fiduciary relationship with WTC as a result of their trustee-beneficiary relationship, Sidney's actual knowledge of the jugular facts disposes of any opportunity to rely on the fiduciary relationship.

But even if Sidney lacked actual knowledge of the purported wrongdoing (a dubious proposition), his claims against WTC do not relate to anything WTC or its representatives did during the course of the fiduciary relationship. The gravamen of Sidney's claims is that WTC representatives made misrepresentations to Charlie during the negotiations for the premium financing plan. While this may be true, and, to be sure, the jury made no findings as to misrepresentations or fraud, Sidney's fiduciary relationship with WTC, if any, did not in fact commence until the ratification date of the Trust Agreement in early 2004.

While Sidney argues that WTC's misrepresentations continued after the formation of the agreement, the record is devoid of such evidence. Indeed, from 2005 until Sidney's suit was filed in 2009, WTC maintained its demand for additional collateral. Regardless, the Court need not

dwell upon this issue. It is enough that Sidney knew or should have known of the wrongdoing such that no tolling of limitations resulting from any fiduciary relationship occurred.

**B. The Estate's Claims**

The Court next considers the claims brought by Charlie's Estate against WTC, Waschull and Wileczek.

1. The Estate's Claims Against Waschull and Wileczek

The Court concludes that all of the Estate's claims against Waschull and Wileczek are barred by the statute of limitations.

As indicated previously, courts sitting in diversity cases apply the procedural laws of the forum state, and statutes of limitations are generally procedural. *Doughty v. Prettyman*, 148 A.2d 438, 440 (Md. 1959). Maryland law provides that "[a] civil action at law shall be filed within three years from the date it accrues[,]" Md. Code Ann., Cts. & Jud. Proc. § 5-101 (West), and an action "accrues when the claimant in fact knew or reasonably should have known of the wrong." *Poffenberger v. Risser*, 431 A.2d 677, 680 (Md. 1981).

Wileczek was involved in the Bresler-WTC relationship from the spring of 2003, when he and Ianni approached Charlie about setting up the premium financing plan. Wileczek continued to work with the Breslers when the dispute over collateral arose in early 2005, attending both the March 2005 meeting and the November 2005 meeting. ECF No. 27-5 at 95 (Feb. 3, 2006 Letter from R. Wileczek to C. Bresler); ECF No. 27-5 at 58 (Nov. 16, 2005 E-mail from M. Waschull to S. Simonton, *et al.*). He continued to be involved in the negotiations after Ianni's departure, corresponding directly with Charlie and Sidney throughout 2006 as the parties tried to resolve their dispute over collateral. ECF No. 27-5 at 95 (Feb. 3, 2006 Letter from R. Wileczek to C. Bresler); ECF No. 27-5 at 100 (Oct. 11, 2006 Letter From R. Wileczek to C. Bresler); ECF No. 27-5 at 104 (Nov. 3, 2006 Letter from R. Wileczek to C. Bresler); ECF No. 27-5 at 115 (Dec. 21, 2006 Letter from R. Wileczek to S. Bresler).

Waschull's role in the case began when he took over management of the WTC-Bresler relationship following Ianni's termination in August of 2005. ECF No. 27-5 at 126 (Aug. 15, 2005 Letter from M. Waschull to C. Bresler). Like Wileczek, Waschull was involved in WTC's efforts to resolve the dispute over collateral from 2005, when he took over the relationship, until he left WTC in early 2007. Waschull attended meetings with Charlie, Sidney and Attorney Shaiman, including the November 2005 meeting, and had direct communications with Charlie and Sidney regarding the dispute. *See, e.g.*, ECF No. 27-5 at 57 (Nov. 16, 2005 E-mail from M. Waschull to S. Simonton, *et al.*); ECF No. 27-5 at 98 (May 8, 2006 E-mail from M. Waschull to R. Wileczek, *et al.*); ECF No. 27-5 at 216 (May 31, 2006 E-mail from Waschull to Shaiman, S. Bresler, and R. Wileczek).

Accordingly, when the Breslers learned in early 2005 that WTC was demanding additional collateral, they were fully aware that Wileczek had been instrumental in negotiating and drafting the premium financing plan documents and that he was likely one of the individuals at WTC responsible for whatever misunderstandings there were about collateral requirements. Similarly, when the attempts to resolve the dispute were not bearing fruit in 2005 or 2006, the Breslers were fully aware that both Waschull and Wileczek were involved in those negotiations and that, quite possibly, they might be held personally responsible for the whole collateral morass. But for whatever reason, the Breslers did not enter into tolling agreements with Waschull or Wileczek, nor did they include them in the tolling agreement with WTC. The Estate knew of the potential liability of Waschull and Wileczek as of November, 2005, at the latest. But they did not file suit against them until September 16, 2009, well outside the three-year limitations period.

As does Sidney with respect to his individual claims, the Estate claims that Charlie had a fiduciary relationship with Waschull and Wileczek that tolled the statute of limitations. There are two problems with this argument.

First, there was no fiduciary relationship between Charlie and WTC representatives (or indeed, as later addressed, with WTC).

As a matter of law, a settlor of a trust cannot sue a trustee for a breach of trust unless the settlor retains an interest in the trust property. *Restatement 2d of Trusts* § 200, comment b (1959); *see also Wilshire Credit Corp. v. Karlin*, 988 F.Supp. 570, 575 n.4 (D. Md. 1997) (noting that it "does not appear . . . that a creditor of the settlor has standing to bring a claim of breach of fiduciary duty against the trustees," as such a suit would require the existence of an underlying fiduciary relationship between the settlor and the trustee). Thus, once the ILIT was created in 2004, WTC, the trustee, did not owe Charlie, the trust settlor, a fiduciary relationship.

Nor did a fiduciary relationship develop between Charlie and WTC's representatives as a result of their business dealings. The Estate argues that Charlie and WTC developed such a relationship, one that was "built on trust and confidence," during the formation of the ILIT. ECF No. 37 at 23 (citing *MacBride v. Pishvaian*, 937 A.2d 233, 239 (Md. 2007)). This relationship, the Estate claims, gave Charlie the "right to relax his . . . guard and rely on the good faith of the other party", because Charlie regarded "Wilmington's much touted professionals as 'his team,' providing him with advice and counsel on wealth preservation, estate, tax, trust and insurance issues." *Id.* at 25. This relationship, the Estate argues, "continued through December 2006, and during that period both Charlie and Sidney sought Wilmington's advice on various personal and family estate and financial issues." *Id.* Accordingly, "Charlie and Sidney were induced 'to relax (their) vigilance to a certain extent and rely on both the good faith of (Wilmington, including Waschull) and (their) duty to disclose all material facts.'" *Id.* (citing *Frederick Rd. Ltd. P'ship v. Brown & Sturm*, 756 A.2d 963, 974 (Md. 2000)).

The record, quite simply, does not support these claims. Charlie was a sophisticated businessman who founded a multi-million dollar real estate company and served as its CEO for more than thirty years. He was represented by competent counsel at all times. Charlie and WTC

17

stood on equal footing and engaged in arms-length negotiations, both before the formation of the agreements as well as after when the dispute over collateral arose. Under such circumstances, no fiduciary relationship can be said to have existed. *Malpiede v. Townson*, 780 A.2d 1075, 1098 (Del. 2001)(upholding Chancery Court's finding that "arm's-length negotiations are inconsistent with participation in a fiduciary breach").

Second, even if there had been a fiduciary relationship between Charlie and WTC and its representatives, such a relationship would not trump the Estate's actual knowledge of purported wrongdoing by the fiduciary.

As previously indicated, although a statute of limitations may be tolled while a fiduciary relationship exists between the parties, this rule does not apply if a party knew, or should have known, of wrongdoing. *MacBride*, 937 A.2d at 239-40 (Md. 2007). The record here is unmistakably clear. Charlie knew by March 2005 that WTC was requesting collateral that he believed he had no obligation to provide. Such knowledge overcomes any alleged fiduciary duty.

Accordingly, the date of accrual for the Estate's claims against Wileczek and Waschull was November of 2005, and, in the absence of a tolling agreement, limitations would have run by November of 2008. But as with Sidney, the Estate had no tolling agreement with Waschull and Wileczek. Because the Estate did not file suit against either Waschull or Wileczek until September, 2009, its claims against them are out of time.

2. The Statute of Limitations for the Estate's Claims Against WTC

Unlike the claims brought against WTC's individual employees, none of the Estate's claims against WTC, such as they may be, are barred by the statute of limitations. On October 4, 2007, Charlie and WTC entered into an agreement that would toll the time for filing any claims Charlie might have against WTC until March 31, 2008. ECF No. 27-5 at 132 (Oct. 4, 2007 tolling agreement). That agreement was extended to June 30, 2008 (*Id.* at 139), October 2, 2008 (*Id.*at 140), November 16, 2008 (*Id.*at 141), January 31, 2009 (*Id.*at 145), April 30, 2009 (*Id.*at

18

143) and finally December 31, 2009 (*Id.* at 142). Since this suit was brought on September 16, 2009, within the final extension of time of the tolling agreement, all the claims by the Estate against WTC are timely.

Do the non-contract claims have merit? The Court concludes that they do not.

3. <u>The Estate's Non-Contract Claims Against WTC</u>

The Estate argues that it is entitled to "three categories of damages that were not available under any of the contract counts tried and decided in the Consolidated Cases, viz.: "statutory treble damages; punitive damages; and attorney's fees." ECF No. 36 at 14. WTC responds that the Estate elected to go forward on the breach of contract claims and sought its full remedy in contract, and thereby waived its remaining claims. ECF No. 27-1 at 22. WTC also says, in addition to Plaintiffs' "election of remedies", the "acceptance of benefits" doctrine also precludes Plaintiffs from going forward on the tort claims.

a. *The Election of Remedies and Acceptance of Benefits Doctrines*

Delaware law[10] provides for damages, whether in contract or tort, to make an injured party whole. *Jardel Co. v. Hughes*, 523 A.2d 518, 528 (Del. 1987)("The object and purpose of an award of compensatory damages in a civil case is to impose satisfaction for an injury done."). A

---

[10] There is some dispute over whether Delaware or Maryland law governs the remaining claims.

The Court applies Delaware law to the remaining claims. First, the Agreements contain choice-of-law provisions identifying Delaware law as governing contract disputes. Article 18.C of the Trust Agreement provides: "This Agreement creates a Delaware Trust, and all matters pertaining to the validity, construction and application of this Agreement, or to the administration of the trusts created by it shall be governed by Delaware law." ECF No. 30-1 at 26. Similarly, the Collateral Pledge Agreement provides: "This agreement shall be governed by and construed in accordance with the laws of the state of Delaware." ECF No. 30-3 at 6. The Investment Management Agreement provides: "This is a Delaware contract and shall be governed by Delaware law in all respects." ECF No. 30-2 at 8. In the Fourth Circuit, courts may apply choice of law provisions that are "sufficiently broad to encompass contract-related tort claims," such as the ones at issue here, to non-contract claims. *Hitachi Credit Am. Corp. v. Signet Bank*, 166 F.3d 614, 628 (4th Cir. 1999).

Even if the choice-of-law provisions did not apply, Delaware law would still control. "A federal court sitting in diversity applies the choice of law rules of the forum state in which it sits." *Cecilia Schwaber Tr. Two v. Hartford Acc. & Indem. Co.*, 437 F. Supp. 2d 485, 488 (D. Md. 2006). The Maryland choice of law rule governing torts is *lex loci delicti*, which provides that a "court applies the law of the state where the wrong occurred." *Smith v. Integral Consulting Servs., Inc.*, No. CV DKC 14-3094, 2016 WL 4492708, at *6 n.3 (D. Md. Aug. 26, 2016). Because the allegedly tortious misrepresentations occurred in Delaware by individuals working on behalf of a Delaware entity, the Court will apply Delaware law to the remaining claims.

party "whose case concerns a single course of conduct . . . and a single injury" should not recover damages "for each legal theory advanced in favor of liability. This would yield an unwarranted windfall recovery." *Fineman v. Armstrong World Indus., Inc.*, 980 F.2d 171, 218 (3d Cir. 1992) ("TINS presented a single loss of future profits to the jury. Simply because TINS was able to wrap that loss into several different legal theories of recovery does not entitle it to recoup twice."); *see also Paul v. Deloitte & Touche, LLP*, 974 A.2d 140, 146 (Del. 2009)("Contract damages are designed to place the injured party in an action for breach of contract in the same place as he would have been if the contract had been performed. Such damages should not act as a windfall.")(internal quotation and citation omitted).

The election of remedies doctrine incorporates this principle by requiring a party that has alleged multiple, contradicting legal theories premised on the same wrong to proceed on just one theory in order to prevent double recovery. *Sannini v. Casscells*, 401 A.2d 927, 931 (Del. 1979). Pursuit of that choice to final judgment precludes a party from seeking additional damages in a subsequent suit. *Id.* (plaintiff's choice "to proceed in equity to impress a constructive trust constituted an election of remedies, and the pursuit of that choice to final judgment, now precludes them from seeking damages"); *see also Stoltz Realty Co. v. Raphael*, 458 A.2d 21, 23 (Del. 1983) ("[T]he prosecution of one remedial right to judgment or decree, whether for or against the plaintiff, is a decisive act which constitutes a conclusive election, barring the subsequent prosecution of inconsistent remedial rights.")(internal quotation and citation omitted).

From the outset, the Estate put forth two competing theories of liability, one sounding in contract and the other in tort, which sought "virtually identical" compensatory damages. Mar. 10, 2014 Tel. Conference Tr. at 7:6; *see also id.* at 5:20–21 (conceding that there were no additional compensatory damages to be had beyond those already awarded). The Court wishes to be perfectly clear. It was the Court that suggested to the parties that it believed it made sense to

bifurcate the contract claims in the case from the non-contract claims.[11] While the Estate did not

vigorously oppose that course of action, it did emphasize that it wanted to reserve all rights with

respect to its non-contract claims. The Court accepts that the non-contract claims are entitled to

separate consideration. That said, however, the question is whether there is any impediment to

entertaining those claims. The short answer is that there is.

The Court finds that, while the Estate itself may not have affirmatively elected to go

forward on the contract claims to the exclusion of the tort claims, the issue of election of

remedies is essentially academic now that it has accepted the contract judgment in full. Under the

"acceptance of benefits" doctrine, a party that accepts satisfaction of a judgment is deemed to

have waived any underlying objections to it. *Deng v. Kayea*, No. CV CPU4-16-000539, 2016

WL 5940321, at *3 (Del. Com. Pl. Oct. 12, 2016); *see also Wynfield Inns v. Edward LeRoux

Grp., Inc.*, 896 F.2d 483, 489 (11th Cir. 1990)("This doctrine is based on the theory that a party

who voluntarily collects a judgment is estopped from seeking reversal of the judgment because

acceptance of payment acts as a release of claimed errors of the trial court."); *Zaklama v. Mount

Sinai Med. Ctr.*, 906 F.2d 645, 650 (11th Cir. 1990) ("Where one in whose favor a judgment is

rendered accepts the benefits, he is estopped from questioning the validity, of the judgment in

any subsequent litigation.")(quoting *Livesay Indus., Inc. v. Livesay Window Co*., 202 F.2d 378,

382 (5th Cir. 1953)). In other words, "a litigant who accepts the benefits or any substantial part

of the benefits of a judgment or decree is thereby estopped from reviewing and escaping from its

burdens." *Smith v. Smith*, 893 A.2d 934, 937 (Del. 2006).

The Court concludes that by accepting the benefits of the judgment, the Estate is now

precluded from challenging any subsidiary decisions supporting that judgment, including the

Court's decision to bifurcate and sever the non-contract claims. Like it or not, the Estate has

---

[11] The Court believed that if Plaintiff's view of the contract was accepted by the jury, that would very likely end the matter. On the other hand, were the jury to have found against Plaintiffs on the contract claim, they would still be able to pursue their non-contract claims—e.g., negligence, fraud, etc.—in the bifurcated proceeding.

effectively waived its right to go forward against WTC on the non-contract claims. But there is more.

### b. Judicial Estoppel

While the Estate may have reserved the right to go forward on its non-contract claims, there are important policy reasons why it should not get a free pass to try those claims on the merits. The doctrine of judicial estoppel presents an insuperable roadblock.

This doctrine "generally prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase." *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001); *see also Motorola Inc. v. Amkor Tech., Inc.*, 958 A.2d 852, 859 (Del. 2008)("Judicial estoppel acts to preclude a party from asserting a position inconsistent with a position previously taken in the same or earlier legal proceeding."). Courts generally consider three factors when deciding whether a party is estopped under the doctrine: first, whether the party's positions are "clearly inconsistent"; second, whether the party has succeeded in persuading the court to accept its earlier position; and third, if allowing the party seeking to assert the inconsistent position would award it an "unfair advantage." *New Hampshire*, 532 U.S. at 750-51. All three factors are met here.

First, the Estate bases its tort claims on a theory regarding the nature of statements made by WTC's operatives to Charlie that contradicts its theory regarding their statements made in the contract action. In the contract action, the Estate argued that, based on statements made by WTC's operatives, Charlie and WTC reached a contractual agreement under which he was not required to post collateral beyond the first year. And the Estate prevailed. The jury confirmed the Estate's position, finding in a special verdict that "WTC agreed to lend funds to cover the annual premiums for the Bresler Trust Life Insurance Policies for the duration of Charlie and Fleur Bresler's lives" and that "WTC's commitment was not contingent upon Charlie Bresler meeting WTC's demands for collateral each year." ECF No. 27-4 at 19 (Mar. 25, 2015 Mem. Opinion in

PJM 09-2957). Now, however, the Estate is arguing that the representations of WTC's operatives to Charlie that he would not have to post collateral were false and intended to deceive him into believing he had an agreement that in fact he did not have. But the jury found that Charlie in fact did have the agreement he sought. Either the statements made by WTC representatives about not requiring collateral beyond year one were true, and Charlie got the agreement he was angling for, or they were false, misleading and fraudulent, as a result of which Charlie did not get the agreement he bargained for and would be left to pursue tort actions to get the benefits of the agreement based upon the statements. The Estate's current position that the statements were false is "clearly inconsistent" with its earlier position that they were true.

Second, the Estate succeeded in persuading the Court to accept its earlier position, because it submitted specific interrogatories to the jury asking it to state whether or not there was a contract and, if so, what its terms were. The Court also relied on the jury's findings when it issued post-judgment rulings awarding Plaintiffs equitable remedies and granting post-judgment interest.

Finally, if the Court were to allow the Estate to assert its new theory, the Estate would unquestionably receive more than 100% compensation for the same basic injury, which would give them an "unfair advantage."

The Estate attempts to avoid the effect of judicial estoppel by arguing that its allegations of fraud are wholly independent of the contract claims, in the sense that they involve fraudulent inducement and a fraudulent intent not to perform the contract as promised. ECF No. 65 (Dec. 20, 2018 Hr'g Tr. at 81:11-20)("If a party to a contract enters into the contract at the time that the party has no intention of performing the contract, which was the case here[, there is a cause of action for misrepresentation or fraud]. Wilmington by its own admission had no intention of making loans without collateral, none. . . . The only people who didn't know that were the Breslers . . . because Wilmington had—until the jury dragged them kicking and screaming into

23

performing under the contract, Wilmington had no intention of performing under what Charlie viewed as the contract.") But both of these allegations are subsumed by the breach of contract action.[12]

As a rule, under Delaware law where an action is based entirely on a breach of the terms of a contract between the parties, and not on a violation of an independent duty imposed by law, a plaintiff is obliged to sue in contract and not in tort. *Greenstar, LLC v. Heller*, 934 F.Supp.2d 672, 696 (D. Del. 2013). "A breach of contract claim cannot be 'bootstrapped' into a fraud claim merely by adding the words 'fraudulently induced' or by alleging that the contracting parties never intended to perform." *Id.* (citing *IOTEX Commc'ns, Inc. v. Defries,* Civ. No. 15817, 1998 WL 914265, at *5 (Del.Ch. Dec. 21, 1998)); *see also Cornell Glasgow, LLC v. La Grange Properties, LLC*, No. CIV.A. N11C-05013JRS, 2012 WL 2106945, at *8-9 (Del. Super. Ct. June 6, 2012)("Even if the defendants never intended to perform, their alleged scheme to breach the Development Agreement simply cannot give rise to an actionable claim for fraud or negligent misrepresentation. At best, [defendants] engaged in an 'efficient breach' of the contract for which it can be held liable for compensatory and expectancy damages."); *Hiller & Arban, LLC v. Reserves Mgmt., LLC*, No. CV N15C-02-161 WCC, 2016 WL 3678544, at *4 (Del. Super. Ct. July 1, 2016)( a "breach of contract claim cannot be turned into a fraud claim simply by alleging that the other party never intended to perform"); *EZLinks Golf, LLC v. PCMS Datafit, Inc.*, No. CVN16C07080PRWCCLD, 2017 WL 1312209, at *5 (Del. Super. Ct. Mar. 13, 2017)("[C]asting an alleged failure to comply with a contract as a failure to disclose an intention to take certain actions arguably inconsistent with that contract is exactly the type of bootstrapping [Delaware courts] will not entertain.")(internal quotation and citation omitted).[13]

---

[12] Compare the argument made in connection with Sidney's claimed damages, which were said <u>not</u> to be "independent of the damages . . . asserted elsewhere on behalf of the estate." *Supra*, Part III; A; 1.

[13] This rule has been widely adopted in other jurisdictions. *See, e.g., Sudul v. Computer Outsourcing Servs.*, 868 F. Supp. 59, 62 (S.D.N.Y. 1994) (plaintiffs "should not be allowed to bootstrap a breach of contract claim into a fraud claim by simply including in his complaint an allegation that defendant never intended to uphold his end of the

Accordingly, if purported misrepresentations prior a contract's formation relate to obligations of a party that are in fact included within the contract, they cannot be used to assert an independent claim for fraud. *Pinkert v. John J. Oliveiri*. No. CIV. A. 99-380-SLR, 2001 WL 641737, at *5 (D. Del. May 24, 2001)(granting defendant summary judgment on fraud claims where "alleged misrepresentations were not collateral to the Construction Contract, but rather memorialized as some of . . . defendants' principal obligations under their agreement with plaintiffs").

Here, the allegations of fraud are not independent of the contract case; they relate in their entirety to promises made by WTC that became essential conditions of the contract itself. The Estate argues that Ianni fraudulently induced Charlie to enter into the agreement by assuring him that he would not need to post collateral, and that WTC never intended to perform the contract that Ianni promised. ECF No. 36 at 24; ECF No. 65 (Dec. 20, 2017 Hr'g Tr. at 81:16-19). But the jury in the contract case found that these statements were not misrepresentations; instead they were promises that became key provisions of an enforceable contract. Whether characterized as common law negligence, fraud, or breach of fiduciary duty, these claims cannot support independent causes of action.

Nor can the purported statements of WTC's operatives be used to support an independent claim for misrepresentation under the Delaware Consumer Fraud Act ("DFCA").

The Estate alleges that WTC violated the DCFA provisions stating that:

(a) The act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, or the concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale, lease or advertisement of any merchandise, whether or not any person has in fact been misled, deceived or damaged thereby, is an unlawful practice.

---

deal"); *Hotels of Key Largo, Inc. v. RHI Hotels, Inc.*, 694 So. 2d 74, 76 (Fla. App. 3d Dist. 1997) ("[W]here the only alleged misrepresentation concerns the heart of the parties' agreement, simply applying the label of 'fraudulent inducement' to a cause of action will not suffice."); *Huron Tool & Eng'g Co. v. Precision Consulting Servs.*, 532 N.W.2d 541, 546 (Mich. App. 1994) (refusing to allow a fraudulent inducement claim where the alleged misrepresentations are "indistinguishable from the terms of the contract").

Del. Code Ann. tit. 6, § 2513 (2016).

In *Pinkert*, plaintiff brought three counts under this provision, arguing that the defendant had made knowing misrepresentations during their performance of the contract. *Pinkert*, 2001 WL 641737, at *5. The court, in dismissing those counts along with common law counts of fraud, found that the misrepresentations related to some of the defendants' "principal obligations under their agreement with the plaintiffs" and that the allegations of misrepresentation arose "solely" from the "defendants' performance of their contractual duties." *Id.* As such, they were insufficient to support independent claims under the DCFA. Here, too, the alleged misrepresentations related to the contractual provisions and obligations that in fact came into being, and cannot sustain a separate cause of action under the DCFA.

Because the Breslers' allegations regarding WTC's fraud relate solely to key contract provisions that were litigated in the first trial, their remaining claims are of a piece with and subsumed by the contract action. As such, the claims are blocked by judicial estoppel. Additional damages that might have been available in a world of alternative facts, such as punitive damages, treble damages, and attorneys' fees, are off the table.[14]

In sum, the Estate has failed to demonstrate that it has any remaining causes of action that overcome the bar of the acceptance of benefits doctrine or the doctrine of judicial estoppel.

---

[14] A final observation: Apart from all else, at oral argument the Estate's counsel seemed to suggest that it could pursue these damages claims without having to undergo an entire re-trial of what was a month-long jury trial. It is impossible to envision how that could occur. The effect of every one of WTC's alleged misrepresentations with respect to the issue of collateral and the issue of WTC's obligation to overfund the insurance policies would be very much in play.

## IV. CONCLUSION

For the foregoing reasons, WTC's Motion for Summary Judgment (ECF No. 27) is **GRANTED**, Waschull's Motion for Summary Judgment (ECF No. 28) is **GRANTED**, Wileczek's Motion for Summary Judgment (ECF No. 32) is **GRANTED**, and the Bresler's Motion for Partial Summary Judgment (ECF No. 26) is **DENIED**.

A separate Order will issue.

_____
*/s/*
**PETER J. MESSITTE**
**UNITED STATES DISTRICT JUDGE**

March 28, 2018